RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0170p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DENNIS SPEERLY; JOSEPH SIERCHIO; DARRIN
DEGRAND; DANIEL DRAIN; WAVERS SMITH; RICHARD
FREEMAN; CHRISTOPHER GILES; LOUIS RAY; RICHARD
SULLIVAN; JAMES NORVELL; MICHAEL BANKS; GUY
CLARK; MARIA BARALLARDOS; CARY SHERROW;
JASON KEVIN SINCLAIR; KIMBERLY COULSON; TROY
COULSON; ANDRE MCQUADE; DONALD DYKSHORN;
TAIT THOMAS; JAMES PAUL BROWNE; WILLIAM
FREDO; JON ELLARD; RHIANNA MEYERS; RANDALL
JACOBS; MICHAEL PONDER; PHILIP WEEKS; KATRINA
FREDO; JIMMY FLOWERS; STEVEN BRACK; KEVIN
WESLEY; BRIAN LLOYD; GREGORY BUTSCHA; JERRY
CARROLL; KIMBERLY CARROLL; DOMINIC EATHERTON;
THOMAS EDMONDSON; RICHARD FILIAGGI; ROBERT
HIGGINS; DAVID THOMPSON; DONALD SICURA,

> No. 23-1940

       *Plaintiffs-Appellees*,

  *v.*

GENERAL MOTORS, LLC,

       *Defendant-Appellant*.

_____

On Petition for Rehearing En Banc.

United States District Court for the Eastern District of Michigan at Detroit.
Nos. 2:19-cv-11044; 2:19-cv-11802; 2:19-cv-11808; 2:19-cv-11875; 2:19-cv-12371—David M.
Lawson, District Judge.

Argued En Banc: March 19, 2025

Decided and Filed: June 27, 2025

Before: SUTTON, Chief Judge; MOORE, COLE, CLAY, GRIFFIN,
KETHLEDGE, STRANCH, THAPAR, BUSH, LARSEN, NALBANDIAN,
READLER, MURPHY, MATHIS, BLOOMEKATZ, and RITZ, Circuit Judges.

---

**COUNSEL**

**ARGUED EN BANC:** Richard C. Godfrey, QUINN, EMANUEL, URQUHART & SULLIVAN, LLP, Chicago, Illinois, for Appellant. Douglas J. McNamara, COHEN MILSTEIN SELLERS & TOLL, PLLC, Washington, D.C., for Appellees. **ON SUPPLEMENTAL BRIEF:** Richard C. Godfrey, R. Allan Pixton, QUINN, EMANUEL, URQUHART & SULLIVAN, LLP, Chicago, Illinois, John F. Bash, QUINN, EMANUEL, URQUHART & SULLIVAN, LLP, Austin, Texas, Stephanie A. Douglas, BUSH SEYFERTH PLLC, Troy, Michigan, Renee D. Smith, Cole T. Carter, KIRKLAND & ELLIS LLP, Chicago, Illinois, Jason M. Wilcox, KIRKLAND & ELLIS LLP, Washington, D.C., for Appellant. Douglas J. McNamara, Karina Puttieva Madelyn Petersen, COHEN MILSTEIN SELLERS & TOLL, PLLC, Washington, D.C., Theodore J. Leopold, COHEN MILSTEIN SELLERS & TOLL PLLC, Palm Beach Gardens, Florida, for Appellees. **ON AMICI BRIEFS:** John M. Thomas, DYKEMA GOSSETT PLLC, Ann Arbor, Michigan, Kyle M. Asher, DYKEMA GOSSETT PLLC, Lansing, Michigan, Aaron D. Van Oort, John L. Rockenbach, FAEGRE DRINKER BIDDLE & REATH LLP, Minneapolis, Minnesota, Brian D. Schmalzbach, MCGUIRE WOODS LLP, Richmond, Virginia, Philip S. Goldberg, SHOOK, HARDY & BACON L.L.P., Washington, D.C., Stephen A. D'Aunoy, KLEIN THOMAS LEE & FRESARD, St. Louis, Missouri, Brandon L. Boxler, KLEIN THOMAS LEE & FRESARD, Richmond, Virginia, Wendy Liu, PUBLIC CITIZEN LITIGATION GROUP, Washington, D.C., William Alvarado Rivera, AARP FOUNDATION, Washington, D.C., David J. Shea, SHEA LAW, PLLC, Southfield, Michigan, Adam J. Levitt, John E. Tangren, DICELLO LEVITT LLP, Chicago, Illinois, Jason L. Lichtman, LIEFF CABRASER HEIMANN & BERNSTEIN, LLP, New York, New York, for Amici Curiae.

SUTTON, C.J., delivered the opinion of the court in which GRIFFIN, KETHLEDGE, THAPAR, BUSH, LARSEN, NALBANDIAN, READLER, and MURPHY, JJ., concurred. THAPAR, J. (pp. 38–52), delivered a separate concurring opinion in which KETHLEDGE and MURPHY, JJ., concurred. NALBANDIAN, J. (pp. 53–65), delivered a separate concurring opinion in which GRIFFIN, J., concurred. MOORE, J. (pp. 66–112), delivered a separate dissenting opinion in which COLE, CLAY, STRANCH, MATHIS, BLOOMEKATZ, and RITZ, JJ., concurred.

---

**OPINION**

---

SUTTON, Chief Judge. With the introduction of automatic transmissions in cars, clutch pedals became obsolete for drivers who do not enjoy using a stick shift. General Motors' Hydra-Matic became the first readily accessible automatic transmission on the market in 1939. It had four gears. From 2015 to 2018, GM offered an eight-gear Hydra-Matic transmission.

That version had two alleged problems. It led some GM cars occasionally to shudder, and it led some GM cars occasionally to lurch. The two problems had nothing to do with operator error, even if some of the symptoms called to mind the experience of getting a ride from a novice stick-shift driver.

A group of car buyers filed a class action against GM to answer for the two defects under a range of state common law and statutory theories: express warranty, implied warranty, consumer protection laws, and fraudulent omission. The district court certified 26 state-wide subclasses with a total of 59 state-law claims on behalf of roughly 800,000 individual car buyers. Because the subclasses do not meet the rigorous requirements for handling all of these cases in one district court, whether as one case or as 26 cases, we vacate the class-certification order.

I.

A transmission translates power into movement. The engine ignites gasoline, converting the chemical energy stored in fuel into the mechanical energy of a rotating crankshaft. The transmission prompts a range of gears to control how much of the crankshaft's torque reaches the wheels, all by selecting an appropriate gear depending on the car's speed. When used effectively, the gears use the engine's torque efficiently and protect the crankshaft from wearing down.

In 2015, GM released the "Hydra-Matic 8-Speed Transmission" as an upgrade to its prior models. R.220-3 at 138. Compared to their 6-speed predecessors, the "8L" transmissions offered "8 gear ratios," which created two more refinements when it comes to engaging the most efficient gear "for performance, fuel economy and general drivability." R.224-17 at 13, 15. It did so, better yet, while taking up the same space and less weight than the six-speed transmissions.

As GM tells it, the 8L's hardware brought together "unique algorithms" that delivered "world-class shift-response times" with "performance that rival[ed] the" "transmissions found in many supercars—but with the smoothness and refinement that comes with a conventional automatic" transmission. R.41-5 at 3. As the class-action representatives tell it, GM knew about problems with the 8L transmission before the first car rolled off the lot.

The class identifies two problems with the transmission. The first turns on the 8L's transmission fluid, a lubricant that protects the gears and valves as the transmission operates. As customers drive, especially in humid climates, the fluid absorbs moisture "introduced via the vent system." R.177-2 at 18–19, 63–64. The moisture changes the fluid's viscosity, which is calibrated to prevent the gears from slipping. When the gears lose traction and slip, the transmission vibrates. Some customers, especially those driving in high gears, feel a "shake/shudder feeling" akin to "driving over rumble strips or rough pavement." R.177-3 at 2. A GM engineer noted as early as 2013 that the "shudder is terrible" on test cars. R.224-9 at 2.

The problem led to a rash of warranty claims. After testing an "Option B" fluid that "did not address the sensitivity to water," R.245-5 at 6, GM developed a "Mod1a" moisture-resistant fluid in December 2018, R.177-3 at 9–10. The company did not conduct a "field action"— similar to a recall—to notify customers that they could receive the new fluid. R.221-1 at 266. But it instructed dealers to resolve shudder complaints by flushing customer transmissions with the new fluid. Most of the customers who received the replacement never complained about the shudder problem again.

The second problem is "unrelated" and concerns how the transmission shifts gears. R.220-3 at 91. What makes a transmission automatic is its ability to monitor a vehicle's speed and decide on its own which gear to apply. The 8L is no exception. Its "Transmission Control Module" first analyzes input from sensors across the vehicle. R.220-3 at 140. When the module software detects the need for a gear change, it instructs the hardware to manipulate the "pressure" and "direction" of transmission fluid to create hydraulic pressure, forcing the gears to change. R.220-3 at 140.

The 8L transmissions, as it happens, sometimes add too much pressure and sometimes fail to "purg[e] trapped air" leaking into the valves. R.177-6 at 2. That design issue has a range of impacts. Some customers feel nothing at all. Some customers who shift their vehicle gears from park to drive in the mornings feel a "[h]esitation" for one to five minutes, as if they remain in neutral, before they can drive their cars. R.177-6 at 2; R.225-3 at 10–11. Other customers feel the vehicles "jerk forward" when the transmission moves from higher to lower gears, as if they have been "rear-ended." R.225-1 at 10, 15. The lunge forces customers to slam the brakes

to stop. Still other customers feel the same "violent[] jerk[]" but only when shifting the transmission from lower to higher gears. R.225-7 at 10–11.

After customers complained about this problem, GM tried to fix it. The company sent its dealerships 60 "Technical Service Bulletins"—what amount to warranty-covered hardware and software fixes—to resolve the issue. R.220-3 at 262; R.177-6 at 23. While some of the workarounds "[i]mproved drive quality," R.206-15 at 5, the underlying issues "could not be resolved without a major redesign of the transmission," R.177-6 at 21. The company instructed dealers to tell customers that harsh shifting was "[c]haracteristic" of GM cars, R.206-15 at 5, while internally noting that "[r]eplacing transmission components or complete assemblies w[ould] not improve" harsh shift conditions, R.177-6 at 40. A full redesign solved the problem when GM released a second generation of eight-speed transmissions for the 2022 model-year (and later) vehicles.

A group of customers who purchased the old vehicles filed this lawsuit on behalf of a putative class. Seventy-four plaintiffs from 32 states brought 104 claims against GM for breach of express warranty, breach of implied warranty, violation of state consumer protection statutes, and fraudulent omission. The district court certified 26 statewide subclasses led by 33 named plaintiffs who purchased selected GM cars from model year 2015 to model year 2019, all with the 8L transmissions. The class, as certified, represents roughly 800,000 individuals. GM appeals.

## II.

We start by stopping to consider whether we have jurisdiction over this case. Article III permits us to decide only "Cases" and "Controversies." U.S. Const. art. III, § 2. That "irreducible constitutional minimum" requires that the plaintiff have suffered an "injury in fact," "trace[able]" to the defendant's actions, and "redress[able]" by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation omitted).

What gives pause is the first prong, injury in fact. It requires that a plaintiff suffer a "concrete" invasion that is "real, and not abstract." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (quotation omitted). "[T]raditional tangible harms" such as "monetary harms" count.

*Id.* at 425.  But the "mere risk of future harm, standing alone," does not suffice for money-damages actions.  *Id.* at 436.

How does this test apply to a consumer who arguably overpays for a product because it allegedly has a hidden defect?  Is that a sufficiently tangible and concrete harm to cross the Article III threshold?  Most of our sister circuits say yes.  If someone pays "more for [something] than they would have, had they known of the risks," these courts have concluded, they suffer a concrete injury.  *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 750–51 (7th Cir. 2011); *In re Evenflo Co., Mktg., Sales Pracs. & Prods. Liab. Litig.*, 54 F.4th 28, 37–38 (1st Cir. 2022); *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 722–23 (5th Cir. 2007); *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 815–16 (9th Cir. 2019); *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1086–87 (11th Cir. 2019).  That company includes us, at least if we include an unpublished and non-binding decision.  *Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 581 (6th Cir. 2013).

Two features of this case complicate the issue.  First is the fact that some courts forbid, as a matter of standing, "purchasers without manifest defects" from "piggyback[ing] on the injury caused to those with manifest defects."  *Johannessohn v. Polaris Indus. Inc.*, 9 F.4th 981, 988 (8th Cir. 2021).  The Seventh Circuit likewise recently cabined overpayment-based injuries to exclude products containing only a "potential risk of harm."  *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 530 (7th Cir. 2024).

Second is the class-action posture of this case.  The Supreme Court has not decided whether an unnamed class member's lack of standing poses an Article III problem.  *See Gratz v. Bollinger*, 539 U.S. 244, 262–63 (2003) (finding the matter unsettled); *Sosna v. Iowa*, 419 U.S. 393, 402–03 (1975) (suggesting that only the named plaintiffs need standing).  No matter how the Court resolves the point, all agree that the class representatives at a minimum must show an injury.  *Sosna*, 419 U.S. at 402–03; *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 404 (1980).  The parties and we agree that the class representatives in today's case own cars that experienced these defects.  "[E]very named plaintiff," the district court found, "testified that their vehicles 'manifested' one or both alleged defects, repeatedly and continuously, despite multiple presentments and failed repairs."  R.284 at 46, 61–74.  The named plaintiffs suffered an injury in

fact if their cars shuddered and shifted, even if their alleged overpayment for the cars may or may not suffice.

The standing of absent class members becomes immaterial once a court, as here, vacates a certification order. Because "class members are not parties before class certification," "a court need not worry about their standing until it certifies the class." *Fox v. Saginaw County*, 67 F.4th 284, 296 (6th Cir. 2023). That is why a "class-certification denial will make a[n absent] class member's standing problem irrelevant." *Id.* at 297. Unless and until the district court certifies the class on remand, the absent class members' standing makes no difference. We need to verify only that the named plaintiffs, who are parties from the start, have standing to pursue their claims. They do on this record.

III.

We review the court's decision to certify a class for abuse of discretion. *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013). The court must exercise that discretion "within the framework of Rule 23." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). A district court abuses its discretion if it misstates the law, relies on clearly erroneous facts, or makes a "clear error of judgment." *In re Ford Motor Co.*, 86 F.4th 723, 727 (6th Cir. 2023) (per curiam); *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 245 (6th Cir. 2024).

Class certification makes mountains out of molehills—sometimes fairly so, sometimes not. In this case, the named plaintiffs ask us to turn their 33 individual lawsuits involving dozens of cars into one lawsuit involving over 800,000 cars. Because this "exponential aggregation" of parties "magnifies the stakes of litigation," *Ford*, 86 F.4th at 726, bypasses our tradition of litigation by "individual named parties only," *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979), and must steer clear of violations of the Seventh Amendment, *see Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845–46 (1999), Civil Rule 23 imposes stringent requirements before permitting the aggregation of so many claims by so many people in one court. To these ends, the class must show that it is "so numerous" that joinder is impracticable. Fed. R. Civ. P. 23(a)(1). It must find "questions of law or fact common" to the class. Fed. R. Civ. P. 23(a)(2). The

named plaintiffs' claims or defenses must be "typical" of those of the unnamed class members. Fed. R. Civ. P. 23(a)(3). And they must show that they will "fairly and adequately protect" class interests. Fed. R. Civ. P. 23(a)(4). For classes certified under Civil Rule 23(b)(3), like this one, the plaintiffs must show that common questions "predominate" and that litigation as a class is "superior to other available methods" of adjudication.

This is not merely a pleading standard. The plaintiffs must affirmatively "prove" that the class meets the prerequisites for certification. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *cf. id.* at 369–72 (Ginsburg, J., dissenting). And they must do so with "significant proof." *Id.* at 353 (majority op.) (quotation omitted). The trial court, for its part, must "probe behind the pleadings" and conduct a "rigorous" examination to ensure that the class satisfies Rule 23 before transforming the retail disposition of claims into the wholesale disposition of them. *See id.* at 350–51.

"[R]igorous" as in substance and process, we emphasize, not as in effort. *Id.* at 351. No one doubts the district court's effort in this massive case. A glance at this docket confirms that a trial court facing a multi-state class action like this one deserves considerable respect and gratitude. In fact, at this stage, we have no reason to dwell on many of the district court's class-action determinations: numerosity, typicality, adequacy of representation, and superiority. No one challenges the district court's handling of them in this interlocutory appeal.

More complicated are the commonality and predominance inquiries, where we train our attention. Rule 23 demands that the court conduct a structured two-step approach to assess commonality and predominance. Step one: check to see that the plaintiffs have identified a "common question of law or fact." Fed. R. Civ. P. 23(a)(2). To be common, a question must (1) yield a common answer with common evidence and (2) meaningfully progress the lawsuit. The decisionmaker must be able to resolve the question with "a yes-or-no answer for the class in one stroke." *Doster v. Kendall*, 54 F.4th 398, 430–31 (6th Cir. 2022), *vacated as moot*, 144 S. Ct. 481 (2023) (quotation omitted). The district court must actually decide whether the questions are common, *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676–77 (7th Cir. 2001), meaning that it cannot "accept [allegations] as true or construe [evidence] in anyone's favor," *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016). If a reasonable

decisionmaker left with the evidence may answer "yes" to a question for some class members and "no" for others, the class has not shown that it is common. *Doster*, 54 F.4th at 430–31; *Nissan*, 122 F.4th at 252.

Even then, not every question with a common answer meets Rule 23(a). Else, the fact that every customer sued GM about a GM car would create a common question suitable for class certification. The plaintiffs must also show that the question "affect[s] at least one" disputed "element" of the class's claims. *Doster*, 54 F.4th at 430. To conduct a rigorous analysis, the court must "walk through each cause of action, identify the relevant elements, and evaluate which elements, if any, submit to common answers." *Nissan*, 122 F.4th at 246–47.

That leads to step two: ensure that the common questions "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The court must "put the common issues on one side, the individual issues on the other, then qualitatively evaluate which side predominates." *Nissan*, 122 F.4th at 252 (quotation omitted). If adding or subtracting plaintiffs from the class substantially varies the "substance or quantity of evidence offered" and the cost of doing so, *see* Fed. R. Civ. P. 23(b)(3), the individualized questions likely overwhelm the common ones. *Brown*, 817 F.3d at 1235.

In conducting a Rule 23 analysis, the district court will inevitably address issues that overlap with the merits inquiry. It "cannot be helped" that commonality and predominance's element-by-element, claim-by-claim inquiry implicates the merits of each claim. *Dukes*, 564 U.S. at 351; *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013). How else could the court assess the elements of Rule 23? While a free-ranging merits prediction—do the claimants have a weak or strong product liability case?—is "not properly part of the certification decision," the district court may—indeed, must—answer merits questions that bear on Rule 23's demands. Fed. R. Civ. P. 23 advisory committee's note to 2003 amendment.

The district court, as a result, must not defer merits questions bearing on commonality and predominance until summary judgment. That kind of deferral concept is nowhere in Rule 23's text, which tells the court to refuse certification until it is assured that certification is proper. Fed. R. Civ. P. 23(a)–(b). The history of the Rules points in the same direction. The deferral

possibility apparently grew out of a previous regime in which a district court could conditionally certify a class and prune the non-common, non-predominant issues later. But under the Rules Enabling Act, the Judicial Conference and the Supreme Court considerably narrowed, if not eliminated, that option in 2003 when it barred conditional certification and mandated that a district court "refuse certification" until it is "satisfied that the requirements of Rule 23 have been met." *See* Fed. R. Civ. P. 23 advisory committee's note to 2003 amendment. Postponing Rule 23 inquiries until everyone has joined the class runs the risk of avoiding an issue for 33 plaintiffs today in order to decide it for 800,000 tomorrow.

GM challenges the district court's analysis at both steps of the process. That requires us to address two questions: Did the district court properly identify common questions of fact or law? And did the court properly find that those questions predominated over individual ones?

IV.

*Commonality.* A common question must "resolve an issue that is central to the validity of each one of the claims." *Dukes*, 564 U.S. at 350. To ensure the questions, whether factual or legal, are central, a court must ensure that they "affect at least one element" of all 59 claims. *Doster*, 54 F.4th at 430. The court "must walk through each cause of action" and "identify the relevant elements." *Nissan*, 122 F.4th at 246. Because an issue is not "central" unless it affects at least one contested element in each cause of action, it flows from *Wal-Mart* that only an element-oriented analysis permits the court to identify which questions meaningfully move the lawsuit forward. 564 U.S. at 350. Only after identifying the relevant elements of each cause of action may it decide whether a "yes-or-no answer" would resolve an element "for the class in one stroke." *Doster*, 54 F.4th at 431 (quotation omitted).

A question is not common if the answer requires "evidence that varies from member to member." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quotation omitted). In assessing whether common issues predominate under Rule 23(b)(3), *Tyson Foods* clarified that a common question was one "where the same evidence will suffice for each member" to answer it. *Id.* (quotation omitted).

The district court reasoned that "three readily discernible common questions that are crucial to the pleaded causes of action" exist:  whether the transmissions have shift and shudder defects; whether GM knew about them; and whether the defects are material.  R.284 at 17.  Every claim, it pointed out, "demand[s] proof of a defect in the vehicles' transmission design."  R.284 at 13.  Because the court determined that these questions lend themselves to a common answer and feature "prominently in the disposition of the case," it found commonality satisfied.  R.284 at 13, 17.

With respect, that does not suffice.  A court may not simply ask whether generalized questions yield a common answer.  That would undermine the bedrock principle that courts must identify common questions with respect to concrete elements of each claim.  By hitching all 59 claims to a question about "defect" in the abstract, the court overlooked how significant differences across each cause of action raise serious commonality concerns.

The plaintiffs, to illustrate the point, claim that the court may answer whether a "defect" exists in each transmission in one stroke.  But that is not necessarily so in the context of the relevant elements of each claim.  Do the plaintiffs mean "defect" in the products-liability sense because it is "unreasonably dangerous"?  *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 444 (Tex. 1989).  Or do they mean "defect in an implied warranty" sense, as in unfit for the "ordinary purposes for which" the accused products "are used"?  *Id.*  Or do they mean defect in the sense of a consumer-protection statute, which asks if the feature "diminished" the "value of the product"?  *Schiffner v. Motorola, Inc.*, 697 N.E.2d 868, 874 (Ill. App. Ct. 1998).

That also means we can't tell which claims the defect question might *not* be central to.  The district court, for example, reasoned that the plaintiffs must identify a defect that is "covered by the express warranty to repair or renders the class vehicles unfit for their ordinary or intended purpose."  R.284 at 20.  And it observed that, without "proof of a defect making the vehicles unsuitable for ordinary use," "the plaintiffs cannot prevail on any implied warranty claims."  R.284 at 25.  But these two claims ask different things of the class, confirming the imperative of an element-driven analysis.  A court might find that the element of breach in an express-warranty claim asks a common question:  Does a problem exist in each transmission that GM promised to fix?  But the element of breach in an implied-warranty claim asks a different question:  Does a

problem in each transmission amount to a defect that makes the car unfit for its ordinary purpose? The second question might *not* be common because some class members' transmission problems might not seriously disrupt the safety and comfort of each class vehicle, especially for those customers who merely felt a "light punch" while upshifting while others felt a "lurch[]." R.225-22 at 18; R.225-26 at 4.

The same goes for knowledge. Is the right question whether GM knew that the transmissions had problems with harsh shifting in 2015, as relevant to a consumer-protection claim? That might lend itself to a common answer to the extent test drivers knew about it. Or is the relevant question that GM knew that it couldn't fix buyer vehicles and kept selling them anyway, as relevant to an express-warranty claim? That might not lend itself to a common answer because GM repaired the shudder defect in 252,059 8L transmissions, most of which GM presumably covered with its free warranties. All of this suggests that, without an element-by-element commonality analysis, this court cannot effectively review which questions are truly central to which claims. We vacate and remand for the district court to conduct an element-by-element analysis that assesses how each question is common by fitting it into each claim.

The dissent objects to this analysis on several grounds. It worries that this approach requires a "rote explication of every element for every cause of action" at the commonality stage. Dissent at 83. Not necessarily and not likely. As the Court said in response to the same critique in *Wal-Mart*, the plaintiffs need to identify only *one* question suitable for common proof with respect to each cause of action. 546 U.S. at 359. But that question must be central to the claim at hand; it can't relate to a non-material point, such as whether the plaintiffs bought a GM car during the relevant period. The plaintiffs must tie that debated question to "the relevant elements" of that claim; they cannot simply ask whether a "defect" exists in the abstract. And the plaintiffs must prove that common evidence would yield a common answer; they cannot ignore the individualized inquiries that might occur with respect to the allegedly "common" question. *Nissan*, 122 F.4th at 246–47; *Doster*, 54 F.4th at 432; *see Dukes*, 564 U.S. at 350–51. Because commonality's one-question inquiry is less onerous than predominance's all-questions-considered inquiry, this approach does not "transform[] Rule 23(a)(2) into a miniature Rule 23(b)(3) analysis." Dissent at 106.

The dissent insists that an "issue central to a claim does not necessarily mean an element of that claim," Dissent at 82, because a "generalized question[], even if not directly tied to an element of a claim, can suffice to yield a common answer that drives the litigation forward," *id*. at 84. That may be true in some settings. A vital factual question may well turn a case. But an engineer alone, to put the point in the context of a product liability case, cannot resolve the commonality inquiry. It takes a lawyer, too. The class must trace the question to a legally salient element in each cause of action and show that common proof will provide yes-or-no answers to that factual/legal question. *Doster*, 54 F.4th at 430–31. Without this analysis, the district court cannot prove that a common defect drives *all 59 claims forward*, even if every plaintiff can prove that they had the same transmission.

The dissent contends that *Wal-Mart* permits a district court to "craft a common contention subject to *generalized* proof." Dissent at 85. That was possible in *Wal-Mart* because the claimants filed a "pattern or practice" claim under Title VII, in which the proof theoretically could be generalized and theoretically could lead to common yes-or-no answers for the entire class. *Wal-Mart*, 564 U.S. at 353 (noting that a "general policy of discrimination conceivably could justify a class" bringing a Title VII claim if "the discrimination manifested itself in hiring and promotion practices in the same general fashion") (quotation omitted). But even that possibility did not become a reality in *Wal-Mart*, as the Court rejected certification on commonality grounds. *See id.* at 359–60. If *Wal-Mart* is a refuge for this class-certification motion, it thus is not a very habitable one. The Court found commonality wanting even in the setting of a "pattern or practice" claim. *Id.* at 352. And today's case does not involve a "pattern or practice" claim. Quite to the contrary, it involves a swath of distinct state-law claims in which it is difficult to see any generalized proof that would permit the yes-or-no answers that *Wal-Mart* requires. *See Doster*, 54 F.4th at 430–31; *Nissan*, 122 F.4th at 246–47, 252; *see also Dukes*, 564 U.S. at 350–51.

The dissent's fourth point—that the plaintiffs have identified "the 8L transmissions' two universal defects" as "*one* common contention that is capable of resolution," Dissent at 75—illustrates why this analysis matters. Because "defect" bears different legal meanings for different causes of action, the class needs to explain how and why class-wide proof of each

alleged fault in the transmission resolves a material component of each cause of action. Otherwise, the word "defect" becomes a chameleon for every cause of action, no matter how differently state law gauges the point, no matter how differently each alleged fault manifests.

Put another way, we do not object to the district court's commonality analysis because it was one page long. The problem is one of process. By choosing to resolve the commonality question at the level of generality of a "defect," the court did not measure the question's impact on each cause of action. District courts can still efficiently conduct the one-question commonality analysis by identifying precisely how each common question advances each claim. To the extent that analysis remains "labored" in this instance, Dissent at 82, that turns on plaintiffs' decision to bring 59 claims in one class action, not the imperatives of Rule 23(a).

V.

*Predominance.* This inquiry requires a district court to make a claim-by-claim comparison of the common and non-common questions to see which ones, if any, predominate. Before undertaking that review, two threshold challenges of bringing these 800,000 claims together deserve attention.

*First*, there are high costs to a legal system that asks one district court to understand and apply nearly 60 causes of action across 26 states. In taking on that task, the court must "follow the decisions of the state's highest court when that court has addressed the relevant issue." *See Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (quotation omitted). But not all high courts have addressed all of the relevant claims as they apply to this action. In that setting, the court must "anticipate" through an educated guess "how the relevant state's highest court would rule." *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013) (quotation omitted).

That's no mean feat. In certifying a class under Rule 23(b)(3), efficiency offers a good reason, sometimes an overriding reason. But, in making that call, it's well to remember what concerns are being overridden. One is the "undesirability of concentrating the litigation of the claims in the particular forum" and "the likely difficulties in managing a class," Fed. R. Civ. P. 23(b)(3)(C)–(D), as opposed to "allowing the claims to be litigated separately in forums to which they would ordinarily be brought," Fed. R. Civ. P. 23 advisory committee's note to 1966

amendment. A bulky multi-state class action forces a federal court to play "central planner" to 26 state economies under "one case, one court, one set of rules," and "one settlement price for all involved." *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1020 (7th Cir. 2002). And it forces one federal judge to guess, sometimes in the first instance, the contours of local business norms. *Id.*

The central-planner model also asks a lot of trial courts and juries. Would the court use hundreds of citizens to form 26 juries, one for each state? If it did, how would it demarcate subtle differences in state laws to comply with the Seventh Amendment's command that "no fact tried by a jury, shall be otherwise reexamined"? More complicated still, would the court empanel one jury to crown the winner, what amounts to empowering six Michigan citizens to predict 59 rules of the road for 26 state commercial and consumer norms? If the court took this approach, must it face head-on the "impossible task of instructing a jury on the relevant law" and provide 59 pages of verdict forms? *Am. Med. Sys.*, 75 F.3d at 1085. Or would the trial court issue a central-planning "Esperanto" jury instruction that "merg[es] the negligence standards of the 50 states and the District of Columbia," letting six people "hold the fate of an industry in the palm of its hand"? *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995). First principles of class-action law—Rule 23(b)(3)'s mandate that we consider "the likely difficulties in managing a class action" in assessing predominance, and the reality that "federal class action[s] based on state law" "undermine federalism," *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 745 (7th Cir. 2008)—deserve serious consideration before certifying such a large class.

*Second*, this class action presents two theories of defect, each with multiple moving parts, exponentially increasing these challenges. In asking whether certification will "achieve economies of time, effort," "expense," and "uniformity of decision," Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment, courts should be wary about whether two different theories will *both* achieve these economies of scale. If just *one* theory for four causes of action in as many as 26 states presents daunting challenges, one should be wary about underwriting those risks for *two* theories.

Many of our sister circuits recognize the perils that multi-state, multi-defect, multi-claim classes pose. They look skeptically on plaintiffs who "aggregate a plethora of discrete claims"

"into one super-claim" because doing so increases "the complexity of performing the required rigorous analysis" for certification, let alone trial. *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 848 (5th Cir. 2012) (quotation omitted); *see Marisol A. v. Giuliani*, 126 F.3d 372, 378–79 (2d Cir. 1997) (per curiam). Filing "a complex class action complaint alleging differing theories of recovery," some of which are common and some not, typically reveals a "failure to demonstrate that the common issues predominate" across each theory. *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 462–64 (4th Cir. 2003). That makes sense. Class actions "economiz[e] on the expense of litigation" by resolving key issues in one stroke. *Thorogood*, 547 F.3d at 744. Certifying multiple theories of liability turns a bet that resolving one set of claims will save time into a multi-leg parlay that resolving *every* set of claims will save time.

The class responds to this second concern with a citation to a Seventh Circuit case permitting certification in a case involving two theories of defect. *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013). But *Butler* underscores our point. The plaintiffs brought "two class actions" for two defects, prompting the district court to certify one class but not the other. *Id.* at 797–98. By contrast, the plaintiffs today ask us to certify both theories. While some courts have considered multiple-defect classes, *see, e.g.*, *Bridgestone*, 288 F.3d at 1019 (refusing to certify on other grounds), we approach them with the caution commensurate with their risk. For like reasons, we cannot agree with the dissent that the union of two distinct theories, viewed through the prisms of 59 claims, poses only a "superficial difference." Dissent at 93.

The dissent claims that we should review only whether the district court's analysis "was careful, thorough, and rigorous." Dissent at 89. But because the plaintiffs "must affirmatively demonstrate" compliance with Rule 23, *Dukes*, 564 U.S. at 350, because we don't defer to district court readings of state law, *Leavitt v. Jane L.*, 518 U.S. 137, 145 (1996) (per curiam), and because even one individualized issue risks dramatically increasing the costs of class litigation, a "rigorous analysis" demands that we confirm that the district court addressed each individualized concern. *Dukes*, 564 U.S. at 351.

In addressing these concerns, the district court may not ignore "slight variations across state law." Dissent at 89. The inquiry evaluates predominance *within*, not *across*, each of the 26

subclasses because they "are each treated as a class." Fed. R. Civ. P. 23(c)(5). And even a slight variation in state law—say, a reliance requirement—might markedly increase the "difficulties in managing [the] class." Fed. R. Civ. P. 23(b)(3)(C).

That helps to explain why the district court may not certify 26 subclasses on the ground that *some* of them do not have defect-manifestation requirements. Dissent at 98. Because a court must treat each subclass "as a class," Fed. R. Civ. P. 23(c)(5), "each subclass must independently meet the requirements of Rule 23," 7AA Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1790 (3d ed. 2005). A subclass with highly individualized issues may not ride the coattails of another subclass without them.

Moving from the general to the specific, we turn to gauge whether any common questions for each of these four causes of action predominate over the non-common ones.

## A. Breach of Express Warranty

Subclasses for 17 of the states—Alabama, Colorado, Delaware, Georgia, Idaho, Illinois, Kansas, Kentucky, Maine, Minnesota, New Hampshire, New Jersey, New York, Oklahoma, South Carolina, Texas, and Washington—bring express warranty claims. Common questions do not appear to predominate in any of them.

Alabama shows why. It offers a typical approach by handling express warranty claims under general contract principles. *Ex parte Miller*, 693 So. 2d 1372, 1376 (Ala. 1997). Under that state's law, the claim requires the plaintiff to show a (1) valid contract, (2) performance by the plaintiff, (3) non-performance by the defendant, and (4) damages. *Childs v. Pommer*, 348 So. 3d 379, 387 (Ala. 2021). An examination of the first and third elements, as applied to this class action, reveals the problem.

At one level, the first and third elements lend themselves to some common proof. A valid warranty consists of an "affirmation of fact" relating to the goods, forming part of the bargain. Ala. Code § 7-2-313(1)(a). And the record suggests that each member of this subclass received the same warranty or at least one that was materially the same. With the presentation of a warranty, GM promised to cover "any vehicle defect" and pay for "repairs, including towing,

parts, and labor" "at no charge."  R.41-2 at 9; R.41-3 at 10; R.245-60 at 10.  The third element—breach—requires a court to answer what looks like one common question: Did GM originally install defective transmissions in each vehicle?

But the breach inquiry also presents an individualized question that overwhelms the efficiency gains of the common questions.  Because the contract makes "repairs" the "exclusive remedy" for defect problems, R.245-60 at 17–18; R.41-2 at 17; R.41-3 at 19, GM fails to perform only if it refuses to repair the buyers' cars or does so ineffectively.  *Am. Suzuki Motor Corp. v. Burns*, 81 So. 3d 320, 325 (Ala. 2011).

Whether the class members brought their vehicles in for repair is deeply individualized. Some people brought their cars in for repair during the warranty period, and some did not.  Some buyers received software repairs, and some received hardware repairs.  Some repairs fixed shudder and shift problems, and some did not.  Some technicians could replicate customer concerns, and some could not.  Some customers received "[s]ervice [c]alibrations" that improved shift quality, and some did not.  R.206-15 at 5.  All of this means that the "substance or quantity of evidence offered" varies among unnamed class members.  *Brown*, 817 F.3d at 1235 (quotation omitted).  That is a problem.

Worse, that problem pervades *every* individual express-warranty claim.  By our reading, every one of the seventeen states provides that a seller breaches a repair warranty only when he fails to repair something, not when the defect manifests.  *Cooley v. Big Horn Harvestore Sys., Inc.*, 813 P.2d 736, 744–45 (Colo. 1991); *Gutridge v. Iffland*, 889 A.2d 283, at *1, *4 n.11 (Del. 2005) (unpublished table decision); *Feinour v. Ricker Co.*, 566 S.E.2d 396, 398 (Ga. Ct. App. 2002); *Clark v. Int'l Harvester Co.*, 581 P.2d 784, 801 (Idaho 1978); *Mydlach v. DaimlerChrysler Corp.*, 875 N.E.2d 1047, 1059 (Ill. 2007); *Voth v. Chrysler Motor Corp.*, 545 P.2d 371, 378 (Kan. 1976); *Moore v. Mack Trucks, Inc.*, 40 S.W.3d 888, 891 (Ky. Ct. App. 2001); *Inniss v. Methot Buick-Opel, Inc.*, 506 A.2d 212, 216 (Me. 1986); *Anderson v. Crestliner, Inc.*, 564 N.W.2d 218, 222 (Minn. Ct. App. 1997); *Welch v. Fitzgerald-Hicks Dodge, Inc.*, 430 A.2d 144, 148 (N.H. 1981); *Kearney & Trecker Corp. v. Master Engraving Co.*, 527 A.2d 429, 434–35 (N.J. 1987); *Solomon v. Canon USA, Inc.*, 920 N.Y.S.2d 565, 566 (N.Y. App. Term 2010) (per curiam); *Osburn v. Bendix Home Sys., Inc.*, 613 P.2d 445, 449–50 (Okla. 1980);

*Cannon v. Pulliam Motor Co.*, 94 S.E.2d 397, 400 (S.C. 1956); *Northland Indus., Inc. v. Kouba*, 620 S.W.3d 411, 417 (Tex. 2020); *Schroeder v. Fageol Motors, Inc.*, 544 P.2d 20, 25 (Wash. 1975).

That is not surprising. Alabama, like the other 16 states with express warranty claims, follows Article 2 of the Uniform Commercial Code, which permits merchants to limit the remedies for warranty breaches to the "repair and replacement of non-conforming goods or parts." U.C.C. § 2-719(1)(a) (Am. L. Inst. & Unif. L. Comm'n 2022). Because that framework requires a district court to differentiate those who received a successful repair from those who did not, a claim-by-claim, element-by-element analysis should have revealed that presentment poses an individualized task, one unsuitable for class relief.

The class and the dissent seek to fend off this conclusion by noting that the plaintiffs need not present their vehicles for repair if GM could not fix them. Some states, true enough, do not require a buyer to seek a futile repair. *See, e.g.*, *Nissan*, 122 F.4th at 250. But any warranty-covered Mod1A flushes would have fixed the shudder problems. And some of GM's software and hardware calibrations materially improved shift quality. That all suggests that some of the warranty repairs would not "fail of [their] essential purpose." Ga. Code Ann. § 11-2-712(2); Dissent at 94.

Because the district court never conducted that analysis state by state, it left unclear whether this is an abstract problem or a real one. The court instead dismissed GM's objections as "merits issues that are irrelevant at this stage." R.284 at 52. In fairness to the district court, the case law in this area is riddled with loose language along these lines—either language that reserves some merits inquiries for trial or reserves the right to revisit class definitions and certification orders if problems emerge down the road. In one sense, these cautions are understandable. No one can predict the future, and some humility is in order about the handling of a years-away trial. But if the predominance inquiry is to serve its critical function, it cannot be answered by "maybe," "perhaps," and other "what ifs" that leave the hard questions for later or, worse, that ignore the questions that cut against certification. The arc of a properly handled class action puts the difficulty of answering individualized legal and factual questions together at

its apex during the class-certification inquiry—and most especially during the predominance inquiry. It is not a merits question that can be sloughed off until a "later" that may never come.

That makes sense, given what's at stake during class certification. "While the benefits to the individual class members are usually miniscule, the possible consequences of a judgment to the defendant are so horrendous that these actions are almost always settled," making the class-certification order too often the main event. *See* Henry J. Friendly, Federal Jurisdiction: A General View 119–20 (1973). "[I]ncorrectly certified classes . . . coerce businesses into costly settlements that they sometimes must reluctantly swallow rather than betting the company on the uncertainties of trial." *Lab'y Corp. of Am. Holdings v. Davis*, 145 S. Ct. 1608, 1612 (2025) (Kavanaugh, J., dissenting). These "coerced settlements substantially raise the costs of doing business" for companies, which "in turn pass on those costs to consumers," investors, and workers. *Id.* Properly applied, the predominance inquiry (and sometimes the superiority inquiry too) avoids that risk by focusing on whether the class action would lead to a fair and efficient trial, not a settlement. An element-by-element comparison of a cause of action to determine whether common questions do, or do not, predominate *requires* a consideration of all of the elements of *each* legal claim at the outset. Any other approach does not come to grips with the central point of the predominance inquiry and subverts the fairness and efficiency considerations underlying Rule 23.

All in all, we are doubtful that the common questions predominate over the non-common ones with respect to this cause of action. But we leave it to the district court to apply these principles in the first instance.

## B. Breach of Implied Warranty

Subclasses for 14 states—Arkansas, Colorado, Delaware, Georgia, Illinois, Kansas, Maine, Michigan, Minnesota, New Hampshire, New Jersey, New York, Oklahoma, and South Carolina—raise implied warranty claims. Here, too, a predominance problem emerges.

Georgia, as an exemplar of this cause of action, illustrates why. In the Peach State, breach of the implied warranty of merchantability requires a plaintiff to prove four elements: (1) the goods were subject to a warranty, (2) the goods were defective, (3) the defect

caused an injury, and (4) that injury caused damages. *Mitchell v. BBB Servs. Co.*, 582 S.E.2d 470, 471–72 (Ga. Ct. App. 2003). Defectiveness bears a technical meaning in the implied-warranty context. *Cf. Nissan*, 122 F.4th at 248–49. A car is merchantable if it "pass[es] without objection in the trade under the contract description," is of "fair average quality," and is "fit for the ordinary purposes for which" it is used. Ga. Code Ann. § 11-2-314(2).

The first and second elements appear to implicate some questions yielding common answers, though the court should re-assess whether they are central to each claim on remand. The court must know whether GM's transmission was defective before it can tell whether that defect rendered GM cars unmerchantable. And GM can supply a single answer to identify the "ordinary purpose[]" for which reasonable consumers use cars: driving. *Id.*

But the second element also has individualized features that rebalance the ledger. Determining whether the alleged common defects made the cars unmerchantable compels individualized inquiries twice over. *First*, different environmental conditions led to different presentations of the alleged defect—and sometimes meant the defect never appeared. Drivers in dry climates experienced fewer instances of shudder because less moisture polluted the automatic transmission fluid. The defendants have attached a compilation of class members who "never experienced shudder" or "no longer" do. R.245-59 at 2. Under Georgia law, a car may have "minor problems" that "never render[] the vehicle unusable," and that's especially so if the dealer resolves them "in [a] timely fashion." *Soto v. CarMax Auto Superstores, Inc.*, 611 S.E.2d 108, 110 (Ga. Ct. App. 2005).

*Second*, the defects that did manifest did so in different ways. Take the alleged shifting defect. Some customers felt a "light punch in the arm" while upshifting. R.225-22 at 18. Others felt a "hesitat[ion]" while accelerating. R.225-16 at 4–5. Still others found their cars "lurch[ing] forward" when entering second gear. R.225-5 at 8. These individualized inquiries, which require assessing the presence and extent of the defect, vary from class member to class member. *See Brown*, 817 F.3d at 1235. Such variations make it difficult to conclude that the common questions predominate.

Every other state at issue agrees. Their positions reflect the commercial norm that a "product is merchantable" if a defective "feature does not make the product as a whole unfit." 2 Hawkland Uniform Commercial Code Series § 2-314:3 (database updated 2024). And each state under which the plaintiffs have brought implied-warranty claims has concluded that unmerchantability does not turn alone on whether there is a defect in a component part. The class must prove that the defect made the entire product unfit for ordinary use. *See, e.g.*, *H.A.S. of Fort Smith, LLC v. J.V. Mfg., Inc.*, No. CA03-1445, 2004 WL 2102009, at *3 (Ark. Ct. App. Sept. 22, 2004); *Anderson v. M.W. Kellogg Co.*, 766 P.2d 637, 643 (Colo. 1988) (en banc), *Freedman v. Chrysler Corp.*, 564 A.2d 691, 697–99 (Del. Super. Ct. 1989); *Malawy v. Richards Mfg. Co.*, 501 N.E.2d 376, 383–84 (Ill. App. Ct. 1986); *Hodges v. Johnson*, 199 P.3d 1251, 1260 (Kan. 2009); *Suminski v. Me. Appliance Warehouse, Inc.*, 602 A.2d 1173, 1175 (Me. 1992); *Rosenbaum v. Toyota Motor Sales, USA, Inc.*, No. 16-CV-12645, 2016 WL 9775018, at *2 (E.D. Mich. Oct. 21, 2016), *aff'd*, 708 F. App'x 242 (6th Cir. 2017) (applying Michigan's definition of merchantability to suggest that the Toyota Prius's poor performance in "electric mode" does not make it unmerchantable in general); *Tellinghuisen v. Chrysler Grp., LLC*, No. A13-2194, 2014 WL 4289014, at *3 (Minn. Ct. App. Sept. 2, 2014); *Ferrari v. Am. Honda Motor Co., Inc.*, No. L-4296-06, 2009 WL 211702, at *3–4 (N.J. Super. Ct. App. Div. Jan. 30, 2009) (per curiam); *see Welch*, 430 A.2d at 147–49 (New Hampshire law); *Wojcik v. Empire Forklift, Inc.*, 14 A.D.3d 63, 66 (N.Y. App. Div. 2004); *Perry v. Lawson Ford Tractor Co.*, 613 P.2d 458, 463 (Okla. 1980); *Seaside Resorts, Inc. v. Club Car, Inc.*, 416 S.E.2d 655, 662 (S.C. Ct. App. 1992). Even if the class may answer with one voice whether the 8L transmissions were defective, the class must answer with many voices whether their specific cars became unmerchantable given how their specific transmissions revealed the alleged defect.

(As a sidenote, the GM express warranty contracts say that repair is the only remedy for implied-warranty claims. If so, the presentment issues identified under the express-warranty claims may apply here as well.)

The proposed class is not analogous to certifying "a class of people sick with a cold because some sniffled" and "others coughed." Dissent at 93. At issue are two distinct engineering diagnoses involving two different transmission components that GM fixed in

different ways under different repair schedules. These are hardly "superficial differences," Dissent at 93, in the context of an implied-warranty claim, to use one example. How the 8L transmission problems manifest is precisely what matters for merchantability in showing how bad the driving experience becomes for each consumer. To the extent healthcare offers a useful analogy to this case, it would be to a class of hospital patients in which some patients had scurvy and others had gout—different diagnoses and different symptoms.

As with the class's express-warranty claims, we doubt that the common questions predominate over the non-common ones with respect to the implied-warranty claims. But we leave it to the district court to apply these principles in the first instance.

## C. Consumer Protection Statutes

Subclasses for 23 states—Alabama, Arizona, Arkansas, Delaware, Florida, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Michigan, Minnesota, New Hampshire, New Jersey, New York, North Carolina, Oklahoma, Pennsylvania, Tennessee, Texas, Washington, and Wisconsin—bring claims under their consumer-protection statutes. These claims face two general hurdles. The first is a requirement in some states that a product defect must manifest before a consumer may bring such a lawsuit. The second is a requirement in some states that a consumer must show he actually relied on a merchant's misrepresentation or omission. Only the state regimes that impose neither requirement avoid these predominance pitfalls.

*Manifest Defect*. States have options when a car company sells a product with a risk of injury. They may compensate with remedies that sound in tort, allowing recovery only to those physically injured by a manifest defect. *Bridgestone*, 288 F.3d at 1017 n.1. But because tort remedies usually don't countenance "purely economic losses," *2000 Watermark Ass'n, Inc. v. Celotex Corp.*, 784 F.2d 1183, 1185 (4th Cir. 1986), they may choose remedies that sound in contract and allow every buyer to recover for the decreased value of a risky product, even if the risk does not manifest, *Bridgestone*, 288 F.3d at 1017 n.1. Because the tort-like approach poses an individualized query, the district court must identify which statutes follow which model.

Texas shows how a manifest-defect requirement overwhelms any common questions. In the Lone Star State, a plaintiff must show that "(1) he is a consumer, (2) the defendant engaged

in a false, misleading, or deceptive act, and (3) the act constituted a producing cause of economic damages." *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 857 (Tex. App. 2005). To address the second element, the court must assess whether GM's 8L transmissions were prone to shudders and harsh shifts, a matter that might lend itself to common proof.

But the third element, causation and injury, hampers a class-wide yes-or-no answer. Under Texas law, economic loss "from a defect that has not manifested" is "too remote in time to constitute an 'injury.'" *Id.* at 858. That brings to the surface highly individualized questions, doubly so in view of the plaintiffs' two theories of defect: identifying which customers actually experienced shudders and which customers actually experienced harsh shifts. In addition, the court must understand which consumers' shudders and harsh shifts arose from the transmissions rather than, say, their tires, as worn tires may create a shudder as well. Just as with the implied warranty claims, those questions appear to overwhelm the common ones.

Texas is not alone. Arkansas, New Hampshire, New York, Oklahoma, and Wisconsin take the same approach. *Wallis v. Ford Motor Co.*, 208 S.W.3d 153, 161 (Ark. 2005) ("Where the only alleged injury is the diminution in value of the product, a private cause of action is not cognizable under the ADTPA."); *Parnell v. FanDuel, Inc.*, 591 S.W.3d 315, 319–20 (Ark. 2019); *Nichols v. Gen. Motors Corp.*, No. 99-C-566, 1999 WL 33292839, at *3–5 (N.H. Super. Ct. Dec. 13, 1999) (barring a consumer claim for failure to allege that "the unreasonably [un]safe condition . . . has manifested itself"); *Frank v. DaimlerChrysler Corp.*, 292 A.D.2d 118, 121–28 (N.Y. App. Div. 2002); *Tietsworth v. Harley-Davidson, Inc.*, 677 N.W.2d 233, 236–37 (Wis. 2004); *see Walls v. Am. Tobacco Co.*, 11 P.3d 626, 629 (Okla. 2000). Although the Alabama Supreme Court has not directly spoken on this issue, we understand Alabama law to bar consumer claims generally when a defect doesn't manifest. *Ford Motor Co. v. Rice*, 726 So. 2d 626, 628–29 (Ala. 1998). The same is true of Minnesota, which rejects "allegation[s] of diminished value due to a propensity to fail" as too "conjectural" and "speculative." *Carey v. Select Comfort Corp.*, No. 27CV 04-015451, 2006 WL 871619, at *3 (Minn. Dist. Ct. Jan. 30, 2006); *see O'Neil v. Simplicity, Inc.*, 574 F.3d 501, 503 (8th Cir. 2009).

By contrast, 12 states—Arizona, Delaware, Florida, Illinois, Kansas, Kentucky, Maine, Michigan, New Jersey, Pennsylvania, Tennessee, and Washington—appear not to require a

defect to manifest. Consumer statutes in those states, as we read them, support a price-premium theory of harm, where someone who purchases a car expecting a defect-free transmission but receives a defective transmission has suffered a cognizable harm. *See Pena v. Opic*, No. 1 CA-CV 09-0401, 2010 WL 1998152, at *5–7 (Ariz. Ct. App. May 18, 2010); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1076 (Del. 1983); *Collins v. DaimlerChrysler Corp.*, 894 So. 2d 988, 990 (Fla. Dist. Ct. App. 2004); *Schiffner*, 697 N.E.2d at 874 (Illinois law); *Ricklefs v. Clemens*, 531 P.2d 94, 100 (Kan. 1975); *Smith v. Gen. Motors Corp.*, 979 S.W.2d 127, 131 (Ky. Ct. App. 1998); *Corder v. Ford Motor Co.*, 285 F. App'x 226, 229 (6th Cir. 2008) (suggesting that failing to disclose that a 2004 truck contained a 2003 engine imposed an ascertainable harm at Kentucky law); *Everest v. Leviton Mfg. Co.*, No. CV-04-612, 2006 WL 381832, at *2 (Me. Super. Ct. Jan. 13, 2006) (citing *Nelson v. Leo's Auto Sales, Inc.*, 185 A.2d 121, 123 (Me. 1962)); *Mayhall v. A.H. Pond Co.*, 341 N.W.2d 268, 271–72 (Mich. 1983) (per curiam) (suggesting that someone suffers an injury when he "does not receive what he expected"); *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 789 (N.J. 2005) (implying that "expert proof of diminution of value" may establish an injury under New Jersey's consumer law); *Grant v. Bridgestone Firestone Inc.*, 57 Pa. D. & C.4th 72, at *2 (Com. Pl. Pa. 2002); *Morris v. Mack's Used Cars*, 824 S.W.2d 538, 539–41 (Tenn. 1992); *Tallmadge v. Aurora Chrysler Plymouth, Inc.*, 605 P.2d 1275, 93–94 (Wash. Ct. App. 1979) (finding an injury when a buyer expected a new car but received a repaired car).

Some states, like New Jersey, do not treat a defect as manifested if it arises within the warranty period and the dealer fixes it. *Thiedemann*, 872 A.2d at 794. That returns the cause of action and state subclass to a one-by-one determination, in which the individual question overtakes the common one.

Some states make district courts guess. North Carolina, for one, has avoided deciding whether its consumer-fraud statute permits plaintiffs to recover for the economic loss of losing the benefit of a bargain. *Coker v. DaimlerChrysler Corp.*, 617 S.E.2d 306, 314 (N.C. Ct. App. 2005). But the state does not apply that restriction to "claims for fraud brought contemporaneously with claims for breach of contract," *Bradley Woodcraft, Inc. v. Bodden*, 795 S.E.2d 253, 259 (N.C. Ct. App. 2016), leading us to cautiously venture that it would not impose

a manifestation requirement for consumer claims either. The same is true of Idaho and Louisiana. *Taylor v. Taylor*, 422 P.3d 1116, 1125 (Idaho 2018); *Albert Switzer & Assocs., Inc. v. Dixie Buick, Inc.*, 265 So. 2d 313, 314–15 (La. Ct. App. 1972).

The district court offered two reasons to defer this question for trial: (1) This court has certified a class without a manifested defect before, *Whirlpool*, 722 F.3d at 856–57, and (2) the "appropriate opportunity to address claims of absent class members whose vehicles never have manifested any defect is a Rule 56 motion for summary judgment," R.284 at 47. That does not suffice to rigorously compare the common and non-common questions for predominance. In *Whirlpool*, this court concluded that "under Ohio law," "not all class members must demonstrate manifestation." 722 F.3d at 857. But the contours of one state's law—and one not even at issue in this case—does not bear on whether the 23 states at issue require manifestation. Treating Ohio as a stand in for everyone would pave over each State's diverse norms and betray Rule 23's requirement that the court conduct a claim-by-claim analysis.

That's also why the court may not defer the question until summary judgment. Without showing that each subclass's consumer statute may proceed on economic injuries alone, commonality "completely collapses, rendering class certification inappropriate." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283 (2014). Whether each state's consumer-fraud statute has a manifestation requirement "must be proved before class certification." *Id.*

*Halliburton*'s teaching, contrary to the dissent's suggestion, extends beyond the setting of that case. *Halliburton* is no more a case just about securities fraud than *Wal-Mart* is a case just about employment discrimination. Rule 23 establishes a set of trans-substantive requirements, and the Court's interpretations of the Rule apply to all manner of causes of action. Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment.

The plaintiffs' objections come up short. They note that a manifest-defect rule is not universal because some states do not require a defect to manifest if the claimant alleges a present economic loss. But that proves our point. If the states have split over whether an alleged defect must manifest, why disrespect half of them by certifying all 26 state-wide subclasses? The rigorous-analysis requirement demands that a district court step through each element of each

claim for each state to identify exactly which ones present individualized issues.  Certifying now, winnowing later, betrays the Supreme Court's imperative that plaintiffs "actually *prove*" "that their proposed class[es] satisf[y] each requirement of Rule 23."  *Halliburton*, 573 U.S. at 275.

As for the states that require manifestation, the plaintiffs argue, the court may dig through GM's "warranty service data" to cull class members whose defects did not manifest after they used their warranties to fix the relevant problem.  R.284 at 47.  It's not that easy.  What of the buyers who never brought their cars to a GM dealership?  That wouldn't be on GM's service data spreadsheet.  What of the buyers whose defects continued to manifest *after* they turned their car in?  That wouldn't be on the spreadsheet either.  What of the fact that shift defect experiences ran the gamut, from nothing at all, to a "hesitat[ion]" while accelerating, R.225-16 at 4–5, to a "light punch in the arm" while upshifting, R.225-22 at 18, to a dangerous "lurch[ing] forward" when entering second gear, R.225-5 at 8–9?  It's highly unclear—indeed doubtful—that the spreadsheet answers these questions.  If culling in this way through the spreadsheet was that easy, why didn't the claimants and the district court agree to limit the class at the certification stage to only those claimants whose defects manifested?  The certify-now-cull-later approach raises many questions, and none of them, so far as this record shows, favors predominance.

As for Texas, the dissent objects that *Everett* was a standing case, not a consumer-law case.  Yes and no.  Yes, *Everett* held that an unmanifested defect could not supply *statutory* standing—whether "a particular plaintiff has established that he has been injured or wronged within the parameters of the statutory language."  *Nephrology Leaders & Assocs. v. Am. Renal Assocs. LLC*, 573 S.W.3d 912, 916 (Tex. App. 2019).  But no, this matter of statutory interpretation has nothing to do with "the Texas Constitution's standing requirements."  *Id.* at 917.  The material points remain:  Texas law simply does not support a cause of action for an unmanifested defect if some cars "functioned as represented" for years.  *Everett*, 178 S.W.3d at 858–59.

*Reliance*.  In the second category are states that require a buyer to show that he relied on a misleading representation or omission.  As we have been told before, reliance tends to pose "an insuperable barrier to class certification."  *Dukes*, 564 U.S. at 351 n.6; *see Halliburton*, 573 U.S. at 265–66.  This case does not call for an exception to the rule.  GM's consumers went to

different dealerships, heard different sales pitches, purchased different vehicles, and received different prices. It thus remains unclear whether they would "react uniformly to a change in information about . . . the alleged transmission issues." R.245-37 at 17. That's why one plaintiff "read brochures from his dealership" that led him to buy a specific car. R.245-37 at 18. That's why another plaintiff chose a different GM model because a salesman marketed it to him. All of this adds up to a tall task for the plaintiffs, who must show that they were "actually deceived" by a "statement or omission" that influenced their purchasing decisions. *E.g.*, *De Bouse v. Bayer*, 922 N.E.2d 309, 316, 319 (Ill. 2009).

Illinois provides a helpful template for what a careful analysis of one state's consumer statute should entail. Under the Illinois Consumer Fraud and Deceptive Practices Act, a plaintiff must show "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *Id.* at 313. The first and third elements may implicate common questions. To know if GM deceived buyers about the transmissions' shift and shudder problems, the court must ask whether the transmissions had faulty fluid and valve-management issues as designed.

But the fourth and fifth elements demand individualized scrutiny. Though the Illinois statute lacks an express reliance element, *Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 754 (Ill. 1994), a buyer "must have relied on the wrong to some extent in order to establish proximate cause," *Zekman v. Direct Am. Marketers, Inc.*, 675 N.E.2d 994, 998 (Ill. App. Ct. 1997), *rev'd on other grounds*, 695 N.E.2d 853 (Ill. 1998). That principle couples with Illinois' common-law tradition that a plaintiff "need[s] to prove actual reliance" to establish proximate cause. *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 161 (Ill. 2002) (quoting M. Polelle & B. Ottley, Illinois Tort Law § 9.05, at 9–32 (3d ed. 2001)). A deceptive statement, then, does not cause a buyer's injury "unless it actually deceives the plaintiff." *Shannon v. Boise Cascade Corp.*, 805 N.E.2d 213, 217 (Ill. 2004).

Divining the purchase price of a broken promise is a personal and individualized matter. To show that GM deceived customers by misstating the efficacy of the 8L transmissions in its advertisements, the court has to know *which* customers received those advertisements. If a buyer

did not see GM's advertisements, or did not attend GM auto shows touting its transmissions, those representations did not hurt him.  To know whether GM's statements or omissions caused a consumer to purchase the car, the court must ask each consumer *why* he purchased it.  *Siegel v. Shell Oil Co.*, 612 F.3d 932, 936 (7th Cir. 2010) (finding proximate cause under the ICFA an individualized inquiry).  Attempting to satisfy this burden, the plaintiffs provide 33 deposition transcripts from customers who say that they would not have purchased the class vehicles had they known of the defect beforehand.  But that's merely 33 down with at least 799,967 interviews to go.  Not every purchaser says no to a product because of a defect, especially those who paid under list price or received too-good-to-pass-up deals on other features.

Arizona, Delaware, Kansas, and Wisconsin follow Illinois's lead.  They require buyers to prove that a merchant's misrepresentation or omission caused their injury, and causation usually requires a showing that a buyer *relied* on the alleged misstatement.  *Kuehn v. Stanley*, 91 P.3d 346, 351–52 (Ariz. Ct. App. 2004); *Carroll v. Philip Morris USA, Inc.*, 163 A.3d 91, 110 (Del. Super. Ct. 2017) (finding that the "variability in the reasons people engage in a consumer transaction" an individualized inquiry under the Delaware Consumer Fraud Act); *Finstad v. Washburn Univ. of Topeka*, 845 P.2d 685, 691–92 (Kan. 1993); *Novell v. Migliaccio*, 749 N.W.2d 544, 151–52 (Wis. 2008) (suggesting that "[r]eliance is an aspect of . . . whether a representation caused" an injury).

Arkansas, Maine, North Carolina, Pennsylvania, and Texas go further and require a consumer to prove that he relied on a deceptive statement, adhering to "the traditional common law elements of reliance and causation."  *Weinberg v. Sun Co.*, 777 A.2d 442, 446 (Pa. 2001); *see, e.g.*, Ark. Code Ann. § 4-88-113(f)(1)(A) (2017) (requiring, after August 2017, a plaintiff to suffer "an actual financial loss as a result of his or her reliance" on an unlawful trade practice); *Bartner v. Carter*, 405 A.2d 194, 201 (Me. 1979) (holding that a consumer cannot show that he suffered a loss "as a result of false representations by proving merely that the representations had a 'capacity or tendency to deceive'"); *Bumpers v. Cmty. Bank of N. Va*, 747 S.E.2d 220, 226 (N.C. 2013); *Toy v. Metro. Life Ins.*, 928 A.2d 186, 202–03 (Pa. 2007); *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 694 (Tex. 2002).

Alabama, Idaho, Oklahoma, and Louisiana provide little indication either way—and return us to the multi-state guessing conundrum. The first two states' consumer-fraud statutes require that a plaintiff sue only those who "cause[]" him harm. Ala. Code § 8-19-10(a); *Patterson v. Beall*, 19 P.3d 839, 846–47 (Okla. 2000). The latter two require the plaintiff to suffer "as a result of" a deceptive act. La. Stat. Ann. § 51:1409(A); Idaho Code § 48-608(1). Prospecting these statutes, we understand the laws' causation requirements to reflect the ordinary understanding that causation "is not possible without reliance." *Apex Oil Co. v. Jones Stephens Corp.*, 881 F.3d 658, 662 (8th Cir. 2018); *see* Restatement (Second) of Torts § 546 cmt. a, at 102–03 (Am. L. Inst. 1977).

Minnesota and New Jersey take a different approach and sometimes presume reliance if a consumer can show it through the "materiality and pervasiveness" of the fraud alone, *State v. Minn. Sch. of Bus., Inc.*, 935 N.W.2d 124, 135 (Minn. 2019), or if "all the representations about the product are baseless," *Lee v. Carter-Reed Co., L.L.C.*, 4 A.3d 561, 580 (N.J. 2010). But that leads to another crossroad. The presumption could apply and commonly prove reliance, or it could *not* apply and require courts to trod through thousands of car salesmen pitches to figure out if the buyer relied on a statement or omission made by GM. When the court faces such a choice, *Halliburton* requires it to determine whether the presumption applies. 573 U.S. at 281–83. That means identifying whether the fraud was so pervasive under Minnesota law, or whether GM's representations were so baseless under New Jersey law, that the district court may presume reliance.

We're skeptical. If different buyers heard different pitches from different dealers about different cars, they experienced the misrepresentation differently too. That's a far cry from what triggered the presumption in Minnesota, where the State sued two universities for disseminating identical online advertisements to students. *Minn. Sch. of Bus.*, 935 N.W.2d at 129. Nor does it fit the prerequisites in New Jersey, where a merchant created an "entire marketing scheme" in which every single proposition was "fictional." *Lee*, 4 A.3d at 527.

Florida, Michigan, New Hampshire, New York, Kentucky, and Tennessee stand on the other side of the line. Their consumer laws reject the common law and are "intended to make it easier to sue." *See State ex rel. Humphrey v. Alpine Air Prods., Inc.*, 500 N.W.2d 788, 790

(Minn. 1993). These states thus do not require reliance as part of their consumer statutes. *Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. Dist. Ct. App. 2000); *Dix v. Am. Bankers Life Assurance Co. of Fla.*, 415 N.W.2d 206, 209–10 (Mich. 1987) (finding sufficient for consumer to show that a reasonable person would have relied on allegedly fraudulent representations); *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 516 (6th Cir. 2015) (finding New Hampshire's consumer law to look to Massachusetts's consumer-fraud statute for guidance, and finding Massachusetts's statute not to require reliance or individualized causation); *Stutman v. Chem. Bank*, 731 N.E.2d 608, 612–13 (N.Y. 2000); *Corder v. Ford Motor Co.*, 869 F. Supp. 2d 835, 837–38 (W.D. Ky. 2012) (finding the only probative signal on Kentucky law a state appeals case suggesting that plaintiffs need prove neither causation nor reliance under the Kentucky Consumer Protection Act); *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 469 (Tenn. Ct. App. 2003).

Washington borrows from federal securities law and *presumes* reliance when a seller conceals a defect. *Morris v. Int'l Yogurt Co.*, 729 P.2d 33, 40–41 (Wash. 1986) (en banc). But the class's theory of the case sounds in both omission and misrepresentation. Its complaint cites GM's statements that eight-speed automatic transmissions offer smooth shifting. Its motion to certify accuses GM of telling customers that poor shifts were "normal" but also of failing to disclose defects. To the extent the class suggests that GM lied not once but twice—passively through omission and actively through misrepresentation—the district court must check if buyers relied on the affirmative statements. Because we don't know if GM stood "mute in the face of a duty to disclose" or "made misstatements of fact and then failed to include other facts," *Tershakovec v. Ford Motor Co.*, 79 F.4th 1299, 1309–10 (11th Cir. 2023) (quotation omitted), we cannot know the answer on this record.

The plaintiffs read the caselaw differently. They claim that most of the state claims do not require reliance. But a rigorous analysis demands that the district court get it right, not that it get close. Because we treat each subclass "as a class under" Rule 23(c)(5), we cannot certify *any* subclass lacking predominance. The subclasses whose claims require reliance cannot take refuge in the subclasses whose claims don't.

The plaintiffs suggest that reliance is a question of state law, one suitable for resolution at summary judgment. *Rikos*, 799 F.3d at 512. That's true enough in one sense. But whether reliance bars the common questions from "predominat[ing] over any questions affecting only individual members" under Civil Rule 23(b)(3) is a question of federal law that must be resolved before certification, not at summary judgment or at trial.

We disagree, at any rate, with the premise that Arizona, Kansas, North Carolina, and Texas permit a plaintiff to show class-wide reliance through uniform material misrepresentations or omissions. Even as we review the final decision to certify for abuse of discretion, we "owe no deference to district court adjudications of state law." *Leavitt*, 518 U.S. at 145.

Start with the class's argument that one may presume reliance under Arizona and Kansas consumer law. The cited district court opinion determined that an omission may be *deceptive*; it did not decide whether it caused injury. *See, e.g.*, *In re Ariz. Theranos, Inc., Litig.*, 308 F. Supp. 3d 1026, 1040 (D. Ariz. 2018) (citing *State ex rel. Horne v. AutoZone, Inc.*, 275 P.3d 1278, 1281 (Ariz. 2012) (en banc)). That explains why the plaintiffs in that case also alleged that they were "harmed by their reasonable reliance on defendants' omissions." *Id.* at 1042. The Kansas case does not apply either, where each class member relied on the same communication. *See, e.g.*, *Delcavo v. Tour Res. Consultants, LLC*, No. 21-2137-JWL, 2022 WL 1062269, at *9 (D. Kan. Apr. 8, 2022). Not so here.

The class's reading of North Carolina and Texas law, in turn, suggests that reliance can sometimes be established circumstantially. But they haven't proven that this is one of those situations. Take North Carolina law as construed in *Rowan County Board of Education v. United States Gypsum Co.*, 418 S.E.2d 648 (N.C. 1992). It held that a jury could find that an architect relied on a supplier's misinformation, planted in a catalogue he called "an architect's Bible" upon which all architects "rely." *Id.* at 659–61. True, those circumstances show *one* buyer's reliance. And we acknowledge the reality that, if reliance "often" is "an insuperable barrier to class certification," that implies it *can be* superable in rare cases. *Dukes*, 564 U.S. at 351 n.6. But it does not prove that in this case hundreds of thousands of plaintiffs all saw and relied on something GM said. So too with Texas. *See Henry Schein*, 102 S.W.3d at 694.

\* \* \*

The dissent identifies some instances in which state courts have affirmed class certification despite defect-manifestation and reliance hurdles. It then urges the district court on remand to "consider the ways in which many state courts apply a more flexible approach." Dissent at 104.

Much as there may be to learn from state law in some settings, we cannot lightly graft 26 States' class-action rules onto the federal tree. While Oklahoma courts might think that the "fact that many members of the class have not yet sustained damage does not prevent class certification" because the court can "conditional[ly]" certify and hash out the merits later, *Hess v. Volkswagen of Am.*, 221 P.3d 132, 140 (Okla. Civ. App. 2009) (quotation omitted), we cannot, Fed. R. Civ. P. 23 advisory committee's note to 2003 amendment. Illinois courts can experiment with "rules which can reduce the difficulties of showing individual reliance," *Steinberg v. Chi. Med. Sch.*, 371 N.E.2d 634, 645 (Ill. 1977), but we cannot, *Amgen*, 568 U.S. at 462–63. Arkansas might find a defect-manifestation rule "inapposite" for class actions because it is good enough that "at least for some plaintiffs" the "existence of damages . . . will depend on" a common statement, *Phillip Morris Cos. v. Miner*, 462 S.W.3d 313, 320 n.4, 321 (Ark. 2015), but it isn't enough under Rule 23, *Bouaphakeo*, 557 U.S. at 453. The list could go on and on, and so could the lesson. Federal law remains supreme, a point not lost on Congress when it "facilitate[d] adjudication of certain class actions in federal court" by passing the Class Action Fairness Act. *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014); 28 U.S.C. §§ 1332(d); 1453(b).

All of this suggests that common questions do not predominate in the state consumer protection statutes that require reliance or defect-manifestation. We vacate and remand for the district court to re-assess, according to these principles, whether common questions predominate and, if so, as to which subclasses.

D.  Fraudulent Concealment

The Illinois, Louisiana, New York, Tennessee, and Washington subclasses bring fraudulent concealment claims.  In none of them, it appears, do common questions of defect predominate over individualized questions of reliance.

By way of a common example, fraud in Illinois consists of the (1) concealment of a material fact, (2) intent to induce a false belief, (3) reliance by the listener (who could not have reasonably discovered the truth) upon the speaker's silence, (4) prospect that the listener would have acted differently had they known the concealed information, and (5) causation leading to injury.  *Schrager v. N. Cmty. Bank*, 767 N.E.2d 376, 384 (Ill. App. Ct. 2002).

As with the consumer claims, reliance typically creates "an insuperable barrier to class certification."  *Dukes*, 564 U.S. at 351 n.6.  And the plaintiffs do not make any affirmative argument that common questions predominate in common-law fraudulent concealment claims.  Louisiana, New York, and Tennessee all require reliance in their fraud claims too.  *Greene v. Gulf Coast Bank*, 580 So. 2d 712, 715–16, 719–20 (La. Ct. App. 1991), *rev'd on other grounds*, 593 So. 2d 630 (La. 1992); *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1108 (N.Y. 2011); *Chrisman v. Hill Home Dev., Inc.*, 978 S.W.2d 535, 538 (Tenn. 1998).

That leaves Washington, whose fraudulent-concealment tort offers a reliance-free route to success.  There, a plaintiff may show fraudulent concealment without "affirmatively plead[ing]" reliance *if* the defendant "breached an affirmative duty to disclose a material fact."  *Crisman v. Crisman*, 931 P.2d 163, 166 (Wash. Ct. App. 1997).  That offers the class an escape hatch.  They can try to prove that GM had a duty to reveal its transmission problems to every consumer, in which case reliance would not pose a barrier to class certification.  But that also means GM can contest this duty if it means that the presumption would not apply and a trial would yield individualized reliance inquiries.  *Halliburton*, 573 U.S. at 281–83.

It is doubtful that a careful analysis of predominance—identifying each state fraudulent-inducement regime and clarifying that "class claims, issues, or defenses" raised may not include common-law fraudulent inducement claims—favors certification.  Fed. R. Civ. P. 23(c)(1)(B).

As before, the district court should apply these principles and re-assess predominance for these state subclasses on remand.

\* \* \*

One last point applicable to this cause of action and the other theories of liability. The district court should clarify whether problems with predominance as to the class's liability theories disrupt the district court's conclusion that "formulaic calculation[s]" can adequately estimate damages for each class member. *Fox*, 67 F.4th at 301 (quotation omitted). At one point, the district court wrote that the experts plausibly "proffered reliable statistical means for estimating" the buyers' overpayment in the context of *every* claim because every plaintiff will seek to recover the difference in price between a car without the 8L transmission problems and a car with them. R.284 at 48–49. That appears to be overinclusive. A "model purporting to serve as evidence of damages . . . must measure only those damages attributable" to a specific theory of harm. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). As one example, an overpayment-based model for a state consumer law claim might overcompensate in the states that require a defect to manifest. *See, e.g.*, *Wallis*, 208 S.W.3d at 161. On remand, the district court should ensure that each damages model accounts for how each claim works.

### E. Arbitration

Arbitration bears on this case as a defense to, not an element of, the class's claims. Because Civil Rule 23 asks only whether common "questions of law or fact" predominate, it applies to affirmative elements and the "defenses of the class" alike. Fed. R. Civ. P. 23(a)(3). That's why the class-certification order must define the relevant "claims, issues, or defenses," the class notice must list the members' "defenses," and a certifying court must consider the costs of controlling "the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A), (c)(1)(B), (c)(2)(B).

An arbitration agreement offers a potential defense. It is one reason why the court might not issue a final judgment for the class "even if all the allegations in the complaint are true." *Affirmative Defense*, Black's Law Dictionary (12th ed. 2024); *see also* Fed. R. Civ. P. 8(c)(1) (denoting arbitration and award as a defense).

Arbitration raises individualized inquiries of law and fact. GM claims that 20 of the 48 customer purchase agreements submitted during discovery contain arbitration provisions. If the plaintiffs agree that this number reflects the composition of the entire class, those agreements would require the district court to bifurcate the class into the 42% who must proceed through arbitration, and the 58% who may proceed through trial.

Different consumers, moreover, signed different contracts. And they appear to have signed the agreements with the car dealers, not GM. Because arbitration is "a matter of contract," *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995), state law determines when a car manufacturer may benefit from a car dealer's arbitration agreement. *See, e.g.*, *AtriCure, Inc. v. Meng*, 12 F.4th 516, 526, 530 (6th Cir. 2021) (equitable estoppel and agency doctrine); *Davis v. Nissan N. Am., Inc.*, 100 Cal. App. 5th 825, 835–37 (Cal. Ct. App. 2024) (identifying when a car manufacturer may use an arbitration agreement in a contract drafted by the car dealer); *Cooper Indus., LLC v. Pepsi-Cola Metro. Bottling Co.*, 475 S.W.3d 436, 442 (Tex. App. 2015) (same). That creates an individualized endeavor. The district court must interpret each arbitration agreement and identify which ones warrant extension to the class's claims against GM.

Because the district court has not answered either question, we vacate for further proceedings over whether questions of arbitrability bar class certification. The record leaves a mere sample of 20 arbitration agreements, some of which bind the consumer in claims against "third parties who do not sign this Lease," R.245-58 at 16, and some of which do not. This twenty-contract document does not permit us to estimate the number of different arbitration agreements in this 800,000-car class. The district court should decide in the first instance whether arbitration questions overwhelm the common ones in this class.

We disagree with what the district court did say—that GM waived arbitration as to the entire class when it waived arbitration as to the named plaintiffs. Federal courts may not resolve the rights of "third persons not parties to" suit. *Singleton v. Wulff*, 428 U.S. 106, 113 (1976) (plurality op.). A party who proposes a class action may not tie the hands of absent class members *until* the court certifies and appoints them the class representative. *See Smith v. Bayer Corp.*, 564 U.S. 299, 315–16 (2011). That is why pre-certification stipulations do not bind a

class. *Standard Fire Ins. v. Knowles*, 568 U.S. 588, 593 (2013). A person who makes a stipulation makes an "express waiver" that *he* concedes some fact. 9 John Henry Wigmore, *A Treatise on the System of Evidence in Trials at Common Law* § 2588, at 821 (J. Chadbourn rev. 1981). But that precertification stipulation "does not bind anyone but himself." *Knowles*, 568 U.S. at 593. For the same reason, waiver, or GM's "voluntary relinquishment" of the right to resolve the named plaintiffs' claims by trial, *Waiver*, Black's Law Dictionary (12th ed. 2024), does not speak for the unnamed class members.

We vacate the order of the district court certifying the class and remand for further proceedings consistent with this opinion.

———————————

## CONCURRENCE

———————————

THAPAR, Circuit Judge, concurring. I join the majority's excellent opinion in full. I write separately to address an undertheorized area of law: standing in class actions.

This case presents two issues related to standing in class actions. First, who must suffer an injury in fact? Everyone agrees that the class representatives must.

Second, what happens if one of the aspiring class representatives seeks to certify a class when he's suffered a harm different than some of the potential class? That is true here. The named plaintiffs' cars experienced a shudder or hard shift while driving, but some of the cars of the proposed class did not. Instead, the named plaintiffs alleged that the threat of the shudder or hard shift makes these class members' cars worth less. This disparity between the named plaintiffs' injuries and those of some prospective class members is called the "disjuncture problem."

Courts have struggled with the disjuncture problem for decades. Some courts have applied Article III standing principles to determine whether a plaintiff may sue on behalf of class members who suffered different injuries or who are perhaps not injured at all, in the Article III sense. But other courts have said that a "disjuncture" doesn't eliminate a court's ability to hear a given case. Rather, it raises a question best addressed during Rule 23's certification inquiry.

The latter view is the better one. Courts should look to Rule 23, not Article III, in determining whether a named plaintiff may represent a class of members who assert different injuries—or no injury at all.

I.

The issues in this case are easier to think about in bite-sized chunks. Here there are two issues: standing and Rule 23. Addressing these concepts separately reveals how each functions and ultimately works together.

Start with standing.  Anytime a plaintiff tries to sue in federal court, he must be able to answer the question, "What's it to you?"  Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983).  If a plaintiff can't answer that question, then he doesn't have standing.

In many disputes, it's easy to determine whether a plaintiff has standing.  A party to a contract can say his counterpart breached the terms of a deal and thus caused him harm.  Or an assault victim can say a tortfeasor harmed him.  Or, relevant here, a plaintiff who bought a defective product can say that he was injured when that product stopped working as it should.

But in the class action context, the inquiry is murky.  Does only the class representative need to have standing?  What about the unnamed class members?  If unnamed members don't have standing, can the case proceed?  These questions have troubled courts and commentators for years.

In answering these questions, courts must focus on the distinction between Article III standing and the requirements of Rule 23.  For one, they "spring from different sources." 1 W. Rubenstein, Newberg on Class Actions § 2:6 (6th ed. 2025).  Standing doctrine comes from Article III of the Constitution, which confines the jurisdiction of federal courts to "Cases" and "Controversies."  To make out a case or controversy, a plaintiff must have a "personal stake" in any dispute that he seeks to litigate.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

In early analogues to class actions called bills of peace, the original plaintiff (the representative party) had to establish his personal stake at the outset of the proceeding.  *Mayor of York v. Pilkington* (1737) 25 Eng. Rep. 946, 947 (Ch.).  And, if other parties (the unnamed parties) were involved on the plaintiff's side, they didn't have to prove *their* entitlement to relief until later in the proceeding.  *Cf.* Story, *Commentaries on Equity Pleadings* § 99, at 99 (2d ed. 1840).  The idea was that joining such parties was impracticable, so the original plaintiff wasn't punished for not doing so at the start (he could always join them later).  *Id.* § 72, at 74–78.  And, as this court explained, "[n]o one doubted that bills of peace created justiciable cases."  *Fox v. Saginaw County*, 67 F.4th 284, 299 (6th Cir. 2023); *cf. Smith v. Swormstedt*, 57 U.S. (16 How.) 288, 298–303 (1853).  Why?  One reason is that while unnamed parties could participate, they

weren't entitled to relief until the representative party established *the unnamed parties' stake* in the proceeding. Story, *Commentaries*, § 99. So courts weren't awarding *judgment* to uninjured parties.

It's true that the original plaintiff in a bill of peace often had to have the same kind of claim as the absent parties. *Cf. Smith*, 57 U.S. (16 How.) at 298. This requirement sometimes arose when one of several creditors wanted to collect from a deceased debtor. Story, *Commentaries*, § 99. So a particular creditor could bring a representative suit on behalf of all creditors, since they all had the same "interest" in getting paid. *Id.* But this common interest requirement doesn't change the jurisdictional analysis—instead, it was a prudential protection to *protect* unnamed parties. How? By making sure the named plaintiff wouldn't resolve the rights of other absent parties in ways that unfairly harmed them. *Id.* In the creditor example, the common claim or interest requirement ensured that one creditor wouldn't unfairly prejudice the others by taking too much money. *Id.* This determination—the adequacy of one plaintiff representing the unnamed parties' interests—resembles the analysis courts conduct under Rule 23. After all, Rule 23 directs courts to consider, among other things, whether there are common questions and whether a named party can adequately represent the unnamed plaintiffs.

This history reveals that Article III isn't a restraint on mass representation; in the class action context, it's a restraint on giving relief to uninjured parties.[1] Indeed, from the early days of the Republic, courts explained that their jurisdiction—the "power to hear and determine the subject matter in controversy"—meant the power "to render a judgment or decree upon the rights of the litigant parties." *Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 718 (1838); *cf.* 2 *The Records of the Federal Convention of 1787*, 430 (M. Farrand ed. 1966) (James Madison stating that courts could only take actions that were of "a Judiciary Nature"). And in *Mills v. Duryee*, Justice Story analogized between jurisdiction and judgment: If a court had jurisdiction

---

[1]It's true that a court also needs jurisdiction before it can declare the law. *See Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868). But in class actions, once the court has jurisdiction over the named parties, it may declare the law as to those parties. Then, once the case proceeds to the judgment stage, the unnamed parties must demonstrate they have standing, too. *Cf. Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (emphasizing that any party invoking the jurisdiction of a federal court "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" (citation omitted)); *Biden v. Nebraska*, 600 U.S. 477, 489 (2023) (explaining that if at least one plaintiff has standing, the suit may proceed).

over the parties, the judgment could be valid.  11 U.S. (7 Cranch) 481, 484–85 (1813).  If not, the judgment wasn't legitimate.  *See id.*  Courts have followed this framework in the centuries since.  *Cf. Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring) (explaining that "Article III does not give federal courts the power *to order relief* to any uninjured plaintiff, class action or not" (emphasis added)).

The fact that some jurisdictional analysis now happens to fall under the label "standing doctrine" doesn't change that principle.  After all, standing is a "jurisdictional doctrine." *Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 8 (2023) (Thomas, J., concurring).  It exists to ensure courts can decide disputes historically resolved through the judicial process, while forbidding courts from exercising power over people who never fell within the sweep of a court's authority.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).  In other words, it protects core jurisdictional power, as it was historically defined.  *See Rhode Island*, 37 U.S. at 718.  And, as the history of the bills of peace shows, mass representation didn't offend jurisdiction.  In a proceeding brought under a bill of peace, if there was a valid controversy between one plaintiff and a defendant, courts could add unnamed parties.  And that didn't create a jurisdictional problem until the court entered judgment for someone without a legitimate interest in the dispute.[2]

All told, history tells us that (1) a named plaintiff must have a personal stake in a dispute from the beginning, and (2) unnamed parties can be a part of a suit without establishing their entitlement to relief at the outset, but those parties must do so before a court may order relief on their behalf.

While standing doctrine governs who can bring a suit and what relief courts can grant, Rule 23 governs what happens during a suit.  Like all the Federal Rules of Civil Procedure, Rule 23 is a procedural tool regulating how cases flow through courts.  It was designed to organize disparate procedural mechanisms into a "coherent set of statements which would govern the

---

[2]This historical inquiry is relevant because "history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider."  *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008).  If certain types of cases fell within a court's traditional powers, courts shouldn't shut their doors to those cases today.  *Cf. TransUnion*, 594 U.S. at 423–25.

conduct of all civil litigation in the federal courts." John G. Harkins, Jr., *Federal Rule 23—The Early Years*, 39 Ariz. L. Rev. 705, 705 (1997). Rule 23, after all, stems from a prudential judgment that it's better to handle some cases en masse than in discrete chunks. *Cf. Sosna v. Iowa*, 419 U.S. 393, 403 (1975).

Rule 23's history confirms this purpose. When older procedural tools struggled with joining large numbers of claims, the body responsible for suggesting new rules sought to replace the old rule with a more flexible version. David Marcus, *Response: Making Adequacy More Adequate*, 88 Tex. L. Rev. 137, 146 n.46 (2009). So it came up with Rule 23. This change was a watershed: Opponents criticized Rule 23 classes as a "form of 'legalized blackmail'" that could force defendants to the table. Arthur R. Miller, *Of Frankenstein Monsters and Shining Knights: Myth, Reality, and the "Class Action Problem"*, 92 Harv. L. Rev. 664, 665 (1979) (citation omitted). But proponents saw a tool that would allow for the joinder of many parties, thereby creating a "panacea for a myriad of social ills." *Id.*; *cf.* Brian T. Fitzpatrick, *The Conservative Case for Class Actions* 9 (2019). The proponents won out, creating the Rule 23 courts know today. If plaintiffs show numerosity, typicality, commonality, and adequacy, their claims may be best heard together (assuming they meet Rule 23's other requirements). If not, the claims should stand alone.

All told, looking at these requirements one-by-one reveals some simple principles about how they fit together. A named plaintiff, like any plaintiff, must allege an injury in fact if he wants to get into court. The fact that a case is a class action doesn't change that result. After all, that a "suit may be a class action . . . adds nothing to the question of standing." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n. 20 (1976). A joinder rule like Rule 23 can't create standing when no standing exists. 1 W. Rubenstein, Newberg on Class Actions § 2:5 (6th ed. 2025). Instead, Rule 23 operates as a guidepost for whether it's efficient to bring a particular suit en masse.

Thus, at the beginning of the suit, courts should consider the same question that they always do: has the plaintiff, the would-be class representative, alleged an injury in fact? If so, the plaintiff has provided a satisfactory answer to Justice Scalia's famous question: "What's it to you?" Scalia, *supra*, at 882. A case or controversy exists.

II.

Here, there's no question that the named plaintiffs have standing.  The named plaintiffs had a car that experienced a shudder and hard shift, and thus, overpaid for a defective product.  *Id.*  That combination is sufficient to create an injury in fact.  *Id.*

But what happens when the named representatives experience an injury in fact, while some of the potential class members may have experienced a different injury or may not have experienced an injury at all?  This situation is where the "disjuncture problem" kicks in.  The name comes from the gap—the disjuncture—between what the named plaintiff says he suffered and what the class plaintiffs may have experienced.  Any court considering this difficult issue faces a confusing situation.  On the one hand, plaintiffs can cite Supreme Court and circuit court caselaw saying that only the named plaintiff needs standing.  Thus, courts often certify classes when the named plaintiff suffered a different injury than some of the potential class members.  On the other hand, defendants can cite caselaw saying that the class should not even proceed to the certification stage because the named plaintiff doesn't have standing to sue on behalf of other litigants with different harms.  So what's a court to do?

A.

Courts facing a disjuncture have adopted two conflicting approaches.  Some courts simply find that the class representative lacks standing to pursue the class members' claims because he did not suffer their potential injuries, if any.  *See, e.g.*, *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266 (11th Cir. 2000); *cf. Barrows v. Becerra*, 24 F.4th 116, 129 (2d Cir. 2022).  Other courts will say that the class representative has standing to pursue his own claims, and then discuss any disjuncture as an issue for class certification.  *See, e.g.*, *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 424 (6th Cir. 1998).  This first approach is called the "standing approach," and the second is the "class certification approach."  1 W. Rubenstein, Newberg on Class Actions § 2:6 (6th ed. 2025).

These doctrines are not well-defined.  Both approaches have some grounding in Supreme Court dicta and circuit court caselaw.  That said, courts often pursue one of these approaches without discussing or acknowledging the other's existence.

1.

Start with the standing approach. Under the standing approach, a named plaintiff may litigate only on behalf of those whose harms are a close match for the harms he suffered.

This framework dates to a Supreme Court case called *Blum v. Yaretsky*, 457 U.S. 991 (1982). There, the Supreme Court considered a suit brought by nursing home residents. *Id.* at 993–95. The named plaintiffs claimed that they hadn't been given adequate notice of decisions to transfer them to a lower level of care. *Id.* But they also wanted to represent unnamed plaintiffs, some of whom were transferred to a higher level of care. *Id.* at 1001. The Supreme Court explained that the named plaintiffs didn't have standing to bring the claims on behalf of the higher-level transfers. Why? A plaintiff "who has been subject to injurious conduct of one kind" does not "possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Id.* at 999 (citation omitted). In holding that the plaintiffs lacked standing to bring these representative claims, the Court said that the "conditions under which such transfers occur are sufficiently different from those which [the plaintiffs] do have standing to challenge that any judicial assessment of their procedural adequacy would by wholly gratuitous and advisory." *Id.* at 1001. The *Blum* Court focused on the "kind" of injury and whether that injury placed the potential representative "within the class of persons who will be concretely affected." *Id.* at 999.

This approach is no relic of the 1980s. The Court has revisited the standing approach in more recent years, starting with *Lewis v. Casey*, 518 U.S. 343, 346 (1996). In *Lewis*, the Court explained that the "actual-injury requirement would hardly serve [its] purpose . . . if once a plaintiff demonstrated harm from one particular [harm], the court were authorized to remedy *all* [similar harms]." *Id.* at 357 (emphasis in original).

Applying this logic to the facts here, a court would consider the harm the named plaintiffs allege (manifest defect leading to their cars' diminished value) and see whether it matched what some of the would-be unnamed plaintiffs claimed (a defective car with diminished value). These harms are similar, but they're not identical.

Thus, there's a key wrinkle. How close of a match must the named plaintiff's injury be to the unnamed class members' injuries to make out an Article III case or controversy? Is it a mirror image? Or something less?

Unsurprisingly, courts splinter when faced with that question. Some courts take a strict approach, explaining that the named plaintiff must have exactly the same "set of concerns" as the potential unnamed members. *See, e.g.*, *Barrows*, 24 F.4th at 129 (quotation omitted); *Fox v. Ritz-Carlton Hotel Co.*, 977 F.3d 1039, 1046 (11th Cir. 2020). Other courts adopt a more flexible approach, reading *Lewis* to require only a general "similarity of injury between the named plaintiffs and passive class members." 1 W. Rubenstein, Newberg on Class Actions § 2:6 (6th ed. 2025); *see, e.g.*, *Armstrong v. Davis*, 275 F.3d 849, 867 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504–05 (2005). Courts applying this latter view are "careful not to employ too narrow or technical an approach. Rather, [they] must examine the questions realistically . . . [and] reject the temptation to parse too finely, and consider instead the context of the inquiry." *Armstrong*, 275 F.3d at 867.

Applying those various tests here yields mixed results. Under a strict framework, the same standing analysis outlined above applies: The harms between the would-be named plaintiffs and potential unnamed members aren't the same, because the named plaintiffs' cars manifested the defect, but some of the unnamed plaintiffs' cars didn't. Thus, under this framework, Article III bars the suit from proceeding in its current form. But under the more flexible test, perhaps Article III doesn't stand in the way of this suit, as a court could find that both the named and unnamed members suffered a similar injury because their cars all had diminished value.

No matter the approach, these tests fall short. Both tests, whether they use flexible language like "parse too finely" and "context," or strict language like "same set of concerns," are vague. *Id.* These abstract standards make for "a terribly confusing way to decide something as essential as the . . . jurisdiction of the court." *Barry v. O'Grady*, 895 F.3d 440, 448 (6th Cir. 2018) (Sutton, J., dissenting). What's more, it's not clear what either concern has anything to do with Article III's case or controversy requirement. After all, the named plaintiff has suffered an

injury, even if it's not identical to the unnamed would-be plaintiffs' injuries. Thus, there is a case or controversy between the named plaintiff and the defendant.

All told, while lacking a robust theoretical basis, some circuits read the Supreme Court's caselaw as suggesting that the standing inquiry requires an examination of how the harms that the named plaintiff suffered compare to the harms that the unnamed class members suffered. This framework is thus called the standing approach.

2.

Next, consider the class certification approach. This framework says that once a named plaintiff shows he has standing to bring a claim, the standing inquiry is at an end, and the court should next examine if the named plaintiff can show that the proposed class meets the Rule 23 prerequisites. Like the standing approach, this framework asks courts to compare the harms of the named representative and the would-be unnamed class members. But it does so through the lens of Rule 23, not justiciability.

As with the standing approach, the class certification approach is grounded in Supreme Court caselaw. In *Sosna*, the Supreme Court considered a named plaintiff who was denied a divorce after failing to live in Iowa for one year (the minimum period required to get a divorce in the state). 419 U.S. at 395. The Court explained that standing "does not automatically establish that [a named plaintiff] is entitled to litigate the interests of the class she seeks to represent." *Id.* at 403. Rather, concluding that the named plaintiff has standing "shift[s] the focus of examination from the elements of justiciability to the ability of the named representative to 'fairly and adequately protect the interests of the class.'" *Id.* (quoting Fed. R. Civ. P. 23(a)). Thus, *Sosna* indicates that the Article III standing analysis, like any other justiciability inquiry, precedes questions of class certification under Rule 23. According to *Sosna*, a court considering a class with a potential disjuncture should first look at whether the individual named plaintiff has standing and then focus on how that individual's injury relates to the class at issue through the lens of Rule 23. The Court followed a similar path in subsequent cases. *See, e.g.*, *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–60 (1982).

Applying that logic here, we'd look to whether the named plaintiff has standing. And here, as the majority opinion correctly notes, he does. Why? He alleged a diminished value injury when his car manifested a shudder or hard shift. Next, we'd look to whether he is suited to represent the class, running through Rule 23's familiar requirements. As the majority opinion explains, the class at issue would fail—not because there's no case or controversy, but because the plaintiff's proposed class lacks some of these necessary characteristics.

Five circuits, including ours, follow this approach. *See, e.g.*, *Fallick*, 162 F.3d at 424.[3]

\*

In sum, there are two plausible ways to resolve classes that feature a disjuncture between the harms the named plaintiff says he suffered and the harms that some of the members of the prospective class may have suffered. Both approaches are grounded in Supreme Court precedent and various circuits have adopted each of the two tests.

## B.

Reasoning from first principles, the class certification approach is superior to the standing framework. As outlined above, Article III standing is a constitutional doctrine that asks whether a definite case or controversy exists. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Once the named plaintiffs establish they have standing, there is a live case or controversy.

As to the other prospective class members' claims, a court must decide whether the would-be unnamed plaintiffs' injures are similar to the named plaintiff's valid case or controversy. That's a textbook prudential determination. And such determinations are the touchstone of Rule 23, which gives courts a framework to consider when parties can bring class actions in the first place. Thus, Rule 23 is the correct tool to use in evaluating the relationship between the named plaintiff and the unnamed parties in a particular lawsuit. *See Lab'y Corp. of Am. Holdings v. Davis*, __ S. Ct. __, 2025 WL 1583302, at \*5–6 (U.S. June 5, 2025) (Kavanaugh, J., dissenting) (applying Rule 23's predominance requirement to classes with

---

[3]*In re Asacol Antitrust Litig.*, 907 F.3d 42, 49 (1st Cir. 2018); *Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 133 (3d Cir. 2022); *Chavez v. Plan Benefit Servs., Inc.*, 108 F.4th 297, 312 (5th Cir. 2024); *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 967 (9th Cir. 2019).

injured and uninjured members).  Such a determination is not a constitutional question.  Instead, it revolves around how a given plaintiff relates to others.

The class certification approach aligns with the broader framework of federal civil procedure.  Rule 23 is a device for aggregating claims.  It has nothing to say about jurisdiction.  Thus, satisfying Rule 23 doesn't create standing when standing doesn't exist.  *Simon*, 426 U.S. at 40 n.20.  And failing to satisfy Rule 23 doesn't destroy a valid claim when such a claim exists.  Indeed, this principle governs federal court practice throughout the federal rules.  *Cf.* Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, & Howard M. Erichson, *Federal Practice and Procedure* § 1681 (3d ed. 2024) (hereinafter "Wright & Miller").  In various contexts, if a plaintiff joins a non-justiciable claim with a justiciable claim, or if a party with standing joins a party without standing, the court doesn't dismiss the action for want of jurisdiction.  *See, e.g.*, Fed. R. Civ. P. 13, 14, 18, 21; *Frank v. Gaos*, 586 U.S. 485, 493 (2019) (explaining that what matters is whether *any* named plaintiff has standing).  Instead, it applies the relevant joinder rule and dismisses the improperly joined claim or the party without standing.  The proper party then proceeds in the normal course.  *See* Fed. R. Civ. P. 21.

On the other hand, adopting the standing approach would return courts to an era when misjoinder ended an action.  *See* Benjamin J. Shipman, *Handbook of Common Law Pleading* §§ 226–28 (3d ed. 1923).  Indeed, at common law, the "perils of misjoinder" were "like the perils of war and contagious disease."  Edson R. Sunderland, *Joinder of Actions*, 18 Mich. L. Rev. 571, 575 (1920).  Why?  They were deadly, ending actions immediately.  *Id.*

But it would be a mistake to return to that rule out of a desire to protect Article III's case or controversy requirement.  Why?  The harsh common law approach did not safeguard courts from hearing matters that sat outside Article III.  Instead, the rule prevented courts from hearing cases that they actually should have heard.  This rule resulted from two historic procedural quirks that courts gradually abandoned.

First, there were common law causes of action (like assumpsit and trover), each of which demanded its own form of process.  *Id.* at 574–75.  And common law jurists didn't want to allow

one action—with a certain form of process—to collapse into another action, with a separate form of process. *Id.* So courts punished parties who joined one action to another.

Second, courts used to issue different judgments (judgments *quod sit in misericordia* and judgments *quod capiatur*) for different causes of action. *Id.* at 578. And they didn't want to allow a cause of action that merited one kind of judgment to join with a cause of action that deserved another. *Id.* All told, these procedural matters became irrelevant when the civil actions and the judgments we know today replaced the historic causes of action and judgments. *Id.* So, as the nineteenth century progressed, equity courts developed rules to allow an "action [to] proceed on its merits despite an initial misjoinder or nonjoinder whenever the error could be corrected without adversely affecting the parties to the action." Wright & Miller, *supra* § 1681.

When equity merged into law, the Federal Rules of Civil Procedure adopted this forgiving approach to misjoinder. *See id.*; Fed. R. Civ. P. 21 advisory committee's note. And when the advisory committee adopted Federal Rule of Civil Procedure 23, it incorporated this equitable principle, noting "an order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). What's more, Rule 23 is not only "derived from" equity—it's an expansion of English equitable rules. Wright & Miller, *supra* 1681. How? At equity, parties had to apply to the court to amend a class. Fed. R. Eq. 43 (1912) *reprinted in The New Federal Equity Rules Promulgated by the United States Supreme Court* 172 (1912). And Rule 23 doesn't require such an application. Thus, a class need not be dismissed just because there's misjoinder.

This principle holds true even when a claim with standing is joined to claims without standing, thereby creating a disjuncture problem. Again, courts facing a class with both injured and potentially uninjured parties are making a determination about joinder. As far back as 1952, the Supreme Court wrote that the proper solution to cases when a party without standing was accidentally joined to a party with standing was to use Rule 21—which provides that parties who are misjoined should be removed from the case. *Mullaney v. Anderson*, 342 U.S. 415, 417 (1952); Riley T. Keenan, *Minimal Justiciability*, 109 Minn. L. Rev. 1, 30 (2025). And under Rule 23, federal courts can remove claims from absent class members who don't have standing

and allow the justiciable claims to proceed, so long as Rule 23's other requirements are satisfied. *Cf.* 1 W. Rubenstein, Newberg on Class Actions §§ 2:2; 2:8 (6th ed. 2025).

That makes sense.  Otherwise, courts would have to adopt an eggshell class principle, under which the presence of a single unnamed plaintiff without standing (or with a different harm than the class representative) would defeat a class.  After all, standing is a constitutional requirement.  So if courts determine that a class is defeated when plaintiffs don't have standing, the presence of even one such unnamed plaintiff would mean the court can't certify a class.  But that can't be right.  The Supreme Court has repeatedly explained that "standing is not dispensed in gross." *Lewis*, 518 U.S. at 358 n.6; Wright & Miller, *supra* § 3531.16.  Thus, what matters is not the standing *of* an entire class but the standing of the individual members *in* a given class.  Whether a given member has standing implicates Article III.  Whether the *class* should exist hinges on Rule 23:  numerosity, typicality, commonality, and adequacy.

This distinction coheres with the Supreme Court's recent standing caselaw.  In *TransUnion*, the Supreme Court held that "[e]very class member must have Article III standing *in order to recover individual damages*."  594 U.S. at 431 (emphasis added).  That conclusion necessarily follows from the fact that Article III doesn't give courts the power to "*order relief* to any uninjured plaintiffs, class action or not."  *Id.* (quotation omitted) (emphasis added).  *TransUnion* teaches that when courts exercise their judicial power by entering judgment, they can't award damages to uninjured parties.  Thus, current doctrine already prevents uninjured parties from recovering damages.

All told, there are several reasons to think the class certification approach is preferable to the standing approach.

### III.

So how should a court confronted with a disjuncture—in which the named plaintiff has standing but members of the class don't—proceed?  In brief, it should do what courts always do.  If the named plaintiff is seeking to certify a class where *none* of the would-be unnamed parties has standing, the court should apply Rule 23 as an analogue to traditional joinder rules, which say such people shouldn't join the suit.

But what happens when the potential class merely *could* contain individuals who don't have standing to sue? This situation doesn't change the analysis because courts should still conduct a standard Rule 23 predominance inquiry. After all, Rule 23 governs which parties courts can join in class actions. And it requires looking at whether removing non-justiciable claims and class members involve individual questions, such as whether a particular buyer's car really was defective. *See, e.g.*, Fed. R. Civ. P. 23(b)(3). If so, then the court faces headwinds if it wants to certify the class because the individual assessments would predominate over the common questions. But if there aren't individual inquiries, the class should proceed. Why? Assuming the class meets the other Rule 23 requirements, like numerosity, commonality, and adequacy, and there's a predominant question of law or fact, Rule 23 is satisfied, too. Of course, if at any point the district court determines that certain plaintiffs don't have standing, the district court must dismiss them and can't award them relief.

One response is that this approach gives Rule 23 classes a great deal of power. If a court were to certify a class that has uninjured members (i.e., where the only determination that must be made is whether the person purchased the product), the logic goes, it could force corporations to the table and lead to settlements. That's true. And it's a large part of why people objected when Rule 23 became part of the rules governing civil procedure. *Cf.* Miller, *supra*, at 665. But the solution to that pragmatic concern isn't to "twist[] the law by the tail" by saying there's a constitutional issue, namely no Article III case or controversy. *Am. Newspaper Publishers Ass'n v. NLRB*, 345 U.S. 100, 113 (Clark, J., dissenting). Instead, courts should either accept that Rule 23 is a powerful and consequential addition to our civil procedure framework or change the rule. *Cf.* 28 U.S.C. § 2072. Until then, judges must apply the rules as written.

What's more, while Rule 23 classes do have power, their might isn't an automatic burden on corporations or society. Why? Rule 23's framers recognized the potential for abuse and provided a protective mechanism: A district court's decision certifying a class is immediately appealable. Fed. Rule Civ. P. 23(f). Indeed, the defendants used that very mechanism to defeat class certification here. Future parties can follow their lead when district courts go too far and don't conduct the rigorous analysis necessary to ensure class certification is proper.

\*

Put Rule 23 aside for a moment. Imagine this were a case in which four friends, who each bought the same truck, sued after they had a transmission problem. A fifth friend then shows up to court to get in on the action. What happens? The court looks to joinder rules to see if it can let the fifth person into the suit. Under those rules, it'd be a mistake to join the newcomer if the court knew he didn't have standing. But if he had standing, the court could join him to the case. And, if it later became clear the friend didn't really have standing, the district court should remove him from the suit but let the original four continue.

The principle doesn't change just because the suit gets bigger. If there are four thousand buyers instead of four friends, a court would still look to joinder rules (once it determines the named plaintiffs have standing). And this time, the court would use Rule 23's joinder principles because the case is so large. Just as in a normal case, the court can't join a bunch of consumers who it *knows* don't have standing, as that violates traditional joinder rules. But if the group were a mixed bag of people as it almost always is, the court would simply do what any court does when determining whether to certify a class action: apply Rule 23. That means looking at whether there are common questions of law or fact and what predominates—individual questions, like whether the buyer's particular car manifested a defect, or a common question. If the individual concerns predominate, the court can't join the parties and thus can't certify the class. But if the common question predominates, the court can proceed with certification. At bottom, the history of jurisdiction, bills of peace, Rule 23, and joinder all point towards this result.

In conclusion, when the named parties have standing, there's a live case or controversy. If other parties want to join in, the court considers whether joinder rules allow their participation. Rule 23 simply sets out how joinder works in the class action context. Since the majority opinion correctly applies Rule 23, I concur.

---

**CONCURRENCE**

---

NALBANDIAN, Circuit Judge, concurring.  I join the majority opinion in full, but I write separately to address two points.  First, I believe this court should have resolved the standing question by holding that a class cannot be certified with members who have not suffered an injury in fact.  Second, a benefit-of-the-bargain theory of injury is inherently speculative and insufficient to permit Article III standing for class members who never experienced either alleged defect.  So I would hold that the district court erred in certifying a class in which many plaintiffs lack standing.

**I.**

Begin with whether this court can—or indeed must—resolve the standing question in this appeal.  As the majority notes, the unnamed plaintiffs in a putative class are not parties to the suit before certification.  And so the district court "need not worry about their standing until it certifies the class."  Maj. Op. at 7 (quoting *Fox v. Saginaw County*, 67 F.4th 284, 296 (6th Cir. 2023)).  And yet that is exactly what happened here.  The district court first certified the proposed classes, but then reserved the standing question as to the unnamed plaintiffs, holding that "the appropriate opportunity to address claims of absent class members whose vehicles never have manifested any defect is a Rule 56 motion for summary judgment." *Speerly v. Gen. Motors*, LLC, 343 F.R.D. 493, 522 (E.D. Mich. 2023).  The court then noted that at the certification stage it was enough "that the plaintiffs have *alleged* that every class member suffered a loss due to overpaying for defective vehicles." *Id.* at 523.

It's true that, despite holding that all unnamed plaintiffs must have standing to recover individual damages under a class judgment, the Supreme Court has so far declined to resolve whether they also need standing at the class certification stage. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 408 n.4 (2021).  And yet leaving this question unanswered imposes real costs, as "the consequences of overbroad and incorrectly certified damages class actions can be widespread and significant." *Lab'y Corp. of Am. Holdings v. Davis*, 145 S. Ct. 1608, 1612

(2025) (mem.) (Kavanaugh, J., dissenting).  So the Supreme Court's failure to find the perfect vehicle to resolve class-action standing doesn't detract from the question's importance.  Nor does it prevent us from resolving this issue when it's squarely presented to us.[1]  *See Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925, 934 (4th Cir. 2025) ("Whatever the resolution of the question posed in *Laboratory Corp.*, the presence of 32% of uninjured members in a proposed class strikes us as much too high").  In any event, this court has an obligation to provide guidance to the district court on remand.  *See United States v. Campbell*, 168 F.3d 263, 268 (6th Cir. 1999).  With the benefit of extensive briefing, the en banc court is well situated to discharge this obligation.  And so I would address the question and hold that a district court cannot certify a putative class when a significant number of unnamed plaintiffs lack standing.

The district court's contrary holding was—in a word—error.  Any party invoking the jurisdiction of a federal court "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'"  *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  And while unnamed plaintiffs are not parties subject to the court's jurisdiction before class certification, they are after.  How else could the court issue a binding judgment as to their claims?  As Justice Scalia noted, the class action form, like "traditional joinder (of which it is a species), merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits."  *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins.*, 559 U.S. 393, 408 (2010) (plurality).  And since it is only a tool for aggregating claims, the class action "leaves the parties' legal rights and duties intact and the rules of decision unchanged."  *Id.*  Because Rule 23 didn't alter the fundamental nature of our judicial system, class action requirements "must be interpreted in keeping with Article III constraints."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997).  For that reason, the district court cannot defer the question of standing for these unnamed plaintiffs until summary judgment.

---

[1]The Supreme Court has stated that the resolution of class-certification issues is "logically antecedent to the existence of any Article III issues." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997).  As a result, issues of class certification "may properly be treated before Article III standing." *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999).  This proposition, though, is prudential and does not preclude the reviewing court from reaching the substance of a properly presented standing challenge.  So we need not blind ourselves to a constitutional error even if there are alternative grounds for reversing certification.

At the core of standing doctrine lies the separation of powers. The separation of powers "was not simply an abstract generalization in the minds of the Framers: it was woven into the document that they drafted in Philadelphia in the summer of 1787." *TransUnion*, 594 U.S. at 422–23 (quoting *INS v. Chadha*, 462 U.S. 919, 946 (1983)). That the judicial power is limited to specific cases and controversies "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "Relaxation of standing requirements is directly related to the expansion of judicial power," such that even small deviations from Article III's limits can upset the delicate balance inherent to our system of government. *Id.* at 408–09 (quoting *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring)). For that reason, these requirements cannot be waived, forfeited, or excused—regardless of the expediency of doing so. *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662–63 (2019). And standing remains "a bedrock constitutional requirement" necessary to the exercise of federal judicial power. *United States v. Texas*, 599 U.S. 670, 675 (2023). As a result, "any person invoking the power of a federal court must demonstrate standing to do so." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). Without that showing, the federal court lacks jurisdiction over the claim.

History also shows that the federal judicial power encompasses not just "the power to hear and determine the subject matter in controversy" but also the power "to adjudicate or exercise any judicial power over" those "parties to a suit." *Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 718 (1838). Even before the entry of final judgment, the exercise of federal judicial power can "profoundly affect the lives, liberty, and property of those to whom it extends."[2] *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,

---

[2]The judicial power of the United States includes—but is not limited to—the power to issue binding judgments. After all, the Supreme Court has long recognized that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution." *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812). Foremost among these is "the power to fine and imprison for contempt . . . inherent in all courts of record." *United States v. Barnett*, 376 U.S. 681, 699–700 (1964) (quoting *Watson v. Williams*, 36 Miss. 331, 341 (1858)). And courts also have "the power to issue subpoenas as to witnesses and documents." *U.S. Cath. Conf. v. Abortion Rts. Mobilization, Inc.*, 487 U.S. 72, 76 (1988). These powers, like all judicial power vested in the federal courts, are "jealously confined" by Article III's requirements. *United States v. Morton Salt Co.*, 338 U.S. 632, 641–42 (1950). So a federal court may only exercise them when considering a case or controversy properly within its jurisdiction, which in turn requires that the parties have standing to sue. This limitation is important. Our Constitution does not authorize federal judges to be either knights errant or inquisitors—pursuing our own ideals or

454 U.S. 464, 473 (1982). Which is why a court must assure itself of its jurisdiction as to all parties at every stage of the litigation. *See FBI v. Fikre*, 601 U.S. 234, 244 (2024). "Without jurisdiction the court cannot proceed at all in any cause" such that when it is lacking, "the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868). Rule 23 didn't—and couldn't—alter this fundamental limitation on the federal judicial power. *See* Fed. R. Civ. P. 82; *see also Amchem Prods.*, 521 U.S. at 613. And so the class action form doesn't exempt unnamed plaintiffs from Article III's essential requirement that they have a "personal stake" in the case. *Moore v. Harper*, 600 U.S. 1, 14 (2023) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

Nor is it too onerous for the district court to consider the standing of the unnamed class members prior to asserting jurisdiction over their claims. The added burden of this inquiry is not enough to require the wholesale disregard of this "irreducible constitutional minimum of standing." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (quoting *Lujan*, 504 U.S. at 560). Because "standing is not dispensed in gross," each plaintiff "must demonstrate standing for each claim that they press." *TransUnion*, 594 U.S. at 431. And each unnamed plaintiff in a class action joins his own claim or claims to the litigation. *See United States v. Sanchez-Gomez*, 584 U.S. 381, 387–88 (2018). After all, the class action is a tool of convenience, simply "provid[ing] a procedure by which the court may exercise . . . jurisdiction over the various individual claims in a single proceeding." *Id.* (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979) (alteration in original)). And once certified, the class has "important consequences for the unnamed members"—binding them to the ultimate judgment and limiting their ability to settle their individual claims. *Id.* (quoting *Sosna v. Iowa*, 419 U.S. 393, 399 n.8 (1975)). Which is why unnamed plaintiffs "are considered parties to the litigation in many important respects." *Id.*; *see e.g.*, *Zahn v. Int'l Paper Co.*, 414 U.S. 291, 301 (1973) (holding that absent class members are parties that must independently satisfy the amount-in-controversy requirement), *superseded by statute*, Judicial Improvements Act of 1990, Pub. L. No. 101-650, Title III, § 310(a), 104 Stat. 5089 (codified at 28 U.S.C. § 1367), *as recognized in Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 566 (2005).

rooting out evil wherever it is found. Our exercise of the judicial power entrusted to us is circumscribed. And we must respect these limitations at all points in the litigation—not just before entry of final judgment.

That's not to say that Article III requires each unnamed plaintiff to provide individualized proof of standing at certification. But it does prevent a district court from certifying a class when the record and class definition make clear that a significant number of the unnamed parties lack standing. *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 263–64 (2d Cir. 2006). As a result, a class must "be defined in such a way that anyone within it would have standing." *Id.* at 264. Such a requirement ensures that federal courts don't assert jurisdiction over claims that fall outside the constitutional limitations imposed on the judiciary by Article III.

This standing requirement for unnamed plaintiffs is also consistent with the historical practice that gave rise to the modern class action form. Though the history of Anglo-American representative litigation is complex, the bill of peace provides the clearest analogue to the modern class action. *See* Stephen C. Yeazell, *From Medieval Group Litigation to the Modern Class Action* 24–26, 214–20 (1987). This was an equitable practice that allowed a representative to sue on behalf of those similarly situated. It arose in response to the restrictive necessary-parties rule, which required "all persons materially interested . . . in the subject matter of the bill . . . to be made parties to the suit." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 832 (1999) (quoting *West v. Randall*, 29 F. Cas. 718, 721 (C.C.D.R.I. 1820) (No. 17,424) (Story, J.)). And this necessary-parties requirement in turn developed to prevent a multiplicity of suits addressing a common question.[3] 1 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* §§ 245–46, at 257–58 (1881). But the joinder of necessary parties could create large and unwieldy suits when many individuals had a common interest in the litigation. So the bill of peace was especially useful when the number of interested parties made traditional methods of joinder impracticable. Joseph Story, *Commentaries on Equity Pleadings* §§ 95–96, at 94–96 (2d ed. 1840). And once joined under the bill, the unnamed parties were, "in a sense, deemed to be before the Court." *Id.* § 99, at 102.

---

[3]This necessary-parties requirement was more than just a prudential protection for unnamed parties. The doctrine hinged on the idea that a court of equity "in all cases delights to do complete justice, and not by halves." *Knight v. Knight*, 24 Eng. Rep. 1088, 1089 (Ch. 1734). And so the inability to join a necessary party rendered a suit "unavoidably defective." Joseph Story, *Commentaries on Equity Pleadings* § 81, at 81 (2d ed. 1840). Though the bill of peace softened this rule's astringency, it extended only to those who were necessary parties due to their common interest. This is relevant to our modern jurisdictional inquiry because "history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008). And so when the history speaks with one voice to show that the bill of peace was limited to parties with a common interest, we should listen.

That is not the same as saying that the bill of peace allowed a court of equity to join necessary parties over whom it lacked jurisdiction. Indeed, lack of jurisdiction over a necessary party was often "fatal to the whole suit" as a court had "no ground for proceeding to any degree against them or their rights or interests." *Id.* § 81, at 81–83. The bill of peace was merely a tool of convenience, allowing representatives to join a multitude of necessary parties over whom the court could already assert jurisdiction.

Review of the English chancery courts' approach to these suits reveals that "in every case in which one person can be permitted to sue on behalf of himself and others . . . he and all for whom he appears, shall have an interest not merely in the property in question, but also in the object of the suit." *See* Frederic Calvert, *A Treatise upon the Law Respecting Parties to Suits in Equity* 20 (1837); *see also* Zechariah Chafee, Jr., *Some Problems of Equity* 201 (1950) ("In such situations, each member of the multitude had the same interests at stake as every other member."). For example, a group of tenants could represent all the tenants of an estate because they all were united in interest since the lord's assertion of "free warren" raised a question of "whether there were sufficient common left for the tenants." *How v. Tenants of Bromsgrove*, 23 Eng. Rep. 277, 277 (Ch. 1681). And certain named ore workers and lead mine owners could represent all others within a parish because they all shared a common interest in the amount of the tithe due on lead ore. *See Brown v. Vermuden*, 22 Eng. Rep. 802, 802 (Ch. 1676). Because of this unity of interest, "[t]he common questions were the only questions in these old bills of peace." Chafee, *supra*, at 158.

Even as the bill of peace expanded beyond cases concerning manorial rights and obligations, the chancery courts emphasized the continued requirement of a unity of interest among the parties. For instance, a group of fishermen could stand in for all those who might claim fishing rights in a river because the city of York's claim of an exclusive right in those waters "extends to all the defendants." *Mayor of York v. Pilkington*, 26 Eng. Rep. 180, 181 (Ch. 1737). And in a similar vein, a group of partners in a brasswork mill could represent the entire partnership in a suit against embezzling managers because the shared interest meant that the unnamed partners "were in effect parties" to the litigation. *Chancey v. May*, 24 Eng. Rep. 265, 265 (Ch. 1722). For that reason two sailors could represent the shared interest of the crew in

seeking an accounting of prize money.  *See Leigh v. Thomas*, 28 Eng. Rep. 201, 201 (Ch. 1751) (upholding the demurrer because the two sailors had not brought the suit on behalf of the entire crew, which raised the possibility of a multiplicity of suits).  So despite the doctrine's expansion, it remained necessary that the absent members in a bill of peace "be interested in the subject matter of controversy in the same way as their representatives."  Chafee, *supra*, at 164.

And this element persisted into the American equitable tradition.  The first case in which the United States Supreme Court addressed this issue concerned the schism between the northern and southern branches of the Methodist church—a schism brought on by the issue of slavery.  *See Smith v. Swormstedt*, 57 U.S. (16 How.) 288, 298 (1853); *see also* Geoffrey C. Hazard, Jr. et al., *An Historical Analysis of the Binding Effect of Class Suits*, 146 U. Pa. L. Rev. 1849, 1896 (1998).  As part of the separation, representatives from the southern branch sought an equitable accounting for their portion of the profits in the church's Cincinnati publishing business, which funded pensions for traveling ministers and their widows.  *Smith*, 57 U.S. at 301.  In response, the northern branch challenged the bill on the grounds that the southern representatives could not seek relief due to a lack of necessary parties.  *Id.* at 302.

As a result, the case squarely presented the Court an opportunity to clarify the requirements for a bill of peace.  Drawing from Justice Story's *Commentaries on Equity Pleadings*, the Court emphasized that in cases where "a few are permitted to sue and defend on behalf of the many, by representation, care must be taken that persons are brought on the record fairly representing the interest or right involved."  *Id.* at 303.  And the existence of the representative suit depended on "a common interest or a common right" that implicates each of the unnamed parties.  *Id.* at 302.  This requirement of common interest or right was understood to limit the bill of peace.  *See Ayres v. Carver*, 58 U.S. (17 How.) 591, 594 (1854) (noting in dicta the apparent absence of an "interest or estate in common . . . that would authorize the rights of the absent parties to be represented in the litigation").  And so the history shows that this equitable practice didn't give the Chancellor free rein to ignore the normal strictures of jurisdiction.

Despite this history, it is tempting to ask whether any of this matters.  Couldn't we wait until summary judgment to do the dirty work of separating the sheep from the goats and

determining who among the unnamed plaintiffs was injured? But this argument tiptoes around the elephant in the room. For many damages class actions, certification is the whole ballgame. The aggregation of hundreds of thousands of claims into a single suit is an immensely powerful tool that raises the "risk of 'in terrorem' settlements that class actions entail." *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 662 (2022) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011)). After all, "[e]ven in the mine-run case, a class action can result in 'potentially ruinous liability'" such that the district "court's decision to certify a class . . . places pressure on the defendant to settle even unmeritorious claims." *See Shady Grove*, 559 U.S. at 445 n.3 (Ginsburg, J., dissenting) (quoting Fed. R. Civ. P. 23(f) advisory committee's note to 1998 amendment). This is the crux of the "procedural unfairness to which class actions are uniquely susceptible." *In re Ford Motor Co.*, 86 F.4th 723, 729 (6th Cir. 2023) (per curiam).

And yet it's not only the defendant's ox that is gored. The district court's improper assertion of jurisdiction can just as easily harm the interests of an unnamed plaintiff. Before certification, a district court's judgment "cannot bind proposed class members." *See Smith v. Bayer Corp.*, 564 U.S. 299, 316 n.11 (2011). But once certified, the court's "judgments bind absentees with respect to their individual claims for relief." *Viking River Cruises*, 596 U.S. at 654 (citing *Cooper v. Fed. Rsrv. Bank of Richmond*, 467 U.S. 867, 874 (1984)). So when a district court certifies a class containing individuals who lack Article III standing, an adverse judgment could purport to bind parties over whom the court lacks jurisdiction. This would be, "by very definition," an ultra vires act. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 101–02 (1998). And such action severely prejudices the unnamed defendant by robbing them of the chance to have their claim adjudicated by a court with proper jurisdiction. After all, Article III only limits the federal judicial power, not that of the state courts. *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989). And the existence of federal standing is not a requirement of alternative dispute resolution—such as arbitration. Since Rule 23(c)(2) presumes the inclusion of all unnamed class members who don't opt out, there is a risk of procedural unfairness if the court doesn't assure itself of jurisdiction at certification.

The latent procedural unfairness of the class action device counsels against a special rule exempting these suits from the injury-in-fact requirement until the final stages of the litigation. Contrary to Judge Thapar's suggestion that such a holding would presage the return of the traditional perils of misjoinder, a lack of standing by some unnamed plaintiffs wouldn't always end the case. When a proposed class has a significant number of unnamed members without a concrete injury, those individuals lacking Article III standing must be excluded—just like in any other case before a federal court. And yet that doesn't mean that the case is over. It would be up to the plaintiffs and the court to redefine the class to exclude the parties shown to lack standing. And so I would hold that Article III's requirements apply with equal force to all suits before the federal courts, class action or not.

## II.

Since a district court cannot certify a class with a significant number of uninjured individuals, I would apply that standard to this case. And a review of the record shows that many unnamed class members lack standing because their claimed harm isn't an injury in fact.

To sue in federal court, a litigant must show that they have suffered or will suffer injury in fact—the "'[f]irst and foremost' of standing's three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (alteration in original) (quoting *Steel Co.*, 523 U.S. at 103). Injury in fact requires that the complained-of harm be concrete and particularized—not abstract or generalized—as well as being actual or imminent—not speculative. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (citing *Lujan*, 504 U.S. at 560–61). These elements ensure that "a federal court may resolve only 'a real controversy with real impact on real persons.'" *TransUnion*, 594 U.S. at 424 (quoting *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 87 (2019) (Gorsuch, J., concurring in judgment)). Since this is a constitutional requirement, Congress cannot sidestep injury in fact "by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo*, 578 U.S. at 339 (quoting *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997)).

When analyzing whether a harm is sufficiently concrete, we look to whether the claimed injury "has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a

lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (quoting *Spokeo*, 578 U.S. at 341). Because of their historical pedigree, certain "physical harms and monetary harms" can "readily qualify as concrete injuries under Article III." *Id.* at 425. But this doesn't mean that every harm measured in dollars and cents automatically qualifies. After all, to constitute a concrete injury the harm must be "real" rather than "abstract." *Hippocratic Med.*, 602 U.S. at 381. So the mere fact that an injury involves claimed economic loss doesn't excuse the requirement that its impact be actual rather than speculative. *See Clapper*, 568 U.S. at 410.

Here the district court held that the injury-in-fact requirement was satisfied because "the plaintiffs have *alleged* that every class member suffered a loss due to overpaying for defective vehicles at the point of sale." *Speerly*, 343 F.R.D. at 523. So the court certified the class even though many of the unnamed class members' vehicles have not manifested either defect. This theory suffers from a simple, but essential, conceptual flaw. Even if a defect manifests in someone else's product, that doesn't affect whether the plaintiff's own product functions as promised. As the Eighth Circuit has noted, "plaintiffs claiming economic injury do not have Article III standing in product defect cases unless *they* show a manifest defect." *Johannessohn v. Polaris Indus., Inc.*, 9 F.4th 981, 988 (8th Cir. 2021) (emphasis added).[4] It isn't until the plaintiff's own product manifests the defect that he is injured. Until that point, he has "necessarily received the benefit of [his] bargain" and has not overpaid. *Id.* (quoting *O'Neil v. Simplicity, Inc.*, 574 F.3d 501, 504 (8th Cir. 2009)). And so in products-liability cases, "it is not enough for a plaintiff to allege that a product line contains a defect or that a product is at risk for manifesting this defect," because "the plaintiffs must allege that their product actually exhibited the alleged defect." *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 530 (7th Cir. 2024) (quoting *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014)).

---

[4]The dissent argues that this case is distinguishable, pointing to the fact that the district court in *Johannessohn* held that the plaintiffs had not shown "evidence of a common design that necessarily manifests itself in discomfort, burns, or melting." *Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 981 (D. Minn. 2020). But the district court noted that the plaintiff's evidence did "establish that the vehicles are *at risk of* overheating and causing discomfort or injury." *Id.* at 983. That is the key similarity between *Johannessohn* and the current case. The plaintiffs here have provided evidence that certain model years have *a risk of* manifesting one or both of the defects. But still that doesn't mean that every single car included within the class definition will necessarily manifest either defect during its useful lifetime.

The plaintiffs here attempt to sidestep Article III's requirements by "recast[ing] their product liability claim in the language of contract law." *See Rivera v. Wyeth-Ayerst Lab'ys*, 283 F.3d 315, 320 (5th Cir. 2002). But it is a poor fit. At base, they argue that class members "without manifest defects should be able to piggyback on the injury caused to those with manifest defects." *See Johannessohn*, 9 F.4th at 988. How else could these individuals without manifest defects have been harmed? They bargained for a car without shift or shudder problems, and that is what they received—even if others who bought the same model car experienced those issues.[5] Indeed, the plaintiffs' theory hinges on the assumption that all class vehicles will malfunction during their normal useful life. But they rely on an "attenuated chain of inferences necessary to find harm." *Clapper*, 568 U.S. at 414 n.5. And so, without manifestation of either defect, the alleged harm is either too abstract or else relies on speculation. After all, "buyer's remorse, without more, is not a cognizable injury under Article III." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 281 (3d Cir. 2018).

That is not to deny that some other circuits have allowed class certification under similar theories of standing based on overpayment. To varying degrees, the First, Fifth, Seventh, Ninth, and Eleventh Circuits have ratified overpayment as injury in fact for products liability claims alleging that the plaintiffs were denied the benefit of their bargain. *See In re Evenflo Co., Mktg., Sales Pracs. & Prods. Liab. Litig.*, 54 F.4th 28, 37–38 (1st Cir. 2022); *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 722–23 (5th Cir. 2007); *In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748, 750–51 (7th Cir. 2011)[6]; *Nguyen v. Nissan N. Am. Inc.*, 932 F.3d 811, 819 (9th Cir. 2019); *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1084 (11th Cir. 2019). So this position does seem to have the numerical advantage. But if blindly following the majority of one's peers was always the wisest course, I doubt that lemmings would bear the brunt of so many jokes.

---

[5]Actually, they bargained for cars that had warranties that would cover defects like these. And some significant number of the plaintiffs received warranty repairs. To be sure, the complaint alleges that some plaintiffs never received adequate repairs—but not close to everyone in the class.

[6]While the Seventh Circuit upheld an economic injury theory of standing for plaintiffs, it has since clarified that this rule applies only when a "fundamental flaw . . . renders each product valueless" and did not apply when "there [wa]s only a potential risk of harm or defect." *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 530 (7th Cir. 2024).

As I see it, these holdings open the door to no-injury classes in products liability litigation, and in so doing, trivialize Article III's requirements and encourage the certification of classes bloated with members who suffered no real injury. Under the plaintiffs' benefit-of-the-bargain theory, a person who experienced no issues with their car is "injured" to the same degree and dollar amount as a person whose vehicle exhibited both defects in a way that inhibited its everyday use. This incongruity shows the pitfalls of watering down a contractual damages theory for a products liability case. In trying to convert an unmaterialized risk of possible future harm into a point-of-sale economic injury, the plaintiffs ask this court to endorse a one-size-fits-all approach to injury-in-fact that is divorced from reality. They ask us to suspend our disbelief and accept their actuarial alchemy, asserting that if each of the hundreds of thousands of class members had been warned of the possible risk of defects, they would have negotiated an identical discount to account for it. But this is a fabrication. For those class members that suffered one or both defects, this number has the potential to undercompensate their injury. And for those that did not suffer the defects, any recovery would amount to a windfall rather than an earnest attempt to remedy a harm.

When plaintiffs abstract the nature of the harm to avoid the fact that most of the class members didn't suffer any monetary damage, the answer cannot be to defer the issue until summary judgment. Certifying such classes gives the plaintiffs outsized bargaining power to extract an *in terrorem* settlement, abusing a process designed to give relief for real injuries.[7] And while large corporations are not the most naturally sympathetic defendants, such coerced settlements impose real costs that are passed on "to consumers in the form of higher prices; to retirement account holders in the form of lower returns; and to workers in the form of lower salaries and lesser benefits." *Lab'y Corp.*, 145 S. Ct. at 1612 (Kavanaugh, J., dissenting). Article III doesn't countenance such a result, and neither should we.

---

[7]It's true that Rule 23(f) makes a district court's decision to certify a class immediately appealable. And yet this establishes a discretionary appeal mechanism rather than an appeal as of right because the party seeking review has only "a right to file a petition for permission to appeal." *Santos-Zacaria v. Garland*, 598 U.S. 411, 426 (2023). And this court "has broad discretion to grant or deny" these petition such that we may weigh "any pertinent factor . . . in the exercise of that discretion." *In re Delta Air Lines*, 310 F.3d 953, 959 (6th Cir. 2002) (per curiam); *accord Nutraceutical Corp. v. Lambert*, 586 U.S. 188, 195–96 (2019) (citing Fed. R. Civ. P. 23(f) advisory committee's note to 1998 amendment.) So treating this provision as a panacea to any and all problems that might arise with the class certification process is leaning on a broken reed.

\*   \*   \*

Since I believe that the district court erred in asserting jurisdiction over the uninjured members of this class, I would vacate the class certification order on those grounds.  Still, I join the majority in full because the district court also abused its discretion by failing to conduct a rigorous analysis of predominance.

———————————

**DISSENT**

———————————

KAREN NELSON MOORE, Circuit Judge, dissenting.  Plaintiffs from twenty-six states have sued GM based on two universal defects, each of which allegedly was present in the 8L45 and 8L90 transmissions of every single GM truck and car manufactured between 2015 and 2019. These defects caused Plaintiffs to experience "shudder" and "harsh shift" problems.  According to Plaintiffs, GM could not repair their vehicles without redesigning the 8L transmission. Following a rigorous analysis of Plaintiffs' claims and proof, the district court certified twenty-six sub-classes under Federal Rule of Civil Procedure 23.  We would hold that the district court did not abuse its discretion in reaching this well-considered conclusion.

At bottom, this appeal concerns the type of rigorous analysis a district court must conduct when certifying a class.  But you might not know it from reading the majority.  The majority would have you believe that the district court's order was slapdash.  No matter that the district court carefully addressed the merits of Plaintiffs' claims and GM's defenses.  No matter that the district court's certification order includes over a dozen pages combing through the elements of every state-law claim in every relevant jurisdiction.  No matter that the district court painstakingly addressed the record evidence and every counterargument raised by GM. According to the en banc court, this is not enough, and we must vacate the district court's order.

The en banc court needs more, but how much more and to what end?  In our view, the majority seeks to erect insurmountable barriers to certification for plaintiffs who file class-action complaints against national manufacturers.  To reach this conclusion, the majority misinterprets binding Supreme Court precedent, ignores the purpose of class-certification motions filed pursuant to Rule 23(b)(3), and conducts a haphazard survey of the relevant state laws.  We reject this approach both for the result it reaches and the process it uses to reach that result.

# I.  BACKGROUND

The factual background is well-explained in the district court's prior opinions.  *See Speerly v. Gen. Motors, LLC*, 343 F.R.D. 493, 501–06 (E.D. Mich. 2023); *see also Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659, 667–72 (E.D. Mich. 2020).

We sit in review of the district court's order granting Plaintiffs' motion for class certification.  The thirty-nine named plaintiffs brought express- and implied-warranty, common-law fraud, and statutory-consumer-fraud claims against GM for its allegedly defective "cars and trucks equipped with its Hydra-Matic 8L90 and 8L45 transmissions."  *Speerly*, 343 F.R.D. at 501.  "The plaintiffs propose[d] the certification of 26 classes, state-by-state."  *Id.* at 502.

According to Plaintiffs, every GM car and truck manufactured between 2015 and 2019 and equipped with either the 8L45 or 8L90 transmission shares a "duo of common defects."  *Id.* at 504.  The universal-two-defect theory is as follows:  "(1) a defective Automatic Transmission Fluid (ATF), which lacks 'robustness to moisture,' and fails to 'maintain a positive friction curve over time,' leading to 'shudder' problems, and (2) an 'inability to purge trapped air due to an insufficient valve body architecture,' which causes problems with 'harsh shifts.'"  *Id.*  GM knew about these defects—its warranty data and "Open Investigation Reports" revealed the "shudder" problem "occur[ed] at an extremely high rate" and that the "harsh shift" problem occurred at a "high rate."  *Id.* at 504–05.  Naturally, GM tried to fix these defects.  *Id.* at 504–05.  But the fixes took years and ultimately required a redesign of the 8L transmissions.  *Id.*  GM could not fix the "shudder" defect until 2019.  *Id.* at 504.  And the "harsh shift" problem "could not be resolved without a major redesign of the transmission, which was approved in early 2018."  *Id.*  Plaintiffs' experts confirmed that these defects were universal, that they were almost certain to manifest, and that GM could not cure the defects without a redesign.  *See id.* at 504, 515.

The district court ultimately granted Plaintiffs' "motions to certify 26 statewide subclasses."  *Id.* at 526.  Relevantly, its certification order held that Plaintiffs' claims satisfied Federal Rule of Civil Procedure 23's commonality and predominance requirements.  Correctly identifying that only one common question is required under Rule 23(a)(2), the district court determined that "[a]lthough the plaintiffs have alleged a variety of legal theories under the laws

of 26 different states, all of them assert some form of warranty and consumer fraud claims in each of the states proposed for class litigation, and all of those claims demand proof of a defect in the vehicles' transmission design." *Id.* at 506. Having determined that Plaintiffs had satisfied their burden to prove at least one common question, the district court moved on with its analysis.

As for Rule 23(b)(3), the district court determined—in addition to the first common question identified as part of its commonality analysis—that there are three total common questions and contentions "that are crucial to the pleaded causes of action in every jurisdiction" that predominated over ancillary individualized issues. *Id.* at 508. "Those [common questions] are (1) whether the 8L45 and 8L90 transmission design has one or more defects that render the class vehicles unsuitable for the ordinary use of providing safe and reliable transportation, (2) whether the defendant knew about the defects and concealed its knowledge from buyers of class models, and (3) whether the information withheld would have been material to a reasonable car buyer." *Id.* In reaching this conclusion, the district court carefully and rigorously analyzed every element for each cause of action pleaded in every state, *id.* at 536–52, and determined that Plaintiffs' claims were subject to common elements and common proof across the relevant state jurisdictions, *id.* at 509–22. Based on this careful and rigorous analysis, the district court held that Plaintiffs had satisfied their burden to prove that common contentions predominated over individualized issues. *Id.*

## II. STANDARD OF REVIEW

"The certification of a [] class, like most issues arising under Rule 23, is committed in the first instance to the discretion of the district court." *Califano v. Yamasaki*, 442 U.S. 682, 703 (1979). Indeed, district courts "have broad power and discretion vested in them by Fed. Rule Civ. Proc. 23 with respect to matters involving the certification[.]" *Reiter v. Sonotone Corp.*, 442 U.S. 330, 345 (1979). Thus, "[t]he district court's decision certifying the class is subject to a very limited review and will be reversed only upon a strong showing that the district court's decision was a clear abuse of discretion." *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 351 (6th Cir. 2011) (quoting *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 559–60 (6th Cir. 2007)).

At nearly every juncture, the majority opinion eschews our limited role as a court of review. The Supreme Court's guidance is clear: we review class-certification orders for abuse of discretion. Our job is to ensure that district courts conduct a careful and rigorous analysis before affirming or vacating a district court's order certifying a class. Instead of following the Court's instructions, the en banc court has sanctioned a roving mandate allowing three-judge panels to vacate class-certification orders simply because they would have decided otherwise. We believe that our analysis below better reflects the type of review most appropriate for assessing a class-certification order.

## III. STANDING

We first address standing. There are two correct ways to think about standing in this case. The first approach is holding that all of the Plaintiffs—both named and unnamed—may properly assert a theory of standing based on an overpayment theory. The second approach is holding that only the named plaintiffs need to assert standing and that questions as to the standing of unnamed plaintiffs can wait until after certification. The latter approach is complicated by the fact that the Supreme Court recently dismissed as improvidently granted a writ of certiorari on the following question: "Whether a federal court may certify a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) when some members of the proposed class lack any Article III injury." *Lab'y Corp. of Am. Holdings v. Davis*, 145 S. Ct. 1133, 1134 (2025) (cert. granted); *see also id.*, 145 S. Ct. 1608 (2025) (per curiam) (cert. improvidently granted).

But Plaintiffs do not proceed solely on a theory under which only the named plaintiffs have standing. Rather, under the first theory described above, Plaintiffs assert that every unnamed plaintiff has standing because each overpaid for their class vehicle. We would hold that Plaintiffs have standing based on their overpayment theory.

As we have already explained, the alleged defects in the class vehicles are universal, and all plaintiffs—both named and unnamed—have suffered an economic injury because of them. At this stage in the litigation, Plaintiffs have provided sufficient proof in support of their economic theory of standing. As the Seventh Circuit has recently stated, "[e]conomic harm can be a concrete injury sufficient to confer standing," specifically identifying the economic harm

flowing from "[a] universal defect inherent in a product . . . ." *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 529–30 (7th Cir. 2024). This is because a "design defect or a fundamental flaw" impacts the value of every product to every purchaser. *Id.* In this case, the purchase of a defective product confers standing because "[t]he plaintiffs' loss is financial: they paid more for the [cars] than they would have, had they known of the risks the [transmissions] posed to [driving]." *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 751 (7th Cir. 2011). "A financial injury creates standing." *Id.* We would adopt this reasoned approach as consistent with our decision in *In re Whirlpool*, in which we held that when a plaintiff purchases a defective product, that plaintiff has "experienced injury" regardless of whether that defect manifests. *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 856–57 (6th Cir. 2013).

GM's cases to the contrary are unpersuasive. *See* Supp. Reply at 11. In *Alig v. Rocket Mortgage, LLC*, the Fourth Circuit held that no standing was conferred where the plaintiffs could prove only "a risk" of future harm. 126 F.4th 965, 974 (4th Cir. 2025). Here, Plaintiffs have not demonstrated a mere risk of future harm. Rather, Plaintiffs have alleged and provided proof that each and every plaintiff—named and unnamed—overpaid for their class vehicle because each vehicle suffered a universal defect, *regardless* of whether that defect ever "manifested." It is Plaintiffs' theory that even if a non-named plaintiff's car never manifested the defect, the car nevertheless still suffers from the defect, and therefore that the plaintiff overpaid for their car. This a present and concrete harm, not a "mere risk of future harm." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 437 (2021). The same is true with the Third Circuit case that GM relies on. Supp. Reply at 11 (citing *Huertas v. Bayer US LLC*, 120 F.4th 1169, 1174–75 (3d Cir. 2024)). There, the Third Circuit expressly approved "the benefit-of-the-bargain theory of injury" for Article III standing purposes. *Huertas*, 120 F.4th at 1174.

GM's only arguably persuasive authority is from the Eighth Circuit. *Johannessohn v. Polaris Indus. Inc.*, 9 F.4th 981, 987–88 (8th Cir. 2021) ("In this circuit, plaintiffs claiming economic injury do not have Article III standing in product defect cases unless they show a manifest defect."). The Eighth Circuit held that the plaintiff's benefit-of-the-bargain injury failed because it was not predicated on a defect that actually manifested. Without a manifest

defect, in the Eighth Circuit's view, there is no injury at all. *See id.* But we have already rejected that reasoning in *In re Whirlpool*, as have many other circuits. 722 F.3d at 856–57; *see also In re Evenflo Co., Mktg., Sales Pracs. & Prods. Liab. Litig.*, 54 F.4th 28, 35 (1st Cir. 2022); *McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 705–06 (9th Cir. 2020).

In any event, that case's holding is inapplicable based on the facts here. In *Johannessohn*, the plaintiffs brought a class action against a manufacturer of ATVs, alleging that the ATVs ran too hot and burned drivers. 9 F.4th at 987. The district court in that case found that although all the plaintiffs allegedly suffered from their ATVs running too hot, the "[p]laintiffs ha[d] adduced no evidence of a common design that necessarily manifests itself in discomfort, burns, or melting." *Johannessohn v. Polaris Indus. Inc.*, 450 F. Supp. 3d 931, 981–82 (D. Minn. 2020). But Plaintiffs here have adduced evidence of two, universal defects that result in the harsh shift and shudder issues. Unlike the defects in *Johannessohn*, the two, universal defects in GM's vehicles are "expected to occur inevitably in all class vehicles sold" by manifesting in the hard shift and shudder issues. *See Speerly*, 343 F.R.D. at 505. In light of these factual differences, *Johannessohn*'s reasoning is inapplicable here.

Having explained why we would hold that Plaintiffs can proceed on their benefit-of-the-bargain theory of standing, we turn to our class-action analysis under Rule 23.

## IV. ANALYSIS

We would affirm the district court's certification order because it was the product of careful and rigorous analysis. The district court did not clearly abuse its discretion when it determined that Plaintiffs have submitted sufficient proof that their claims are subject to classwide determination under Federal Rule of Civil Procedure 23. In explaining how and why we reach a different conclusion than the majority, we must go back to the basics of Rule 23 analysis and highlight what we see as an overreach in appellate authority by the en banc court.

The majority's overreach reveals itself across three themes. The first theme, which is perhaps most concerning to us, is that the majority's approach to class certification under Rule 23 ignores Supreme Court precedent. The en banc court draws on misguided circuit precedent untethered from foundational, guiding principles. Rule 23(b)(3) was designed to balance the

interests of an individual "who might prefer to go it alone" as against the interests of the collective in aggregating complex, but individually paltry, claims. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–19 (1997). The majority's opinion does not reflect these concerns. Under the Rule 23 framework as articulated by the en banc court, district courts in this circuit will now have to balance the interests of defendants—who are alleged to have put defective, dangerous, and unsafe products into the stream of commerce—as against the interests of the everyday consumer who, without Rule 23, has no financial incentive or ability to litigate a complex design-defect case.

The second theme is that the majority opinion disagrees with Plaintiffs on the merits of their claims. As we address in depth below, the majority opinion's position is tenable only on the assumption that Plaintiffs' design-defect theory is wrong. Not only is this an improper inference to make on appeal from the district court's certification order, but also it ignores the substantial evidence that Plaintiffs submitted below. The majority opinion oversteps its authority and guides its resolution of Plaintiffs' class-certification motion from the belief that Plaintiffs cannot prove their two-defect theory of liability.

The final theme is that the majority, in its unwieldy dicta on predominance, has offered a myopic view of state law that is tethered to its preferred outcome. Our own survey of the state law not only confirms that the district court conducted a careful and rigorous analysis, but also it demonstrates that the majority opinion's state-law analysis is fatally flawed.

## A. Rule 23

"Class certification is governed by Federal Rule of Civil Procedure 23." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). "Under Rule 23(a), the party seeking certification must demonstrate, first, that:

'(1) the class is so numerous that joinder of all members is impracticable;

'(2) there are questions of law or fact common to the class;

'(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

'(4) the representative parties will fairly and adequately protect the interests of the class.'"

*Id.* (quoting Fed. R. Civ. P. 23(a)). "Second, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." *Id.* Plaintiffs here seek certification under Rule 23(b)(3). "Federal Rule of Civil Procedure 23(b)(3) requires that . . . a district court [] find that 'questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting Fed. R. Civ. P. 23(b)(3)).

The majority's Rule 23 framework suffers by expanding on two circuit decisions that have misread the law: *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239 (6th Cir. 2024), and *Doster v. Kendall*, 54 F.4th 398 (6th Cir. 2022), *judgment vacated*, 144 S. Ct. 481 (2023). These opinions misstate the law on commonality and predominance. The majority, by drawing heavily from these opinions, has misconstrued key Supreme Court decisions and erected insurmountable barriers to class certification.

We start with commonality before addressing predominance.

## B. Commonality

Reviewing the district court's decision for abuse of discretion, we would hold that it conducted a sufficiently rigorous analysis under Rule 23(a)(2) that faithfully applied our precedents. But the problems we identify with the majority's analysis do not end with the result the majority reaches. We also note that the majority opinion, by drawing on two circuit decisions—*Nissan* and *Doster*—has effectively disregarded the Supreme Court's Rule 23(a)(2) decisions: *Wal-Mart Stores, Inc. v. Dukes* and *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982).

Our analysis under Rule 23(a)(2) proceeds in two parts. First, we start with the law that binds us: Supreme Court precedent. Applying the relevant law, we explain how the district court did not abuse its discretion. Second, we address the problems with the Rule 23 framework as described by the en banc court.

**1. Commonality Analysis**

*Wal-Mart* is the touchstone for commonality. "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart*, 564 U.S. at 349–50 (quoting *Falcon*, 457 U.S. at 157). In other words, class-action plaintiffs' "claims must depend upon a common contention[.]" *Id.* at 350. "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "[F]or purposes of Rule 23(a)(2) '[e]ven a single [common] question' will do." *Id.* at 359 (second and third alterations in original) (quoting *Wal-Mart*, 564 U.S. at 376 n.9 (Ginsburg, J., concurring in part and dissenting in part)).

"[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Id.* at 350–51 (quoting *Falcon*, 457 U.S. at 161). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Id.* at 351. But, ultimately, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

The district court here found that all of Plaintiffs' legal theories "under the laws of 26 different states . . . assert some form of warranty and consumer fraud claims in each of the states proposed for class litigation, and all of those claims demand proof of a defect in the vehicles' transmission design." *Speerly*, 343 F.R.D. at 506. This conclusion was the well-considered result of a rigorous analysis of the alleged defects, Plaintiffs' proof, and a survey of the relevant state laws. *Id.* at 504–05, 536–52. The majority's analysis obfuscates this point by pointing to multiple definitions of "defect" without recognizing that Plaintiffs' theory satisfies all definitions. *See* Maj. Op. at 11–12. The class vehicles were designed with a defect almost certain to manifest, and the manifestations (the shift and shudder) pose a "significant safety risk." *Speerly*, 343 F.R.D. at 512. This renders the vehicles "unreasonably dangerous" (for the purposes of product-liability claims), "unfit for the 'ordinary purposes for which [cars] are

used'" (for the purposes of warranty claims), and "diminished" in "value" (for the purposes of consumer-protection statutory claims). Maj. Op. at 11 (citations omitted). Thus, resolution of this common question "drive[s] the resolution of this litigation" forward on all claims. *Wal-Mart*, 564 U.S. at 350 (citation omitted).

As for Plaintiffs' defect theory—the glue holding together the class claims—the district court found that Plaintiffs could proceed on common contentions subject to classwide proof. "Each of the named plaintiffs asserts that the 8L45 and 8L90 transmissions share a common design," and "that the class transmissions have a duo of common defects[.]" *Speerly*, 343 F.R.D. at 504. Relying on warranty and investigation reports produced by GM, Plaintiffs' experts concluded that both the "shudder" and "harsh shifts" problems resulted from universal defects, and that "the problems would be expected to occur inevitably in all class vehicles sold." *Id.* at 504–05. It was appropriate for the district court to conclude that Plaintiffs' two-defect theory satisfies Rule 23(a)(2). Thus, Plaintiffs have identified *at least one* common contention that is capable of resolution on a classwide basis: the 8L transmissions' two universal defects. The truth or falsity of this contention can be resolved in a single stroke on a classwide basis. Either Plaintiffs' defect theory is correct that every 8L transmission suffers from a duo of defects—a finding that is necessary for every claim Plaintiffs pursue—or their defect theory is incorrect, and their claims fail on the merits for each and every claim.

This is exactly the type of common question and common evidence that the Court in *Wal-Mart* indicated satisfies Rule 23(a)(2). In *Wal-Mart*, the Court held that the plaintiffs could not pursue their Title VII claim "about literally millions of employment decisions at once[,] [w]ithout some glue holding the alleged *reasons* for all those decisions together . . . ." 564 U.S. at 352. In *Wal-Mart*, the plaintiffs attempted to demonstrate "by means of statistical and anecdotal evidence" that Wal-Mart discriminated against women, but did not offer any evidence that Wal-Mart had expressly adopted a universal discriminatory policy. *Id.* at 356. The plaintiffs in *Wal-Mart* offered this theory of liability because "[o]ther than the bare existence of delegated discretion [in hiring and promotion decisions], [plaintiffs] ha[d] identified no 'specific employment practice'—much less one that tie[d] all their 1.5 million claims together." *Id.* at 357 (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988)). The Court held that the

plaintiffs needed to "bridge[]" a "conceptual gap" between "an individual's claim" and "the existence of a class of persons who have suffered the same injury as that individual[.]" *Id.* at 352–53 (quoting *Falcon*, 457 U.S. at 157–58). The plaintiffs could bridge this gap by two means: (1) allegations and proof that Wal-Mart implemented a universal, biased testing procedure or (2) "significant proof that [Wal-Mart] operated under a general policy of discrimination . . . ." *Id.* (quoting *Falcon*, 457 U.S. at 159 n.15). Accordingly, the plaintiffs could pursue their claims by pointing to a common policy of discrimination at the root of the disparate employment decisions (a testing procedure or similar universal evidence) *or* provide significant proof that a policy of discrimination existed despite direct evidence that Wal-Mart had adopted a policy against discrimination on the basis of sex.

Contrary to the majority's position, *Wal-Mart* does not flatly demand "significant proof" that a class-action plaintiff assert at least one common contention. *See* Maj. Op. at 8 (quoting *Wal-Mart*, 564 U.S. at 353); *but see also Doster*, 54 F.4th at 436–37 ("*Wal-Mart* did not require the plaintiffs to present significant proof of a policy of sex discrimination for its own sake. It instead required the plaintiffs to present this evidence to ensure that *their theory* of sex discrimination could 'be proved on a classwide basis.'" (emphasis added) (quoting *Wal-Mart*, 564 U.S. at 356)). Instead, significant proof was demanded in *Wal-Mart* because of the amorphous and disjointed common contention posed by those plaintiffs. 564 U.S. at 353. As the Court explained, Rule 23(a)(2) would have been satisfied by a universal policy or procedure that resulted in disparate treatment on the basis of sex. Because the plaintiffs in *Wal-Mart* did not offer a universal theory, "'[s]ignificant proof' that Wal-Mart 'operated under a general policy of discrimination'" was required to bridge the gap between the plaintiffs' sex discrimination theory and the 1.5 million discrete, subjective employment decisions that formed the basis of their claims. *Id.* (alteration in original) (quoting *Falcon*, 457 U.S. at 159 n.15). Plaintiffs here, however, offer a universal theory of liability.

Applying this framework to Plaintiffs' claims, we would hold that there is at least one "common contention" at the heart of Plaintiffs' claims: "[A]n inappropriate combination of ATF and clutch friction material in the 'Torque Converter Clutch' ('TCC') assembly, as well as defects in the design or function of certain valve components, contributed to both the 'shudder'

and 'harsh shift' issues." *Speerly*, 343 F.R.D. at 505 (citation omitted). Whether every class member's car suffered from these universal design defects can be answered "in one stroke." *Wal-Mart*, 564 U.S. at 350. After conducting a rigorous analysis, the district court found that Plaintiffs provided both: (1) a universal theory of defect that applies to each and every class car and (2) significant evidence in support of this theory. *See Speerly*, 343 F.R.D. at 504–05. The "truth or falsity" of Plaintiffs' defect theory "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Plaintiffs' claims live and die on this common contention.

Furthermore, proving the existence of these universal defects does not suffer from the problems identified in *Wal-Mart*. Plaintiffs do not offer a similarly unwieldy theory of liability. Although Plaintiffs' proposed class is large, that is because their theory of liability is universal and inherent to hundreds of thousands of cars that GM manufactured between 2015 and 2019. But, unlike the plaintiffs in *Wal-Mart*, the size of this certified class is no obstacle to affirming the district court's finding of commonality. Plaintiffs propose a simple, universal true-or-false question: Did GM's 8L transmissions suffer from two universal defects? This question can be answered yes or no for all class members at once. If Plaintiffs' defect theory is true, it is common to all class members. If their defect theory is false, then it is also common to all class members.

This satisfies all the requirements set forth in *Wal-Mart*. In holding otherwise, the majority's analysis goes astray from guiding Supreme Court principles. We would urge district courts to adhere to the principles articulated by the Court.

Finally, as we noted above, one common question is enough. *Wal-Mart*, 564 U.S. at 359. But the district court concluded that two other questions were common to the class: "whether the defendant knew about the defects and concealed its knowledge from buyers of class models," and "whether the information withheld would have been material to a reasonable car buyer." *Speerly*, 343 F.R.D. at 508. As we describe further in our predominance analysis, we agree that these issues are susceptible to classwide resolution and that answering them would also materially advance the litigation. *See Wal-Mart*, 564 U.S. at 350.

**2. The Majority Opinion Goes Astray**

To see why and how the majority opinion goes astray, one has only to look under the hood at the cases it relies on: *Nissan* and *Doster*. Maj. Op. at 7–9 (citing *Nissan*, 122 F.4th at 246–47, 252; *Doster*, 54 F.4th at 430–31). *Nissan* and *Doster* get the law wrong.

**a. *Nissan***

*Nissan*'s most egregious sin is misapplying cases from the Rule 23(b)(3) context to explain the proper analysis under Rule 23(a)(2). *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (recognizing that Rule 23(a) is less demanding than Rule 23(b)(3)). This muddies the law and effectively requires class-action plaintiffs to argue Rule 23(b)(3) two times over. Consider five ways *Nissan* gets the law wrong.

First, *Nissan* states that commonality is defeated "if different class members must use different pieces of evidence to answer the [common] question." 122 F.4th at 247 (citing *Tyson Foods*, 577 U.S. at 453); *see also* Maj. Op. at 10. The majority opinion uses this reasoning to say there is no common question here. But *Tyson Foods*, which *Nissan* and the majority opinion cite, does not undermine commonality in this case. First, *Tyson Foods* is not directly relevant to Rule 23(a)(2) because, in *Tyson Foods*, there was no "dispute that there [were] important questions common to all class members." *Tyson Foods*, 577 U.S. at 454. Second, and more to the point, *Tyson Foods* explains that a common question may be answered in more than one way. "[A] common question is one where 'the same evidence will suffice for each member to make a prima facie showing [*or*] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods*, 577 U.S. at 453 (emphasis added) (second alteration in original) (quoting William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 4:50).

*Wal-Mart* provides a prime example of the type of generalized evidence on which a class-action plaintiff may rely in proving commonality. As the Supreme Court noted in *Wal-Mart*, a class-action plaintiff asserting a discrimination claim may proceed under two theories of commonality. First, a class-action plaintiff may submit the *exact same* evidence for each class member to prove that the defendant employer discriminated on the basis of sex by, for example, "us[ing] a biased testing procedure." 564 U.S. at 353 (quoting *Falcon*, 457 U.S. at 159 n.15).

But, even where a class-action plaintiff cannot submit the *exact same* evidence of sex discrimination for each class member (i.e., a universal biased testing procedure), the plaintiff may nevertheless submit "[s]ignificant proof" of a "general policy of discrimination" so long as "the discrimination manifested itself in hiring and promotion practices in the same general fashion, as through entirely subjective decisionmaking processes." *Id.* (quoting *Falcon*, 457 U.S. at 159 n.15). This second theory assumes that each individual class member might have experienced sex discrimination differently but that generalized evidence of a general policy of sex discrimination could tie their claims together. The problem for the plaintiffs in *Wal-Mart* was not their reliance on generalized evidence, but their lack of proof in support of that common contention.

In this way, both *Tyson Foods* and *Wal-Mart* recognize that a class-action plaintiff can prove a common contention *even if* each class member individually could rely on different pieces of evidence for their claims. This is appropriate so long as commonality is established by providing a universal question applicable to each and every plaintiff—named and unnamed. *Tyson Foods* and *Wal-Mart* explain that a class-action plaintiff can proceed where every plaintiff could rely on the same generalized proof, even if facial differences between the plaintiffs' injuries could appear to defeat commonality. Those concerns are more appropriately resolved at the predominance stage. Thus, by the plain terms of *Tyson Foods* and *Wal-Mart*, commonality is not necessarily defeated if plaintiffs *could potentially* use different pieces of evidence to prove their claims, so long as the common question is susceptible to *generalized* classwide proof that each and every plaintiff could rely on. *Nissan*, 122 F.4th at 247.

Second, the majority opinion reaffirms *Nissan*'s misguided demand that "a careful analysis of commonality must assess potential '[d]issimilarities within the proposed class' and explain why these apparent differences do not defeat class certification." *Id.* (quoting *Wal-Mart*, 564 U.S. at 350); Maj. Op. at 10. The majority follows *Nissan*'s misreading of *Wal-Mart*. *Wal-Mart* does not say exactly what *Nissan*, and thereby the current majority, wants it to say. *Nissan* imposes a higher burden under Rule 23(a) than *Wal-Mart* instructs. All that *Wal-Mart* requires is "a single [common] question" subject to common proof. 564 U.S. at 359 (alteration in original) (citation omitted). That class members may be distinct in other ways—even in possibly

significant and dispositive ways—does not mean that a plaintiff fails to offer just a *single* common contention. *Nissan* suffers from the "blend[ing]" of Rule 23(a)(2) with Rule 23(b)(3) that *Wal-Mart* warns against. *Id.* (alteration added). The fact that dissimilarities may exist across members does not matter if "[e]ven a single [common] question" exists. *Id.* (alterations in original) (citation omitted). Dissimilarities are considered only to the extent they are relevant to assessing that single common contention. *Id.* Other dissimilarities are irrelevant at the commonality step. The majority's and *Nissan*'s confused blending of Rule 23(b)(3) and Rule 23(a)(2) demonstrates why its approach is inconsistent with *Wal-Mart*.

Third, *Nissan* mistakenly concludes that "[t]he court must consider opposing arguments to ensure that the plaintiffs 'actually *prove*' a common answer exists." *Nissan*, 122 F.4th at 247 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*), 573 U.S. 258, 275 (2014)). The Supreme Court has given district courts greater flexibility in assessing classwide proof— engaging with counterarguments should not be treated as a simple box to check on the road to resolving class certification. Although Rule 23(a)(2) requires more than "a mere pleading standard," the Court does not require a district court to check a box that it has engaged with counterarguments. Rather, all a district court must determine is that the plaintiff has "prove[n] that there are *in fact* . . . common questions of law or fact." *Comcast*, 569 U.S. at 33 (quoting *Wal-Mart*, 564 U.S. at 350); *accord Halliburton II*, 573 U.S. at 275. No box check required. *Wal-Mart* does not require a box check. Nor does *Halliburton II*. That is *Nissan*'s invention. Rather, all the Court requires is that a district court rigorously examine a plaintiff's proof of commonality. To the extent a plaintiff's common contention is susceptible to counterarguments that it is not subject to common proof, obviously a district court will engage those arguments. But that does not mean the district court's analysis must be any more searching. Nor does it mean that a district court must engage merits analysis or dissimilarities *irrelevant* to commonality.

Fourth, *Nissan* states the following as the test for commonality: "If a reasonable jury could answer 'yes' to the defect question for those members of the class who did not receive updates and 'no' for those who did, the question does not represent a 'common' one within the meaning of Rule 23." *Nissan*, 122 F.4th at 252 (citing *Doster*, 54 F.4th at 430–31); *see* Maj. Op.

at 8. There is no "reasonable jury" standard for assessing class-action claims, and *Nissan*'s language either intentionally or unintentionally suggests the imposition of a higher standard for class-action plaintiffs than that imposed by the Supreme Court. *Nissan*'s description is improper because it suggests that the district court should put itself in the shoes of the jury when assessing commonality. This is improper for two reasons.

First, it closes the analytical gap between the merits analysis and the Rule 23 analysis. At the Rule 23(a) stage, the merits of the class-action plaintiffs' claims matter only to the extent the merits touch on commonality. By instructing district courts to place themselves in the shoes of the jury, who would enter proceedings only at the trial stage, *Nissan* erodes this important distinction. The words we use to instruct the lower courts matter. Instructing district courts to think like juries at the early stages of class-action litigation is dangerous because it goes beyond the limited "peek" at the merits allowed by Supreme Court precedent.

Second, *Nissan*'s "reasonable jury" standard elides the distinction between a class-action plaintiff's burden at trial with their burden at class certification. Although *Wal-Mart* indicates that a plaintiff must actually show that they meet Rule 23(a)'s requirements, the Court has not specified the level of proof required. At minimum, the burden is higher than mere pleading. At its maximum, "[s]ignificant proof" is required. *Wal-Mart*, 564 U.S. at 353. But, by referencing a "reasonable jury," *Nissan* implicitly and improperly references a plaintiff's burden at trial. There is no authority to connect, even indirectly, a plaintiff's burden under Rule 23 to the preponderance of the evidence standard, or, indeed, an even higher standard under which the plaintiff succeeds only if no reasonable jury could disagree. Obviously, the Court requires more than mere pleading, but requiring proof such that no reasonable jury could disagree demands too much, especially at the more basic Rule 23(a) level.

*Nissan*'s only support for this suggestion of a heightened standard is *Doster*, 54 F.4th at 430–31. *Doster*, in turn, purports to quote *Wal-Mart* for the proposition that a common question "must allow a decisionmaker to reach a yes-or-no answer for the class in 'one stroke.'" *Id.* (quoting *Wal-Mart*, 564 U.S. at 350). But *Wal-Mart* says a plaintiff may prove commonality at the Rule 23(a)(2) stage by simply showing that the "determination of [a common contention's] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one

stroke." *Wal-Mart*, 564 U.S. at 350. *Wal-Mart* does not impose a standard whereby the plaintiff loses if a reasonable jury could disagree on the merits. *Doster*, *Nissan*, and now the majority opinion have filled in the gaps with a heightened, unarticulated standard. Ultimately, the standard these cases apply does nothing to elucidate Supreme Court precedent. Instead, these cases insert unnecessary confusion.

Finally, the current majority opinion imposes the requirement that a "court 'must walk through each cause of action' and 'identify the relevant elements'" before deciding that a common question is subject to common proof. Maj. Op. at 10 (quoting *Nissan*, 122 F.4th at 246–47); *see also Doster*, 54 F.4th at 430–33 (requiring the same analysis). The only relevant Supreme Court case on this point, *Wal-Mart*, does not perform this type of labored, mechanized analysis. *See Wal-Mart*, 564 U.S. at 349–60 (declining to list the elements of a Title VII claim). The majority derives its theory from *Nissan*, which in turn derived its theory from *Doster*. So where did *Doster* get its theory from? The answer: selectively quoting from *Wal-Mart* and then filling in the gaps with its own point of view. We now address the problems with *Doster*.

### b. *Doster*

*Doster* gets the law wrong in three ways.

First, *Doster* cites a treatise for the position that a common question "typically will affect at least one element of the claims." *Doster*, 54 F.4th at 430 (citing 1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 3:20, at 400 (6th ed. 2022)); *see also id.* at 433 (stating that a plaintiff must prove "a common question that, if answered, would resolve any element in one stroke." (citing *Wal-Mart*, 564 U.S. at 356–59)). But *Wal-Mart* never says this. As discussed above regarding *Nissan*, *Wal-Mart* never goes so far as to say that common proof must satisfy an element of every claim brought by a plaintiff in a putative class action. Rather, *Wal-Mart* says a couple of different things. For one, *Wal-Mart* says that an answer to a common question "will resolve an issue that is central to the validity of each one of the claims . . . ." 564 U.S. at 350. An issue central to a claim does not necessarily mean an element of that claim. *Wal-Mart* also says that the commonality analysis will "generally" but not always "involve[]" considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause

of action." *Id.* at 351 (quoting *Falcon*, 457 U.S. at 160). Again, no mention of the elements of a claim. *Wal-Mart* also says that commonality ensures that the class "possess[es] the same interest and suffer[s] the same injury." *Id.* at 348–49 (quoting *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). Same thing here.

As we see it, the Supreme Court leaves more room than the rote explication of every element for every cause of action. In assessing important issues, common interests, and common injuries, a district court has greater leeway under the commonality requirement. Sometimes the common contention central to a plaintiff's claim(s) will be immediately obvious from the pleadings—like this case, where it is obvious that every single claim requires finding that GM's 8L transmissions were defective. Other times a district court will have to look at the merits of a plaintiff's claim(s) to assess whether the plaintiff has proof of common answers that satisfy Rule 23(a)(2).

As *Falcon* explains, "[s]ometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." 457 U.S. at 160. A district court will not always have to lay out every element of every claim to determine that a common contention exists. This demands too much in light of *Wal-Mart* and *Falcon*. *Doster*'s suggestion that a district court assess the elements of every claim is more appropriate during the predominance analysis, not the commonality analysis. In this case, it is obvious that an issue central to *every single one* of Plaintiffs' claims is that the 8L transmissions suffered from universal design defects. If the transmissions did not suffer from universal design defects, then Plaintiffs cannot establish their claims. This easily satisfies Rule 23(a)(2).

Second, *Doster* says that *Wal-Mart* requires that a common "question must allow a decisionmaker to reach a yes-or-no answer for the class in 'one stroke.'" *Doster*, 54 F.4th at 430–31 (quoting *Wal-Mart*, 564 U.S. at 350). Yes and no. Yes, *Wal-Mart* says "that determination of [a common contention's] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." 564 U.S. at 350. No, to the extent that referencing a decisionmaker requires district courts to address the merits of a plaintiff's claims

beyond Rule 23's demands (or apply a heightened burden of proof beyond that described in *Wal-Mart*), *Doster* is wrong. *See id.* *Doster* cites only *Wal-Mart* for this position, but, as discussed at length already, *Wal-Mart* does not impose this standard.

Third, *Doster* holds that plaintiffs must provide "'[s]ignificant proof' of a critical fact" to establish commonality.[1] *Id.* at 432 (quoting *Wal-Mart*, 564 U.S. at 353). *Doster* once again rips *Wal-Mart* from its context and applies extraneous language whole cloth. The problem is that *Wal-Mart* does not hold that plaintiffs must prove a common contention by "[s]ignificant proof." *Wal-Mart*, 564 U.S. at 353. Rather, *Wal-Mart*'s discussion of the proof necessary to establish a common question is limited in important ways that *Doster* obfuscates. It is clear from the Court's analysis that different theories of liability can be subject to different levels of proof to satisfy Rule 23(a)(2). The Court did not go so far as to hold that all evidence must be held to the standard of "[s]ignificant proof." *Wal-Mart* itself cautions against this approach, and we see no reason to expand its holding in this context.

### c. Majority Opinion's Commonality Analysis

The problems we have identified in *Nissan*'s and *Doster*'s framing pervade the majority opinion's analysis. First, the two cases frame how the opinion approaches its analysis. From *Doster*, the majority opinion states that all common questions, "whether factual or legal," must affect at least one element of every claim brought by Plaintiffs. Maj. Op. at 10. Following *Nissan*, the majority opinion argues that "only an element-oriented analysis" can suffice for the commonality analysis. *Id.* We need not reiterate why these positions are wrong. Then, the majority opinion selectively quotes from *Tyson Foods* to emphasize its position that a common question is one where each plaintiff can answer with the same evidence. Again, *Tyson Foods* does not take this limited approach to defining a common question.

The majority opinion's self-constrained reasoning leads it to adopt a series of mistaken positions. For one, the majority opinion fails to grapple with the fact that generalized questions, even if not directly tied to an element of a claim, can suffice to "yield a common answer" that

---

[1]*Doster* later contradicts itself when it rejects this same position as it was offered by the defendant in opposition to class certification. 54 F.4th at 436–37.

drives the litigation forward. *Id.* at 11. Thus, the majority opinion's short-sighted view of the commonality analysis is revealed in its discussion of Plaintiffs' two, universal defects theory. The majority opinion criticizes the district court's analysis of Plaintiffs' defect theory on the basis that different claims apply different standards. But this misses the fact that Plaintiffs' universal theory of defect is applicable to each and every claim *despite* purported differences in manifestation and presentment. As we explained above, Plaintiffs can present the exact same evidence about GM's transmissions in satisfaction of every relevant element of every claim. In this context, the majority opinion's questions about how Plaintiffs' proof could support Plaintiffs' various claims are simple to answer. "Does a problem exist in each transmission that GM promised to fix?" *Id.* Each and every Plaintiff can answer this question with the exact same proof related to the alleged universal defects. "Does a problem in each transmission amount to a defect that makes the car unfit for its ordinary purpose?" *Id.* at 11–12. Each and every Plaintiff can answer this question with the exact same proof related to the alleged universal defects. The majority opinion does not preclude the district court from reaching these conclusions on remand.

The same goes for knowledge. The majority opinion poses two questions that it believes prove that Plaintiffs cannot proceed with a common contention. The problem with the single-minded focus on an elemental analysis is that it ignores the much more basic and flexible approach to the commonality analysis endorsed by the Supreme Court as we have explained above. Again, the majority opinion should not be read to prevent the district court from conducting this flexible approach on remand. For one, Plaintiffs do not necessarily have to argue that they can craft a common question that can be resolved with the exact same proof for every class member, so long as they can craft a common contention subject to *generalized* proof in the alternative. The majority opinion's dogged focus on this issue reveals its harshly limited view and obfuscates the fact that Supreme Court precedent authorizes the use of generalized evidence. As the Supreme Court has explained, the purpose of the commonality analysis is "to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (quoting Nagareda, *supra*, at 132). That someone could generate dozens of ways to formulate specific questions related to peculiar claims does little to help a district court rigorously determine whether a class-action plaintiff has provided sufficient proof that there are "common *answers* apt to drive the resolution of the litigation." *Id.* The district court should carefully

consider its approach on remand because the majority opinion should not be read to preclude the more flexible approach supported by governing precedent and discussed herein.

We now turn to the district court's predominance analysis under Rule 23(b)(3).

## C.  Predominance

The district court's class-certification order under Rule 23(b)(3) reflects the type of "rigorous analysis" demanded by the Supreme Court.  As with commonality, we start with Supreme Court precedent before addressing where the majority's analysis goes astray.  Our primary criticism of the majority's predominance analysis is that ignores the Supreme Court's admonition that courts look to the merits of a class-action plaintiff's claims *only* to the extent the merits are relevant to addressing certification.  The majority opinion goes much further.  We can surmise from its analysis that only plaintiffs with unassailable claims may proceed past class certification in our circuit.  This has dangerous consequences.  The majority opinion renders class-action claims under Rule 23(b)(3) practically toothless, leaving plaintiffs with small-sum, but factually complex, claims without recourse.  It creates an incentive structure that allows manufacturers to place dangerous and defective products into the stream of commerce without fear that the everyday consumer will have any financial incentive to pursue an individual claim against them.

### 1.  Rule 23(b)(3) Framework

"Federal Rule of Civil Procedure 23(b)(3) requires that . . . a district court must find that 'questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Tyson Foods*, 577 U.S. at 453.  "The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Id.* (quoting *Amchem Prods., Inc.*, 521 U.S. at 623).  Unlike during the commonality analysis, "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.* (*Halliburton I*), 563 U.S. 804, 809 (2011) (quoting Fed. R. Civ. P. 23(b)(3)).

"This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods*, 577 U.S. at 453. "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Id.* (alteration in original) (quoting 2 *Newberg and Rubenstein on Class Actions* § 4:50). "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (quoting 2 *Newberg and Rubenstein on Class Actions* § 4:49). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id.* at 453–54 (quoting 7AA Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1778 (3d ed. 2005)).

"Rule 23(b)(3), however, does *not* require a plaintiff seeking class certification to prove that each elemen[t] of [her] claim [is] susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (alterations in original) (internal quotation marks omitted). "What the rule does require is that common questions '*predominate* . . . .'" *Id.* (quoting Fed. R. Civ. P. 23(b)(3)). This is because Rule 23(b)(3) "is designed for situations 'in which class-action treatment is not as clearly called for,'" *Comcast*, 569 U.S. at 34 (quoting *Wal-Mart*, 564 U.S. at 362), but it "permits certification where class suit 'may nevertheless be convenient and desirable,'" *Amchem*, 521 U.S. at 615 (quoting Fed. R. Civ. P. 23, advisory committee's note to 1966 amendment). The rule "cover[s] cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Id.* (second alteration in original) (quoting Fed. R. Civ. P. 23, advisory committee's note to 1966 amendment). To ensure fairness to "those who might prefer to go it alone or in a smaller unit," *id.*, it is "the court's duty to take a 'close look' at whether common questions predominate over individual ones," *Comcast*, 569 U.S. at 34 (quoting *Amchem*, 521 U.S. at 615). This "inquiry trains on the legal or factual questions that qualify each class

member's case as a genuine controversy . . . ." *Amchem*, 521 U.S. at 623. Ultimately, "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Id.* at 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 334 (7th Cir. 1997)).

The Supreme Court does not countenance amateur accounting of "common" vs. "individualized" issues. Instead, *Tyson Foods* explains that "[t]he predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" 577 U.S. at 453 (quoting 2 *Newberg and Rubenstein on Class Actions* § 4:49). This is more than mere ledgering. It could be that there are many individualized issues, but that a single common contention is so important that certification is appropriate. Mere ledgering cannot account for the careful analysis necessary to balance, as the Supreme Court has instructed, the interests of the individual against the collective.

## 2. Predominance Analysis

The district court did not abuse its discretion when it found that "[t]here are three readily discernible common questions that are crucial to the pleaded causes of action in every jurisdiction where class certification has been sought." *Speerly*, 343 F.R.D. at 508. Following a rigorous analysis of the relevant claims and proof, the district court found that those common questions are "(1) whether the 8L45 and 8L90 transmission design has one or more defects that render the class vehicles unsuitable for the ordinary use of providing safe and reliable transportation, (2) whether the defendant knew about the defects and concealed its knowledge from buyers of class models, and (3) whether the information withheld would have been material to a reasonable car buyer." *Id.*

As we describe below, we agree with the district court that these questions are common to the statewide classes, and that the answers to each question would materially advance the litigation. Moreover, we would hold that the district court appropriately concluded that these

common contentions, which are "amenable to proof by common evidence on a classwide basis," predominate over the "importance of any ancillary individualized issues." *Id.*

### a. Warranty Claims

We would hold that the district court did not abuse its discretion when it found that common contentions predominated over individualized issues for Plaintiffs' warranty claims. After reviewing the elements for every express- and implied-warranty claim in every relevant state, *Speerly*, 343 F.R.D. at 536–52, the district court found that Plaintiffs' warranty claims could be analyzed under a set of common elements, as exemplified by Illinois law, *id.* at 509. After identifying that Plaintiffs could proceed using common elements, the district court engaged in a careful and rigorous analysis of Plaintiffs' proof and GM's counterarguments. Following this careful and rigorous analysis, the district court found that Plaintiffs' warranty claims were "subject to common proofs and present no individualized issues." *Id.* We identify no abuse of discretion in reaching this conclusion.

We reiterate: Our job is to make sure the district court's decision reflects a careful and rigorous analysis that faithfully applies precedent. This means ensuring the district court's survey of state law was complete and that its analysis of Plaintiffs' proof was careful and rigorous. We harbor no doubts that the district court's order was careful, thorough, and rigorous. Our job is not to address the motion for class certification anew. We are not district-court judges managing the case in the first instance.

### i. Common Elements for Express- and Implied-Warranty Claims

The district court did not abuse its discretion when it found that Illinois's rules on warranty claims were "exemplary" for both express- and implied-warranty claims. *Speerly*, 343 F.R.D. at 509, 536–52 (providing a detailed survey of state laws that reveal similar elements to Illinois's warranty claims).

*Common Elements for Express-Warranty Claims*. "To state a claim for breach of express warranty under Illinois law, a plaintiff must allege that a seller: (1) made an affirmation of fact or promise; (2) relating to the goods; (3) which was part of the basis for the bargain; and

(4) guaranteed that the goods would conform to the affirmation or promise." *Id.* at 509 (internal quotations omitted) (quoting *Rudy v. Fam. Dollar Stores, Inc.*, 583 F. Supp. 3d 1149, 1162 (N.D. Ill. 2022)).

*Common Elements for Implied-Warranty Claims*. "To prevail on [a claim for breach of implied warranty], Plaintiff must establish: (1) a sale of goods, (2) that the seller of the goods is a merchant with respect to those goods, and (3) that the goods were not of merchantable quality." *Id.* (alteration in original) (quoting *Walker v. Macy's Merch. Grp., Inc.*, 288 F. Supp. 3d 840, 868 (N.D. Ill. 2017)). "Goods are not of merchantable quality if they are unfit for their intended purpose." *Id.* (internal quotations omitted) (quoting *Walker*, 288 F. Supp. 3d at 868).

*Common Elements for Proving Existence of a Defect for Warranty Claims*. The district court did not abuse its discretion when it found that "[u]nder the laws of the several states, the implied warranty cause of action (variously identified under other labels in some jurisdictions) requires the plaintiffs to prove that a product is not 'merchantable,' meaning that it is unsuitable for its ordinary or intended use." *Id.* at 510. "The weight of authoritative commentary and contemporary court decisions from numerous jurisdictions hew consistently to the view that 'merchantability' of an automobile requires a showing that the vehicle operates in a 'safe condition' or provides 'safe transportation.' The principle that a product must be reasonably safe for its ordinary or intended use also has been recognized expressly by decisions in the overriding majority of state jurisdictions where implied warranty claims were pleaded in this case." *Id.* at 511. "Proof of a 'defect' covered by the limited warranty is also essential to all the express warranty claims." *Id.* at 512.

### ii. Common Proof of Design Defect in Express- and Implied-Warranty Claims

We would hold that the district court did not abuse its discretion when it concluded, after a rigorous analysis, that common contentions about the 8L transmissions' design defects predominated over individualized issues related to Plaintiffs' warranty claims.

The district court concluded that "[t]here is ample evidence already in the record from which a jury reasonably could find that (1) the alleged defects are inherent in universal aspects of

the design of the 8L transmissions, (2) the defendant identified the 'root causes' of the defects early in the lifespan of the class models — and according to some accounts even before the earliest models were sold — along with known solutions to cure the problematic shifting behavior, and (3) the defect poses a significant safety risk to drivers of the class vehicles." *Speerly*, 343 F.R.D. at 512; *see also id.* at 512–18 (addressing Plaintiffs' evidence and GM's counterarguments in depth). "All of that evidence adequately suggests that one or more universal defects in the 8L transmission design exist, that both 'shudder' and 'hard shift' issues were identified by the defendant as having a common cause or causes, and that the problems are pervasive and reasonably expected to occur sooner or later in all class vehicles sold. The common evidence also amply suggests that the defect rendered the class vehicles unfit for their ordinary or intended purpose of providing safe, reliable transportation." *Id.* at 517. These common contentions allow for classwide resolution of Plaintiffs' express- and implied-warranty claims.

These common contentions related to the defects predominate over individualized issues. The district court considered and rejected relevant counterarguments. For instance, the district court rejected the argument that varying rates of manifestation of the defects could outweigh the presence of a common defect. *Id.* at 523 (citing *In re Whirlpool*, 722 F.3d at 857). This is because manifestation rates "do not affect whether the vehicles were sold with a[] [] defect." *Id.* (quoting *In re Whirlpool*, 722 F.3d at 857). Nor do any apparent variations in designs among the class vehicles prevent a finding of predominance because "the plaintiffs have argued persuasively that the problematic elements of the 8L design are universal and inherent despite any such variations. The question is not whether every single aspect of the design is common – only those aspects that allegedly caused the problems." *Id.* at 525; *see also In re Whirlpool*, 722 F.3d at 854. Accordingly, common contentions about defects in the design of the 8L transmissions are central to the validity of Plaintiffs' warranty claims and outweigh minimal individualized issues posed by manifestation rates and design variations amongst class vehicles. The district court did not abuse its discretion in reaching this conclusion.

GM and the majority have no good response to the district court's thorough and well-reasoned explanation. At every turn, both tip their hand that their true problem with the district

court's analysis is their own conclusion as to the merits of Plaintiffs' design-defect theory. The majority opinion does not directly dispute that the district court rigorously analyzed Plaintiffs' theory and evidence related to the universal defects. Instead, it poses concerns about how Plaintiffs' defect theory fits into their various claims, Maj. Op. at 11–12, whether Plaintiffs may properly pursue a two-defect theory, *id.* at 13–16, and whether Plaintiffs could actually prove their claims of unmerchantability, *id.* at 21–23.

As for the majority's apparent difficulties in understanding how Plaintiffs' defect theory and evidence is central to Plaintiffs' warranty claims, we find this position puzzling. The district court rigorously analyzed the relevant state laws and concluded that "the question whether the class vehicles are suitable for their ordinary or intended purpose of providing safe, reliable transportation is an entirely objective inquiry which is 'susceptible to generalized, class-wide proof,' on a common basis applicable to all class vehicles, without regard to the individual circumstances of the buyers." *Speerly*, 343 F.R.D. at 512 (quoting *Tyson Foods*, 577 U.S. at 453). Not only did the district court conclude that the state laws were susceptible to common proof, but it also concluded that Plaintiffs have provided sufficient proof in support of this common contention. "The common evidence also amply suggests that the defect rendered the class vehicles unfit for their ordinary or intended purpose of providing safe, reliable transportation." *Id.* at 517. It is obvious how a defective and unsafe transmission—as theorized by Plaintiffs—is central to each of Plaintiffs' warranty claims. The majority opinion obfuscates this point by pointing to multiple definitions of merchantability without recognizing that Plaintiffs' theory satisfies all definitions. Although the majority may not be convinced that Plaintiffs' theory will ultimately win the day, Plaintiffs have done more than enough to satisfy their burden of proof at the class-certification stage that they can prove unmerchantability on a classwide basis with evidence that satisfies all definitions.

As for Plaintiffs' two-defect theory, this putative-class-action case is precisely the sort that Rule 23(b)(3) was designed to address. *See* Maj. Op. at 13–16. The majority poses a series of hypothetical problems with managing class-action litigation under the law of multiple states. But the majority's position simply assumes that Plaintiffs' case is unmanageable because it seems to believe that Plaintiffs' theory is unprovable. After assuming that Plaintiffs will lose,

the majority then bemoans the practical problems posed by what the majority sees as conflicting state law and theories of liability. Our response to the majority is simple: the trial will not be hard to manage because the state laws are substantially similar and turn on a showing that Plaintiffs are prepared to make—that the 8L transmissions suffer from two universal defects. A class-action trial is perfectly appropriate and straightforward to manage in this context.

Finally, individualized merchantability issues do not predominate over common contentions. That some drivers subjectively experienced the defects differently than others does not predominate over the overwhelming common contention that every single class vehicle suffered from the same universal design defects. *Speerly*, 343 F.R.D. at 512–18, 523, 525. The majority's position is like saying that you cannot certify a class of people sick with a cold because some sniffled, others coughed, and others yet sniffled *and* coughed. The majority ignores the common condition at issue (a cold) by pointing to superficial differences (symptoms). But all ostensible differences flow from a common contention. The same is true here. Plaintiffs may ultimately fail in proving their theory on the merits. If their universal-two-defect theory is wrong, then Plaintiffs lose each and every claim on the merits. The fact that Plaintiffs can win or lose their claims in a single stroke shows why this case is particularly suited to class resolution. Plaintiffs have more than met their burden to provide sufficient proof of a common contention that predominates over individualized issues.

### iii. Express-Warranty Claims

Now we turn to the majority opinion's survey of state laws addressing express-warranty claims. That survey of the law is shortsighted for two reasons. First, as we have explained at length, the majority opinion appears to assume that Plaintiffs' theory of defect is incorrect and cannot be proved on the merits. The majority opinion, therefore, argues that individualized issues related to proving that theory will predominate over common contentions. Second, the majority opinion's analysis of the relevant states' laws is, simply put, inadequate.

The majority holds that individualized issues predominate over common contentions because a plaintiff must present a defective product for repair before bringing an express-warranty claim. Therefore, according to the majority opinion, a district court must conduct

thousands of individualized inquiries into whether every unnamed plaintiff actually presented their vehicle for repair. But consider Plaintiffs' theory in this case that the 8L transmissions cannot be repaired. According to the majority, even these consumers with fatally flawed products must go through the futile effort of presenting these products for repair. Why would a consumer who purchased a defective product that cannot be repaired be forced to present it for repairs? The answer to the complex problem posed by the majority is simple: under all the states' laws, this consumer would not have to present their product for repairs. The majority adopts a rule of contract construction that effectively immunizes defendants from suit where their product is defective beyond repair. Thankfully, that reading of the contract is wrong.

We start with the language of the express warranty. "Performance of repairs and needed adjustments is the exclusive remedy under this warranty or any implied warranty." R. 41 (Consolidated Amended Class Action Complaint ¶ 87 (quoting Cadillac Warranty)) (Page ID #2266). The majority opinion interprets this language to mean that a plaintiff must present a product for repair to prove breach of the express warranty, even if the defendant could never repair the product. Maj. Op. at 17–19. Certainly, it is hard to debate the majority that the language of the contract makes "repair" the exclusive remedy under the express warranty. But, under the UCC, every state has adopted the position that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose," Ga. Code Ann. § 11-2-719(2), then a plaintiff may pursue a claim for damages as provided "under Article 2 [of the UCC] without regard to the limited remedy provision," *Hydro Sys., Inc. v. Factor Automation Sys., Inc.*, — F. Supp. 3d —, 2025 WL 756028, at *9 (N.D. Ga. Mar. 10, 2025). This rule uniformly applies to repair-and-replace provisions in express warranties. "The repair-and-replace remedy fails of its essential purpose when [the] seller is *unable* or unwilling to repair or replace in a reasonable time." *S. Fin. Grp., LLC v. McFarland State Bank*, 763 F.3d 735, 741 (7th Cir. 2014) (alteration in original) (emphasis added) (quoting Douglas Laycock, *Modern American Remedies* 72 (2010)). Plaintiffs have provided more than sufficient proof that GM was unable to repair the defective transmissions during the class period, thus permitting them to seek damages as a remedy from GM without first making the futile gesture of presenting their fatally defective cars for an impossible-to-complete repair. *Speerly*, 343 F.R.D. at 525.

The Supreme Court of Alabama has explained the purpose of this doctrine well, pointing out the exact problems posed by the majority's position:

> Exactly when it becomes futile to submit a [product] to a warrantor for repair is a fact question for the jury. The main point of this doctrine, after all, is to prevent a warrantor from limiting its customers solely to the remedy of repair after it has become obvious to reasonable persons that the warrantor *cannot* or will not repair the [product] in compliance with the limited warranty.

*Ex parte Miller*, 693 So. 2d 1372, 1379 & n.10 (Ala. 1997) (emphasis added). And, in addition to the states already referenced, every other class state provides Plaintiffs with a statutory right to pursue a claim for damages where an express warranty fails of its essential purpose. *See, e.g.*, *Cooley v. Big Horn Harvestore Sys., Inc.*, 813 P.2d 736, 743–45 (Colo. 1991) (en banc); *J. A. Jones Const. Co. v. City of Dover*, 372 A.2d 540, 549–50 (Del. Super. Ct. 1977); *Clark v. Int'l Harvester Co.*, 581 P.2d 784, 798 (Idaho 1978); *Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 615 (Ill. 2006); *Elite Pros., Inc. v. Carrier Corp.*, 827 P.2d 1195, 1205 (Kan. Ct. App. 1992); *Middletown Eng'g Co. v. Climate Conditioning Co.*, 810 S.W.2d 57, 59 (Ky. Ct. App. 1991); *Bernath v. Potato Servs. of Mich.*, 300 F. Supp. 2d 175, 182 (D. Me. 2004); *Durfee v. Rod Baxter Imps., Inc.*, 262 N.W.2d 349, 356 (Minn. 1977); *Xerox Corp. v. Hawkes*, 475 A.2d 7, 11–12 (N.H. 1984); *Gen. Motors Acceptance Corp. v. Jankowitz*, 523 A.2d 695, 703 (N.J. Super. Ct. App. Div. 1987); *Cayuga Harvester, Inc. v. Allis-Chalmers Corp.*, 465 N.Y.S.2d 606, 611–12 (N.Y. App. Div. 1983); *Collins Radio Co. v. Bell*, 623 P.2d 1039, 1051 (Okla. Civ. App. 1980); *Herring v. Home Depot, Inc.*, 565 S.E.2d 773, 776 (S.C. Ct. App. 2002); *Safety Vision LLC v. LEI Tech. Can.*, 738 F. Supp. 3d 859, 870–71 (S.D. Tex. 2024); *Lindstrand v. Silvercrest Indus.*, 623 P.2d 710, 714–15 (Wash. Ct. App. 1981).

Accordingly, in every relevant state, Plaintiffs can submit as common proof that GM cannot fix the defects. *See Speerly*, 343 F.R.D. at 525. This obviates any potential concerns about individualized presentment issues as identified by the majority and GM. If Plaintiffs' theory of defect is correct, then it is irrelevant if an unnamed plaintiff did not present their vehicle for repair.

### b. Fraud Claims and Knowledge of Defect

We would hold that the district court did not abuse its discretion when, following a rigorous analysis, it concluded that common contentions about GM's knowledge of the defect predominated over individualized issues.

### i. Elements of Fraud Claims

Following a rigorous analysis of the relevant state laws, the district court concluded that the statutory and common-law fraud claims were subject to common elements and that Illinois was "exemplary" of those elements. *Speerly*, 343 F.R.D. at 518–20.

"The elements of a claim under [the Illinois Consumer Fraud & Deceptive Business Practices Act] are (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, and (3) the occurrence of the deception during a course of conduct involving trade or commerce." *Id.* at 518 (alteration in original) (quoting *Mosier v. Village of Holiday Hills*, 128 N.E.3d 1210, 1217 (Ill. Ct. App. 2019)). "The elements needed to prove fraudulent concealment are (1) concealment of a material fact, (2) intent to induce a false belief where there exists a duty to speak, (3) that the other party could not have discovered the truth through reasonable inquiry and relied upon the silence as an indication that the concealed fact did not exist, (4) that the other party would have acted differently had it known of the concealed information, and (5) that its reliance resulted in its injury." *Id.* (quoting *Vandenberg v. Brunswick Corp.*, 90 N.E.3d 1048, 1056 (Ill. Ct. App. 2017)).

The district court also properly concluded that "[i]n every jurisdiction proposed for certification, the typical proof of 'materiality' of a misstated or omitted fact for fraudulent concealment and statutory consumer fraud claims turns on consideration of the mindset of an objectively reasonable consumer deciding whether to buy the defendant's product. That rule uniformly has been adopted by either codification in the relevant consumer protection statutes, incorporation of relevant federal authority, or express construction by case law of the various states." *Id.* at 520–22.

### ii. District Court's Analysis

Applying these elements, the district court reached two conclusions: (1) "[t]he consumer protection statutes in every proposed class jurisdiction generally prohibit 'deceptive' or 'misleading' acts and practices in the marketing and sales of goods and services," *Speerly*, 343 F.R.D. at 518; and (2) "concealment of a material fact from another party to a transaction is a foundational element of fraudulent concealment in every jurisdiction where that cause was pleaded," *id.* at 519. And "[a]t least two elements of those claims will predominate over any individualized inquiries in this case, which are (1) proof of intentional concealment or deception by the defendant concerning its knowledge of the alleged defects, and (2) the significance of the information withheld to a reasonable consumer." *Id.* at 518. Finally, the district court found that "[i]n every jurisdiction proposed for certification, the typical proof of 'materiality' of a misstated or omitted fact for fraudulent concealment and statutory consumer fraud claims turns on consideration of the mindset of an objectively reasonable consumer deciding whether to buy the defendant's product." *Id.* at 520.

We agree with the district court that Plaintiffs have offered sufficient proof in support of these common contentions. Plaintiffs' fraud claims are susceptible to classwide resolution precisely because GM made concerted efforts to conceal the defects from the public. As the district court found, "[t]he defendant's determined efforts to maintain the 'confidentiality' of the information defies any suggestion that any of the relevant information previously was disclosed by GM or its dealers to any buyers of class vehicles." *Id.* at 519. Thus, "[t]he record so far presented discloses ample proofs that could be offered in every instance to establish concealment." *Id.*

The district court sufficiently explained how common proof of GM's knowledge predominates over individualized issues. *Id.* at 525–26. "[T]here is substantial evidence in the record that GM had knowledge of the defect from even before the class models were launched, that it rapidly accumulated irrefutable evidence of a widespread defect as a result of a years-long — and apparently still ongoing — investigation, and that it never disclosed any of its findings to prospective purchasers before this litigation was well underway." *Id.* at 525. GM also ignored accidents and other safety issues posed by consumers in safety reports submitted to GM. *Id.* at

526. In short, GM concealed the fact from consumers that its cars were unsafe to drive, but nevertheless knowingly continued to market them as safe and merchantable vehicles. *Id.* at 525–26.

For these reasons, we would hold that the district court carefully and rigorously considered that common contentions predominate over individualized issues related to Plaintiffs' common-law and statutory fraud claims.

The majority opinion does not directly dispute that GM's knowledge of the defects, willful concealment of those defects, and knowing misrepresentations predominate over individualized issues. Instead, it points to two apparent variations across state law that purportedly demand decertification. The first variation is the manifest-defect rule. According to the majority, decertification is required because six sub-classes require that a defect manifest to recover under a tort theory of liability. Maj. Op. at 23–27. The second state-law variation that the opinion says demands decertification is individualized reliance. *Id.* at 27–33. Because reliance is individualized, according to the majority, Plaintiffs cannot meet their burden under Rule 23(b)(3) in proving that common contentions predominate.

We address each point in turn.

### iii. Manifest Defect

Once again, the majority opinion overstates the laws of the states. As an initial matter, nothing in the case law or in the text of Rule 23(b)(3) requires a district court to deny class certification because of slight variations across state law. The majority opinion identifies only six states that it believes require a manifest defect. Even if we agreed with the majority opinion that those states apply a manifest-defect rule, the fact that only six states apply the rule does not mean that individualized issues predominate. Yet the majority would decertify every single consumer-protection subclass based on its reading of the law of six states.

Even assuming GM could assert manifestation of the defect as a defense to *some* of the unnamed plaintiffs in *some* of the states, that does not on its own preclude certification. "When 'one or more of the central issues in the action are common to the class and can be said to

predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Tyson*, 577 U.S. at 453–54 (quoting 7AA Wright & Miller, Federal Practice and Procedure § 1778). Because the universal defect and fraud claims are the most important issues, they could be said to predominate and support class certification despite the concern posed by post-merits litigation about individualized manifest-defect defenses.

In any event, we disagree with the majority's analysis of the manifest-defect rule. The majority opinion gets the state law wrong. Take its reference to Texas law, for example. The majority overstates the Texan approach to the manifest-defect rule (if it can even rightly be said that Texas applies such a rule). The case relied on by the majority, *Everett v. TK-Taito, L.L.C.*, by its own terms stops short of holding that plaintiffs can never pursue class-action claims based on an unmanifested defect. 178 S.W.3d 844 (Tex. Ct. App. 2005). As that court explained, "[w]e do not hold that a consumer may never possess standing to bring suit under the DTPA for benefit-of-the-bargain damages based on an unmanifested product defect. We simply hold that, taking the Everetts' pleadings as true, . . . they have not pleaded facts establishing the existence of economic damages, that is loss-of-benefit-of-the-bargain damages or cost-of-replacement damages." *Id.* at 859 n.14. The majority cites *Everett* for the proposition that a plaintiff cannot succeed on the merits of a consumer-protection claim under Texas law on a benefit-of-the-bargain theory of damages. But that is not the precise issue addressed by *Everett*. The question raised by *Everett* was what type of benefit-of-the-bargain allegations could satisfy *standing requirements* under Texas law. *Everett* did not squarely resolve this question in either direction, let alone go so far as to hold that a plaintiff must allege a manifest defect under Texas law.

On that point, the Supreme Court of Texas has "not decide[d] the degree to which a defect must manifest itself in a product before a warranty is breached." *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 307 (Tex. 2008). Although the Supreme Court of Texas declined to address the exact degree to which a defect must manifest, it did note that standing could be satisfied if a defect would manifest as "a matter of time." *Id.* at 306. This, in our view, sufficiently explains that a plaintiff can pursue a consumer-protection claim on a benefit-of-the-

bargain theory (i.e., that a consumer has been harmed by paying more for a defective product) if they allege that the product would manifest the defect in "a matter of time." *Id.* Here, the district court concluded "that the problems [caused by the defects] are pervasive and reasonably expected to occur sooner or later in all class vehicles sold." *Speerly*, 343 F.R.D. at 517. This satisfies the standard articulated in *DaimlerChrysler*—the defects in the 8L transmissions are almost certain to occur, reducing the value of all class vehicles. We see no reason why Texas's manifest-defect rule would create any significant individualized issues—let alone individualized issues that would predominate over the common contentions. In our view, Texas would allow the class as a whole to proceed on their claims.

Texas is not alone in allowing plaintiffs to proceed on the benefit-of-the-bargain theory—as a necessary corollary to the manifest-defect rule—advanced here. Arkansas, for example, has explained that its benefit-of-the-bargain rule is "totally immaterial" as to "whether the requirements of Rule 23 are met" in assessing a motion for class certification. *Philip Morris Cos. v. Miner*, 462 S.W.3d 313, 320 n.4 (Ark. 2015) (quoting *Am. Abstract & Title Co. v. Rice*, 186 S.W.3d 705, 710 (Ark. 2004)). In fact, the Supreme Court of Arkansas expressly stated that *Wallis v. Ford Motor Co.*, 208 S.W.3d 153 (Ark. 2005)[2]—the case relied on by the majority in support of its position that manifest-defect rules prevent class certification—was "inapposite" for assessing class-action motions. *Philip Morris*, 462 S.W.3d at 320 n.4. In Arkansas, on a motion for class certification, it is enough that "the existence of damages, at least for some plaintiffs, will depend on whether [GM] misrepresented its product." *Id.* at 320–21. Same with Oklahoma. A court of appeals affirmed certification of a class action related to a cosmetic defect in a car, "agree[ing] that certification as to 'all owners' [was] proper, notwithstanding VW's protestation that many class members [were] unlikely to ever sustain injury." *Hess v. Volkswagen of Am., Inc.*, 221 P.3d 132, 140 (Okla. Civ. App. 2009). The court did so "on the basis of the 'commonality' of the prospective member's interest," holding that "[t]he fact that many members of the class have not yet sustained damage [to their vehicles] does not prevent class certification." *Id.*

---

[2]The majority opinion's reliance on *Parnell v. FanDuel Inc.* would be inapposite for the same reason, namely that the benefit-of-the-bargain element is a merits question that does not implicate individualized predominance issues. 591 S.W.3d 315, 319–20 (Ark. 2019).

In light of these decisions, we would hold that Plaintiffs' benefit-of-the-bargain theory is subject to common contentions that predominate over individualized issues related to manifestation of the defects.  The two defects are almost certain to manifest in all class vehicles.**3**

### iv.  Reliance

We now turn to similar problems in the majority opinion's survey of reliance laws.  Even the states that the opinion holds demand individualized inquiries into reliance are not so straightforward.

Take Illinois, for instance, which the district court correctly identified as "exemplary" in its approach to statutory and common-law-fraud claims.  The majority opinion argues that Plaintiffs cannot sustain their Illinois common-law-fraud and consumer-protection claims because individualized issues of reliance and causation predominate over common contentions.  Maj. Op. at 28, 34.  This is too narrow a view to take in the context of a motion for class certification.  Illinois permits class-action common-law and statutory-fraud claims.

For instance, in *Clark v. TAP Pharmaceutical Products, Inc.*, the Illinois Court of Appeals affirmed that the plaintiffs could pursue as a class a fraud claim under the Illinois Consumer Fraud Act.  798 N.E.2d 123, 131–32 (Ill. App. Ct. 2003).  *Clark* takes a position contrary to the majority opinion on individualized reliance and class actions.  The court in *Clark* was undeterred by the defendant's argument that "individual issues of fact required by the materiality, proximate cause, and injury elements of a Consumer Fraud Act claim defeat class certification." *Id.* at 130–31.  This was because "[t]he record reveal[ed] the question common to the class [] predominate[d] over questions affecting individual class members." *Id.* at 132.  Specifically, the court held that the common contentions related to "whether the defendants engaged in a fraudulent and deceptive scheme" predominated over individualized inquiries into unnamed plaintiffs' injury, causation, and damages, like the plaintiffs' reliance on the defendant's fraud. *Id.*

---

**3**But even if you eliminate all the claims that purportedly require a manifest defect, that applies only to some claims and the rest remain.  There remain state-law claims in every state for which the district court certified a class, and the defect issue still would be common and predominate.

This is not a one-off application of the rule either. In fact, in 1977, the Illinois Supreme Court squarely rejected the position adopted by the majority opinion. "That one count is based on fraud does not prohibit a class action." *Steinberg v. Chicago Med. Sch.*, 371 N.E.2d 634, 644 (Ill. 1977). Prior to Illinois enacting its modern class-action statute, it was unclear whether fraud claims could be maintained on a class basis precisely because of the reliance issued raised by the majority opinion. Prior to the *Steinberg* decision, Illinois courts were split as to whether individualized reliance issues prevented class-certification under Illinois law. "One case prohibited a class action based upon fraud because individual proof was required." *Id.* (citing *Langson v. Goldberg*, 26 N.E.2d 111 (Ill. 1940)). Yet, in two other cases, "a class action was allowed on behalf of 3,300 participants in an allegedly fraudulent puzzle contest," and "a class action was permitted under the [Illinois] Consumer Fraud Act." *Id.* (first citing *Kimbrough v. Parker*, 101 N.E.2d 617 (Ill. App. Ct. 1951); and then citing *Brooks v. Midas-Int'l Corp.*, 361 N.E.2d 815 (Ill. App. Ct. 1977)). The Illinois Supreme Court took the opportunity to resolve this split.

The Supreme Court of Illinois ultimately determined that courts may "adopt[] procedures and rules which can reduce the difficulties of showing individual reliance," thereby allowing plaintiffs to pursue class-action fraud claims. *Id.* at 645 (quoting *Korn v. Franchard Corp.*, 456 F.2d 1206, 1213 (2d Cir. 1972)). Accordingly, Illinois courts routinely reject the type of arguments made by the majority opinion today. For example, in *Gordon v. Boden*, an Illinois court rejected the argument that individualized issues predominated in an orange-juice fraud-based class action because "each class member's purchase of an adulterated orange juice product involved a unique set of facts, such as the exact type of item purchased, the particular retail grocery store where the item was purchased, the date it was purchased, the label the item bore, the purchase price, and each *consumer's reliance on defendants' misrepresentations*." 586 N.E.2d 461, 465 (Ill. App. Ct. 1991) (emphasis added). The court affirmed class certification because "[t]he record shows the existence of at least one question common to the class that predominates over questions affecting individual class members. That question is simply whether defendant . . . [sold defective] products and committed the other fraudulent acts as alleged." *Id.* Replace orange juice with GM's cars, and you have this case. Based on the majority opinion's survey of Illinois law, the rule elucidated in *Steinberg* and the position

adopted in *Gordon* would seem improbable if not impossible.  And yet, this is black-letter state law.

Illinois is not alone in taking the position that plaintiffs may proceed on class-action-fraud claims as a class, reliance questions notwithstanding.  Arkansas goes further.  On facts analogous to this case, the Supreme Court of Arkansas held that common contentions related to design defect and fraudulent concealment predominated over individualized issues.  *Gen. Motors Corp. v. Bryant*, 285 S.W.3d 634, 639–40 (Ark. 2008) ("Whether or not the class vehicles contain a defectively designed parking-brake system and whether or not General Motors concealed that defect are predominating questions.").  The plaintiff in *Bryant* filed a "class-action complaint in which he alleged that some 4,000,000 pickup trucks and sport utility vehicles sold by General Motors were equipped with defectively designed parking brakes."  *Id.* at 636. He further alleged that GM redesigned the parking brakes but refused to admit responsibility until after the warranty period expired.  *Id.* at 637.  The plaintiff brought claims on behalf of a putative class asserting breach of express warranty, breach of implied warranty, and fraudulent concealment.  *Id.*  The Arkansas Supreme Court rejected GM's arguments that knowledge of the defect, reliance on GM's misrepresentations and omissions, variations in the defect across the class members, presentment for repair under the warranty, and other individualized issues precluded finding that the plaintiffs' common contentions predominated.  *Id.* at 641–43.  The Supreme Court of Arkansas affirmed the order certifying the class.  *Id.* at 646.  Again, this is crystal-clear state-court instruction that plaintiffs can pursue fraud claims on a classwide basis despite individualized reliance questions.

Other states identified by the majority also have allowed claims to proceed where "[t]he class has met its burden of establishing class-wide proof of reliance[.]"  *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 922 (Tex. 2010).  For instance, in two car-defect class actions, Oklahoma courts permitted plaintiffs to proceed on a classwide fraudulent-concealment theory.  *Hess*, 221 P.3d at 138; *Masquat v. DaimlerChrysler Corp.*, 195 P.3d 48, 55–57 (Okla. 2008).  The courts held that requiring individualized reliance to prevent class-action cases "is clearly inconsistent with Oklahoma law," *Hess*, 221 P.3d at 138, because "[t]he essence of fraudulent concealment is knowledge in possession of the person committing the fraud,"

*Masquat*, 195 P.3d at 55–56 (alteration in original) (quoting *Karriman v. Orthopedic Clinic*, 516 P.2d 534, 539 (Okla. 1973)). Thus, because the fulcrum of a fraudulent concealment claim is the defendant's knowledge, not the plaintiff's reliance, classwide resolution is appropriate. The same logic applies here, where for years GM knew about the defects in the 8L transmissions, but nevertheless allowed hundreds of thousands of consumers to purchase defective and dangerous vehicles.

New Jersey, a state the majority identifies as on the fence about reliance issues, also has expressly affirmed the propriety of class certification in car-design-defect cases. *In re Cadillac V8-6-4 Class Action*, 461 A.2d 736 (N.J. 1983). New Jersey is not on the fence. In *In re Cadillac*, the plaintiffs alleged that GM's V8-6-4 engine was defective and "predicated liability on various legal theories: negligence, strict liability, breach of express and implied warranties, violations of the *Magnuson-Moss Warranty Act*, 15 U.S.C. § 2301 *et seq.*, fraud, and misrepresentation." *Id.* at 740. Even though, unlike Plaintiffs here, the plaintiffs in *In re Cadillac* could not "identify the precise design defects that caused the[ir] complaints," the trial court nevertheless certified the class. *Id.* at 741. On appeal, the Supreme Court of New Jersey affirmed that common contentions related to "the existence of a design defect," "the existence of implied warranties of fitness and merchantability," and "misrepresentation by GM of the performance characteristics of the V8-6-4 engine," predominated over individualized issues related to "proof that the design defect caused the claimed damage," failure "to cure the defect," and "actual reliance by class members of the misrepresentation of GM[.]" *Id.* at 745–47. In other words, reliance was not a problem for the predominance inquiry. New Jersey's highest court affirmed that it is entirely appropriate to pursue the type of class-action claim pursued by Plaintiffs here. If there is in fact any fence that splits the states in how they approach class-action-fraud claims, it is obvious which side of that fence New Jersey falls on.

As this brief survey identifies, on remand, the district court should consider the ways in which many state courts apply a more flexible approach—as reflected in the Court's Rule 23(b)(3) precedents described below, *infra* Parts IV.C.3 & 4—to claims when they are presented as part of a class action. Moreover, even if on remand the district court concludes that some

states require individualized reliance, that would not preclude the district court from recertifying the classes of states that do not require a showing of individualized reliance.

### c. Arbitration Agreements

Finally, the possible existence of arbitration agreements does not preclude certification. As the district court held, GM "has waived any right to compel arbitration by engaging in this litigation and seeking dispositive rulings[.]" *Speerly*, 343 F.R.D. at 524. When considering a district court's denial of a motion to compel arbitration based on waiver, "we review the underlying factual determinations for clear error and then decide de novo whether those facts constitute waiver." *Schwebke v. United Wholesale Mortg. LLC*, 96 F.4th 971, 974 (6th Cir. 2024).

The district court found that GM waived any right to compel arbitration when it moved to dismiss the case prior to moving to compel arbitration. *Speerly*, 343 F.R.D. at 524–25. This finding is entirely consistent with how other circuits approach the issue. For instance, the defendant in GM's proffered case, *Gutierrez v. Wells Fargo Bank, NA*, preserved its arbitration rights in important ways that GM did not. GM Supp. Br. at 23 (citing 889 F.3d 1230, 1238 (11th Cir. 2018)). Key to *Gutierrez* was the fact that the defendant repeatedly preserved its rights to arbitrate with unnamed plaintiffs, despite waiving that right with named plaintiffs. *Gutierrez*, 889 F.3d at 1234–35, 1237–38. GM did not preserve its rights in the same way here. As the district court found, GM did not act to preserve its rights with respect to nonnamed plaintiffs. Nor has the Eleventh Circuit categorically stated that a defendant cannot waive its right to arbitration with unnamed plaintiffs before class certification. *See id.* at 1237. In fact, the Eleventh Circuit has stated that class certification is the appropriate time for a district court to consider whether a defendant has waived their rights to arbitrate with unnamed plaintiffs. *In re Checking Acct. Overdraft Litig.*, 780 F.3d 1031, 1039 n.10 (11th Cir. 2015) (noting that the issue of whether a defendant has waived the right to assert its arbitration agreements with unnamed plaintiffs "is properly litigated via a motion to certify a class").

Other circuits approach the issue of waiver in the class-action context in much the same way. *See, e.g.*, *Forby v. One Techs., L.P.*, 909 F.3d 780, 783–86 (5th Cir. 2018); *Al-Nahhas v.*

*777 Partners LLC*, 129 F.4th 418, 426–27 (7th Cir. 2025); *In re Pawn Am. Consumer Data Breach Litig.*, 108 F.4th 610, 612 (8th Cir. 2024); *Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 471–78 (9th Cir. 2023); *In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.*, 790 F.3d 1112, 1120 (10th Cir. 2015). We see no reason to reach a different result than that reached by the district court.

### 3. Limited Role of Merits Analysis Under Rule 23(b)(3)

As we have explained in detail, the majority opinion's survey of the various state laws is incomplete. But there is a deeper problem potentially posed by the majority's analysis. The majority opinion should not be read to require district courts to delve too deeply into the merits of a class-action plaintiff's claims. This would be obviously contrary to Supreme Court instruction. Rule 23(b)(3) allows only a limited look into the merits of a class-action plaintiff's claims. Expanding this rule could obliterate any meaningful distinctions between a merits and a class-certification analysis. We would caution the district court on remand from adopting any Rule 23(b)(3) framework that would require a searching analysis of the merits.

True, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466. But, as the Advisory Committee's 2003 notes explain, "an evaluation of the probable outcome on the merits is not properly part of the certification decision." Fed. R. Civ. P. 23, advisory committee's note to 2003 amendment. The district court's analysis on remand must avoid any temptation to read the majority opinion's analysis as requiring class-action plaintiffs to come to court ready to prove their claims on the merits four-times over. There is no such exceptionally high burden on plaintiffs seeking class certification under Rule 23(b)(3). We would find untenable any reading of the majority opinion that requires this position.

First, a class-action plaintiff does not have to prove their claims on the merits under Rule 23(a)(2). And the majority opinion cannot and should not be read to transform the Rule 23(a)(2) analysis into a miniature Rule 23(b)(3) analysis. At the commonality stage, a plaintiff does not need to refute any irrelevant counterarguments of the defendant. Irrelevant arguments include

those that are related to the merits of a plaintiff's claims *beyond* what Rule 23 requires and those unrelated to the common contention proffered. Requiring a district court to address these arguments would essentially force a plaintiff into a mini-merits analysis at the commonality stage. Worse yet, the truncated commonality analysis gives the appearance that variations across a class—but irrelevant to the single, proffered common contention—may serve to defeat commonality. The majority opinion's approach cannot be read to demand this much at Rule 23(a)(2)'s basic stage.

Second, the majority opinion's approach cannot be read to require a plaintiff to prove the merits of their claims at the Rule 23(b)(3) certification stage beyond what is necessary to show predominance. Although the majority opinion is not clear on this point, the majority's predominance analysis should not be read to require a plaintiff to provide classwide evidence on every element of every claim. The opinion does not impose on class-action plaintiffs a requirement to provide classwide evidence to rebut every possible defense a defendant could muster on the merits. This would upset the careful balance the Supreme Court has struck with its Rule 23(b)(3) holdings. The efficiency of classwide resolution must be weighed against individualized issues by only a peek at the merits. No more is required. A plaintiff need not have an unassailable claim that is subject to little, if any, differentiation whatsoever among class members. A class-action plaintiff could reach this result only by proving that a defendant could not refute any of the claims on the merits. This is clearly more than what the Supreme Court demands, so the majority opinion's analysis does not reach so far.

Third, the majority opinion's approach cannot be read to require that a plaintiff at class certification prove their claims as if the proceedings were at summary judgment. As we discussed in regard to the majority's reasonable-jury approach, a plaintiff's burden at summary judgment is different in substantive respects from the predominance inquiry. The Rule 23 inquiry does not require that a plaintiff first prove that they could submit every element of every claim to classwide proof or that any possible defense offered could be rebutted by classwide evidence. Unless the merits analysis is relevant to commonality or predominance, this type of merits analysis is more relevant on summary judgment. Otherwise, how would summary judgment be different in any substantive respect from class certification?

If these reasons were not enough to cabin the majority opinion's merits analysis, consider the alternative scenario. If a class-action plaintiff were required to prove the merits at every stage of the litigation, from class certification to summary judgment, then a class-action plaintiff would still have to prove their claims for the final time at an actual trial. We cannot discern what good a trial would do by that point. To reach this final stage, the class would have had to prove their claims once again, and perhaps to a new factfinder (the jury). The prospect of a factfinder reaching any other conclusion appears improbable.

It seems to us that the majority opinion takes one step forward on a path toward requiring that only plaintiffs with unassailable claims, with air-tight classwide proof on every element, defense, and theory of harm, should benefit from the flexibility of Rule 23(b)(3). *See* Maj. Op. at 26 ("Without showing that each subclass's consumer statute may proceed on economic injuries alone, commonality 'completely collapses, rendering class certification inappropriate.'" (quoting *Halliburton II*, 573 U.S. at 283)). But this is wrong. And for all the reasons we have already discussed, the opinion does not require this much. Consider *Halliburton II*, the case the majority opinion cites for its broad pronouncement about the necessary merits analysis at class certification. *Halliburton II* does not demand an extensive merits inquiry at the class-certification stage.

*Halliburton II* is a peculiar case decided in a peculiar context, all of which is omitted by the majority opinion. It is one of many cases the Court has decided related to the *Basic* presumption. *See Halliburton II*, 573 U.S. at 283. In *Basic v. Levinson*, the Court "held that investors could satisfy th[e] reliance requirement [under Section 10(b) of the Securities Exchange Act of 1934] by invoking a presumption that the price of stock traded in an efficient market reflects all public, material information—including material misstatements." *Halliburton II*, 573 U.S. at 263. Purchasers could demonstrate that they relied upon alleged misrepresentations by showing that they purchased stock at the market rate. *Id.* In order to apply the *Basic* presumption, a plaintiff must satisfy the presumption's prerequisites by showing publicity and market efficiency. *Id.* at 283. But the presumption was rebuttable with evidence that the alleged misrepresentation did not affect the stock's price. *Id.* at 263–64.

In this context, the question at the heart of *Halliburton II* was whether a district court must address defense price-impact evidence allegedly rebutting the *Basic* presumption, or if the district court could wait to assess price-impact evidence at the merits stage. *Id.* at 279–80. The Court held that price-impact evidence could not wait because, if the *Basic* presumption were rebutted, "the fraud-on-the-market theory underlying the presumption completely collapses," and because requiring the plaintiffs to take the alternative route of individually showing reliance through direct evidence created predominance issues in the context of that particular case. *Id.* at 281–83.

*Halliburton II* stands for the proposition that district courts can and should consider some merits evidence, including evidence related to defenses, but only to the extent that such evidence establishes that a particular question is not susceptible to classwide proof. Where the proverbial peek under the hood establishes that the plaintiff will need to provide individualized proof of certain issues because collective proof would necessarily fail, the district court must factor the potential need for that individualized proof into its predominance analysis. *Id.* It does not stand for the proposition that the district court must require the plaintiff to prove that all plaintiffs will succeed on every merits issue or even that every merits issue will be resolved the same way for all plaintiffs. *Halliburton II* reiterates the uncomplicated position that defense evidence relevant to class certification may be addressed appropriately at class certification. In *Halliburton II*, the plaintiffs' reliance on the *Basic* presumption rendered certain merits evidence relevant to class certification, but the case does not command that a district court conduct a searching inquiry on the merits to ensure that a plaintiff can offer classwide proof on every element of every claim.

Indeed, the Supreme Court expressly limited the extent of the "merits" inquiry required by *Halliburton II*. "[The Court's] choice in [*Halliburton II*], then, [wa]s not between allowing price impact evidence at the class certification stage or relegating it to the merits. Evidence of price impact w[ould] be before the court at the certification stage in any event. The choice, rather, [wa]s between limiting the price impact inquiry before class certification to indirect evidence, or allowing consideration of direct evidence as well." *Id.* The *Halliburton II* plaintiffs had to prove "publicity and market efficient prerequisites . . . before class certification" precisely because the *Basic* presumption demanded it, and because, without the *Basic* presumption, class

certification would have been inappropriate on the particular facts of that case, *not* because a district court must determine in every class action that a plaintiff can provide classwide proof for each and every element of a state-law claim. *Id.*

Not only has the majority opinion ripped *Halliburton* from its peculiar context, but also it has applied it in support of a novel proposition that the Supreme Court has not endorsed, and which our own caselaw expressly disclaims. *In re Whirlpool*, 722 F.3d at 858 ("A plaintiff class need not prove that each element of a claim can be established by classwide proof[.]"). There may be questions which turn out to be dispositive for specific plaintiffs which the class questions do not answer. *Id.* This is not inherently a problem. A class certification is not improper simply because it turns out that, after discovery and on summary judgment, some portion of the class cannot succeed because of issues outside the classwide questions—provided that those issues do not predominate.

The majority opinion decertifies Plaintiffs' class and remands for a more careful and rigorous analysis, not because the district court's analysis was lacking, but because the opinion concludes that Plaintiffs cannot secure relief on the merits of their state-law claims. But the majority opinion should not be read to turn a peek under the hood into a full-blown diagnostic test. The Supreme Court has clearly cautioned against this type of searching merits analysis, and the district court should not engage in one on remand. *Amgen*, 568 U.S. at 466.

### 4. Hamstringing Rule 23(b)(3)

We take a moment here to address another fundamental problem. The majority opinion cannot and should not be read to offer a dangerous all-or-nothing approach to class certification that would essentially render class actions under Rule 23(b)(3) toothless and anemic. This approach would be a mistake, and we must address its consequences.

Although the majority opinion stops short of endorsing this approach, the majority opinion's analysis as a whole suffers because it ignores the central purpose of class actions under Rule 23(b)(3). Rule 23(b)(3) is "framed for situations 'in which class-action treatment is not as clearly called for,'" *Wal-Mart*, 564 U.S. at 362 (quoting *Amchem*, 521 U.S. at 615), but "may nevertheless be convenient and desirable," *Amchem*, 521 U.S. at 615 (quoting Fed. R. Civ. P. 23,

advisory committee's note to 1966 amendment). Yet it is precisely because the majority opinion argues that Plaintiffs' claims do not, in the majority opinion's view, clearly call for class resolution that the opinion decertifies this class. The majority opinion overlooks the basic principles underlying Rule 23(b)(3). Rule 23(b)(3) is "[s]ensitive to the competing tugs of individual autonomy for those who might prefer to go it alone or in a smaller unit, on the one hand, and systemic efficiency on the other . . . ." *Id.* On the side of systemic efficiency, "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" *Id.* at 617 (quoting Benjamin Kaplan, *A Prefatory Note*, 10 B.C. Ind. & Com. L. Rev. 497, 497 (1969)). The case brought by Plaintiffs here is exactly that type of case, where the individually modest sums at issue are insufficient to pursue on an individual basis, but ripe to aggregate on a classwide basis. "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Id.* (quoting *Mace*, 109 F.3d at 344).

Reading the majority's opinion, one would be hard pressed to discern any sensitivity for protecting the interests of the individual as against the interests of the collective in aggregating small but complex claims. It is abundantly clear to us that Plaintiffs' claims are perfectly poised to be aggregated in a class action. The sums are small, and so an individual plaintiff would not be incentivized to pursue a claim on their own. The claims require complex proof, meaning there is little incentive for attorneys to take up the case except on behalf of a class. But money is not everything. The drafters of Rule 23 sought to ensure that aggregated claims are also fair. Thus, the drafters devised the requirements of Rule 23(b)(3). This case is an excellent example of how Rule 23(b)(3) promotes both efficiency and fairness. Assuming that Plaintiffs could prove their theory of defect, each and every plaintiff—named and unnamed—has the exact same design defects in their 8L transmission. Each and every plaintiff—named and unnamed—was deceived about safety and merchantability of their vehicles. And each and every plaintiff—named and unnamed—would pursue their claims against GM. GM designed the transmissions. GM had the knowledge about the defects and took active steps to cover up their mistakes. Each of these contentions goes to the heart of Plaintiffs' claims and overwhelms individualized issues. Rule 23(b)(3) was designed precisely for this type of action.

This does not mean we are insensitive to the difficult position in which GM is put by virtue of a class action. One might speculate that the threat of a class action is a good incentive to refrain from manufacturing a defective product and then fraudulently declining to inform your customers about your defective and dangerous product. In any event, the Supreme Court is clear that a class action is appropriate so long as it does "not deprive [a defendant] of its ability to litigate individual defenses." *Tyson Foods*, 577 U.S. at 457. Certifying this class does not deprive GM of its ability to assert any individualized defenses to liability.[4] As we have addressed at length, if Plaintiffs' theory of liability is correct and it is a near certainty that all 8L transmissions will manifest the defect, then GM cannot assert a manifest-defect rule as a defense. Same thing with reliance. Similarly with merchantability. We see no barriers to class resolution in this case.

So, what would happen to the everyday consumer injured by a defective product if Rule 23(b)(3) were sundered? Fortunately, the majority opinion stopped short of erecting near insurmountable barriers to class certification. Nevertheless, we find it deeply troubling that the en banc court has rendered our circuit more inhospitable to class-action claims and an apparent safe haven for mass-manufacturers of dangerous and defective products. The purpose of Rule 23(b)(3) is to leverage the power of the collective to vindicate rights, secure remedies, and ensure justice "[w]here it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages[.]" *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980). The majority ignores the central purpose of Rule 23(b)(3). Respectfully, we dissent.

## V. CONCLUSION

For the forgoing reasons, we dissent from the majority opinion and would instead affirm the district court's order granting class certification.

---

[4]Decertifying the class does, on the other hand, deprive Plaintiffs of their ability to litigate their claims, given practical impediments to prosecuting solo actions in this context, as described above.